PAGES 1 – 75

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA

KAREN SOLBERG, NANCY MORIN, AND          )
NARISHA BONAKDAR, ON THEIR OWN           )
BEHALF AND ON BEHALF OF OTHERS           )
SIMILARLY SITUATED,                      )
                                         )
              PLAINTIFFS,                )
                                         )
  VS.                                    ) NO. 14-CV-5266 VC
                                         )
VICTIM SERVICES, INC., D/B/A             )
CORRECTIVESOLUTIONS, NATIONAL            )
CORRECTIVE GROUP, INC., D/B/A            )
CORRECTIVESOLUTIONS, AMERICAN            )
JUSTICE SOLUTIONS, INC., D/B/A/          )
CORRECTIVESOLUTIONS, BIRCH GROVE         )
HOLDINGS, INC., MATS JONSSON AND         )
KARL THOMAS JONSSON,                     )
                                         )  SAN FRANCISCO, CALIFORNIA
              DEFENDANTS.                )  THURSDAY
                                         )  NOVEMBER 1, 2018
_____ )


**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND**

**RECORDING   11:10 – 11:57 A.M. & 12:07 – 12:59 P.M.**

**APPEARANCES**:

**FOR PLAINTIFFS**          LAW OFFICE OF PAUL ARONS
                            685 SPRING STREET, #104
                            FRIDAY HARBOR, WA 98250
                   **BY:  PAUL ARONS, ESQUIRE**


(FURTHER APPEARANCES ON FOLLOWING PAGE)

*TRANSCRIBED BY:  JOAN MARIE COLUMBINI, CSR #5435, RPR*
                  *RETIRED OFFICIAL COURT REPORTER, USDC*

**APPEARANCES (CONTINUED):**

**FOR PLAINTIFFS**         TERRELL MARSHALL DAUDT AND WILLIE PLLC
936 N. 34TH ST., SUITE 300
SEATTLE, WASHINGTON 98103
BY:  **BETH E. TERRELL, ESQUIRE**
**BLYTHE H. CHANDLER, ESQUIRE**


GUPTA WESSLER PLLC
1900 L STREET NW, SUITE 312
WASHINGTON, DC 20036
BY:  **DANIEL RONALD MARTIN TOWNSEND, ESQUIRE**


**FOR DEFENDANTS**         FREEDMAN & TAITELMAN LLP
1901 AVE OF THE STARS #500
LOS ANGELES, CALIFORNIA 90067-6007
BY:  **MICHAEL ANDREW TAITELMAN, ESQUIRE**
**SEAN MICHAEL HARDY, ESQUIRE**

```
 1   THURSDAY, NOVEMBER 1, 2018                    11:10 A.M.
 2   (TRANSCRIBER'S NOTE: DUE AT TIMES TO COUNSELS' FAILURE TO
 3   IDENTIFY THEMSELVES WHEN SPEAKING, CERTAIN SPEAKER
 4   ATTRIBUTIONS ARE BASED ON EDUCATED GUESS.)
 5                         ---O0O---
 6                       PROCEEDINGS
 7         THE CLERK:  CALLING CASE NO. 14-CV-5266, SOLBERG, ET
 8   AL. VERSUS VICTIM SERVICES, INC., ET AL.
 9         COUNSEL, PLEASE STEP FORWARD AND STATE YOUR
10   APPEARANCES FOR THE RECORD.
11         MS. TERRELL:  GOOD MORNING, YOUR HONOR.  BETH TERRELL
12   (INDISCERNIBLE) ON BEHALF OF (INDISCERNIBLE) CLASS.
13         THE COURT:  GOOD MORNING.
14         MR. ARONS:  PAUL ARONS REPRESENTING THE PLAINTIFFS.
15         THE COURT:  GOOD MORNING.
16         MS. CHANDLER:  GOOD MORNING, YOUR HONOR.  BLYTHE
17   CHANDLER, ALSO FOR PLAINTIFFS.
18         MR. TOWNSEND:  GOOD MORNING, YOUR HONOR.  DANIEL
19   TOWNSEND FOR THE PLAINTIFFS.
20         THE COURT:  GOOD MORNING.
21         MR. TAITELMAN:  MICHAEL TAITELMAN FOR THE DEFENDANTS.
22         MR. HARDY:  GOOD MORNING, YOUR HONOR.  SEAN HARDY FOR
23   THE DEFENDANTS.
24         THE COURT:  GOOD MORNING.
25         OKAY.  SO THERE ARE A LOT OF BALLS IN THE AIR HERE.
```

1    I -- WHAT I PROPOSE WE DO IS TALK ABOUT TWO ISSUES FIRST, AND I

2    THINK THESE ARE ISSUES THAT I SHOULD BE SPEAKING WITH YOU

3    ABOUT, MS. TERRELL.  IS IT "TERRELL" OR "TERRELL"?

4          **MS. TERRELL:**  "TERRELL," YOUR HONOR.

5          **THE COURT:**  SO -- AND THOSE ARE STANDING TO SEEK

6    INJUNCTIVE RELIEF AND STANDING TO CHALLENGE THE POST-CFPB

7    SETTLEMENT LETTER, BECAUSE I THINK IF WE RESOLVE THOSE TWO

8    ISSUES IN FAVOR OF THE DEFENDANTS, WHICH I THINK WE SHOULD,

9    THEN THAT KIND OF NARROWS THE OTHER ISSUES THAT WE NEED --

10   WOULD NEED TO DISCUSS SURROUNDING CLASS CERTIFICATION AND THE

11   LIKE.

12         **MS. TERRELL:**  OKAY.  SO I'M GOING TO DEFER TO MY

13   COLLEAGUE, MR. TOWNSEND, TO ADDRESS THOSE ISSUES.

14         **THE COURT:**  OKAY.  SO I DON'T -- I DON'T --

15   MR. TOWNSEND, I DON'T UNDERSTAND -- UNDER *LOS ANGELES VERSUS*

16   *LYONS*, I DON'T UNDERSTAND HOW ANY OF THE NAMED PLAINTIFFS COULD

17   HAVE STANDING TO SEEK INJUNCTIVE RELIEF, AT LEAST IN FEDERAL

18   COURT.

19         **MR. TOWNSEND:**  GREAT.  THANK YOU, YOUR HONOR.

20        I'D LIKE DISCUSS THAT ISSUE WITH REFERENCE TO A FEW

21   CASES THAT WE DIDN'T HAVE A CHANCE TO CITE IN OUR BRIEFS, IN

22   PART BECAUSE THE DEFENDANTS CHANGED THEIR ARGUMENT ON STANDING

23   FROM THEIR INITIAL MOTION TO DISMISS INTO THE REPLY.  IN THE

24   INITIAL MOTION TO DISMISS THEIR ARGUMENT WAS THAT WE DON'T HAVE

25   STANDING BECAUSE THE CFPB CONSENT DECREE FIXED EVERYTHING, AND

1   IN THEIR REPLY THEY RAISED, REALLY, THE *LYONS* ISSUE YOU'RE

2   DISCUSSING HERE.

3        THAT'S JUST BY WAY OF EXPLAINING WHY THERE ARE A FEW

4   CASES I WILL BE CITING THAT WE HAVEN'T SHOWED IN THE BRIEFS

5   BEFORE.

6        ON THE *LYONS* ISSUE, I THINK THE NINTH CIRCUIT HAS

7   BEEN CLEAR IN MULTIPLE CASES THAT WHERE PLAINTIFFS CAN TRACE

8   THEIR INJURY TO A WRITTEN POLICY THAT THE DEFENDANTS IMPLEMENT

9   ON A CONSISTENT BASIS, THAT GREATLY REDUCES THE PLAINTIFF'S

10  BURDEN IN WITHSTANDING THE *LYONS* TEST.

11        SO I WOULD POINT YOU TO A CASE *FORTYUNE VERSUS*

12  *AMERICAN MULTICINEMA*, AMC THEATERS.  THAT'S AT 364 F.3D 1075.

13            **THE COURT:**  HOLD ON ONE SECOND.

14            **MR. TOWNSEND:**  YEAH.

15            **THE COURT:**  OKAY.  WHAT'S THE CASE AGAIN?

16            **MR. TOWNSEND:**  FORTYUNE, THAT'S F-O-R-T-Y-U-N-E.

17            **THE COURT:**  WHAT'S THE CITE?

18            **MR. TOWNSEND:**  364 F.3D 1075.

19            **THE COURT:**  OKAY.  AND WHAT WAS THAT CASE ABOUT?

20            **MR. TOWNSEND:**  SO THAT WAS A CASE IN WHICH THE

21  PLAINTIFF WAS A DISABLED MAN WHO WAS CHALLENGING A POLICY OF

22  AMC'S THEATERS THAT MEANT THAT IF HE WERE TO ARRIVE AT THE

23  THEATER AND THE THEATER HAD SOLD OUT A SHOWING, HE WOULD NOT BE

24  ABLE TO TAKE ADVANTAGE OF ONE OF THE SEATS THAT WERE RESERVED

25  FOR DISABLED PEOPLE.

1          **THE COURT:**  RIGHT.  BUT I ASSUME IN THAT CASE -- I'LL

2     READ THE CASE, BUT I ASSUME IN THAT CASE THERE WAS NO

3     SIGNIFICANT DISPUTE THAT THIS PERSON WANTED TO SEE MOVIES IN

4     THE FUTURE AND WANTED TO GO TO AMC THEATERS IN THE FUTURE,

5     MAYBE A PARTICULAR AMC THEATER, AND THERE WAS A LIKELIHOOD THAT

6     SOME SHOWS WOULD BE SOLD OUT IN THE FUTURE, AND, THEREFORE,

7     THAT HE WOULD BE A VICTIM OF THIS POLICY.

8          **MR. TOWNSEND:**  SO I THINK THAT THERE'S TWO

9     DISTINCTIONS TO BE DRAWN.  FIRST IS THE QUESTION OF INTENT

10    VERSUS THE LIKELIHOOD OF HARM.

11          I DON'T THINK THE INTENT INQUIRY IS ALWAYS

12    DISPOSITIVE.  SO, FOR INSTANCE, THERE ARE A VARIETY OF CASES

13    ADDRESSING THE *LYONS* ISSUE IN THE CONTEXT OF PLAINTIFFS

14    CHALLENGING ARREST POLICIES OF MUNICIPALITIES, AND THE

15    PLAINTIFFS NEVER HAVE TO ALLEGE THAT THEY INTEND TO GET

16    ARRESTED AGAIN IN ORDER TO HAVE STANDING UNDER THOSE CASES.

17    WHAT THE COURTS SAID --

18          **THE COURT:**  RIGHT.  BUT I WAS TALKING TO YOU ABOUT

19    THE FORTYUNE CASE YOU WERE TELLING ME ABOUT.

20          **MR. TOWNSEND:**  SURE, SURE.

21          **THE COURT:**  I MEAN, IN THAT CASE IF THERE HAD BEEN

22    EVIDENCE THAT HE NEVER INTENDED TO GO BACK TO THE MOVIES,

23    RIGHT, THEN THERE WOULD HAVE BEEN NO STANDING TO SEEK

24    INJUNCTIVE RELIEF.  PART OF THE -- PART OF THE -- PART OF WHY

25    THERE WAS STANDING IN THAT CASE, NO DOUBT, IS THAT THERE WAS A

1    POLICY THAT REMAINED IN PLACE AND THAT THE POLICY WAS LIKELY TO

2    BE APPLIED TO HIM, AND THE REASON THE POLICY WAS LIKELY TO BE

3    APPLIED TO HIM IS BECAUSE HE WANTED TO GO BACK TO THE MOVIES.

4           **MR. TOWNSEND:**  SURE.  SO THE REASON THAT THE

5    POLICY -- THE ONLY INSTANCE IN WHICH THE POLICY WOULD HAVE

6    GENERATED HARM, THOUGH, IS IF A MOVIE WAS SOLD OUT.  AND ONE OF

7    THE THINGS THE COURT NOTED IS THAT --

8           **THE COURT:**  RIGHT, BUT THAT'S VERY EASY TO ESTABLISH,

9    PROVE, PRESENT EVIDENCE THAT MOVIES ARE LIKELY TO BE SOLD OUT

10   IN THE FUTURE.  YOU CAN LOOK AT THE PATTERNS, YOU KNOW, IN THE

11   PAST AND HOW OFTEN MOVIES ARE THEY SOLD OUT AND ALL THAT STUFF.

12          **MR. TOWNSEND:**  SO THE COURT NOTED IN ITS OPINION --

13   AND THIS IS WHY I THINK IT'S IMPORTANT IN TERMS OF CALIBRATING

14   WHAT THE THRESHOLD OF LIKELIHOOD IS THAT'S NECESSARY.

15          THE COURT NOTED THAT IT HAD BEEN FOUR YEARS SINCE THE

16   INITIAL INJURY THAT HE HAD COMPLAINED OF, AND HE HAD BEEN

17   REGULARLY ATTENDING MOVIES IN THAT TIME, AND IT NEVER HAPPENED

18   ONCE TO HIM.

19          **THE COURT:**  OKAY.

20          **MR. TOWNSEND:**  WHEREAS, HERE, THE DEFENDANTS' OWN

21   DATA SHOWS THERE ARE TENS OF THOUSANDS OF PEOPLE WHO HAVE

22   RECEIVED LETTERS BASED ON MULTIPLE DIFFERENT CHECKS THAT

23   THEY'VE WRITTEN FROM THE DEFENDANTS HERE, TENS OF THOUSANDS OF

24   PEOPLE OVER THE YEARS.

25          MS. MORIN HERSELF, ONE OF OUR OWN PLAINTIFFS,

1  RECEIVED A LETTER IN 2010 AND THEN THE LETTER WRITING HERE IN

2  2014.  AND IT'S THROUGH --

3          **THE COURT:**  WHAT ABOUT -- SO WHAT ABOUT POST-CFPB

4  SETTLEMENT LETTERS?

5          **MR. TOWNSEND:**  SO, YOUR HONOR --

6          **THE COURT:**  WHAT DOES THE DATA SHOW -- BECAUSE,

7  AGAIN, WE HAVE THIS OTHER ISSUE THAT I FLAGGED WHICH IS THAT,

8  YOU KNOW, THE THREE NAMED PLAINTIFFS IN THIS CASE RECEIVED

9  PRE-CFPB SETTLEMENT LETTERS.  WE NOW HAVE A CHANGE IN THE

10  LETTERS.

11          **MR. TOWNSEND:**  THAT'S CORRECT.

12          **THE COURT:**  AND, APPARENTLY, ALSO A CHANGE IN THE WAY

13  THE PROGRAMS ARE OPERATING.  HAVE ANY OF THE NAMED PLAINTIFFS

14  RECEIVED POST-CFPB LETTERS?

15          **MR. TOWNSEND:**  SO THE NAMED PLAINTIFFS HAVE NOT

16  RECEIVED POST-CFPB SETTLEMENT LETTERS, BUT WE ALSO DON'T THINK

17  THE CFPB CHANGES THE NATURE OF THE INJURY THAT THEY WOULD BE

18  SUFFERING.

19          IF YOU LOOK AT THE POST-CFPB LETTER THAT'S IN THE

20  EXHIBITS TO OUR MOTION MORE CLASS CERTIFICATION, THERE ARE

21  STILL SEVERAL VIOLATIONS THAT ARE STILL STRAIGHTFORWARD

22  VIOLATIONS OF THE FDCPA.  ONE OF THEM, FOR INSTANCE, IS THE

23  VIOLATION OF THE (E)11 NOTICE, THE DISCLOSURE NOTICE.  THAT'S

24  QUITE STRAIGHTFORWARD.  IT DOESN'T REALLY REQUIRE --

25          **THE COURT:**  WELL, THERE'S A BIG ISSUE ABOUT WHETHER

```
 1   THEY ARE A DEBT COLLECTOR WITHIN THE MEANING OF THE FDCPA.

 2            MR. TOWNSEND:  OF COURSE.  AND THAT'S --

 3            THE COURT:  AND WITH THE CHANGES THAT THEY HAVE MADE,

 4   MAY MAKE IT MORE LIKELY THAT THEY CAN ESTABLISH THAT THEY ARE

 5   NOT A DECLARANT.

 6            MR. TOWNSEND:  BUT WE DON'T THINK THE CHANGES

 7   ACTUALLY DO CHANGE THAT INQUIRY.

 8            THE COURT:  YOU DON'T THINK THE CHANGES CHANGE THE

 9   INQUIRY?

10            MR. TOWNSEND:  THAT'S CORRECT.  IN TERMS OF 1692P --

11   I MEAN, OBVIOUSLY, THERE'S DIFFERENT FACTS YOU APPLY FOR THE

12   STATUTE, BUT THE INQUIRY IS THE SAME WHETHER 1692P APPLIES.

13            THE COURT:  YEAH, BUT THE FACTS ARE DIFFERENT ABOUT

14   HOW THE PROGRAM OPERATES NOW COMPARED TO HOW THEY OPERATED

15   BEFORE.

16            MR. TOWNSEND:  THAT'S CORRECT.  BUT THE CFPB CONSENT

17   DECREE DIDN'T ADDRESS, FOR INSTANCE, THE UNLAWFUL FEES THAT

18   HAVE BEEN COLLECTED BY THE DEFENDANTS.

19            THE COURT:  I KNOW.  BUT ON THE QUESTION OF WHETHER

20   THE DEFENDANT IS A DEBT COLLECTOR WITHIN THE MEANING OF THE

21   FDCPA, THE -- I MEAN, TO TEE UP WHETHER -- THE ISSUE OF WHETHER

22   THEY ARE A DEBT COLLECTOR BASED ON THE WAY THEY ARE DOING STUFF

23   NOW, IT SEEMS TO ME THAT THERE NEEDS TO BE A PLAINTIFF WHO WAS

24   SUBJECT TO THE DEFENDANT'S CONDUCT BASED ON THE WAY THEY'RE

25   DOING IT NOW.  HOW CAN A PLAINTIFF WHO WAS NOT SUBJECT TO THAT
```

1  CONDUCT HAVE STANDING TO ARGUE THAT THE -- THAT THE DEFENDANT

2  WAS OR WAS NOT A DEBT COLLECTOR AS TO THAT CONDUCT?

3          **MR. TOWNSEND:**  SO, YOUR HONOR, I'D LIKE TO

4  DISTINGUISH JUST BETWEEN TWO PARTICULAR ISSUES.  ONE IS WHO HAS

5  STANDING TO MAKE THAT CHALLENGE, AND ONE IS THE MERITS OF THAT

6  QUESTION UNDER CLASS CERTIFICATION.

7          SO THE WAY WE'VE TEED THIS UP ON OUR SIDE IS I

8  PREPARED TO ARGUE THE MOTION TO DISMISS ISSUES, AND MS. TERRELL

9  IS ARGUING THE CLASS CERTIFICATION.  I REALIZE THAT CAN BE

10  SOMEWHAT INCONVENIENT FOR JUMPING BACK AND FORTH BETWEEN THE

11  TWO.

12          BUT AS FOR THE ISSUE --

13          **THE COURT:**  MY QUESTION FOR YOU NOW --

14          **MR. TOWNSEND:**  YES.

15          **THE COURT:**  I DON'T CARE WHO ANSWERS IT, BUT I WANT

16  MY QUESTION ANSWERED, WHICH IS:  HOW CAN A NAMED PLAINTIFF WHO

17  ONLY WAS SUBJECTED TO A BAD CHECK DIVERSION PROGRAM, WHETHER

18  THEY PARTICIPATED IN IT OR NOT, WAS ONLY SUBJECTED TO THE BAD

19  CHECK DIVERSION PROGRAM UNDER THE OLD REGIME, HOW CAN THAT

20  PLAINTIFF HAVE STANDING TO ASSERT THAT IN THE NEW REGIME, THE

21  DEFENDANT IS A DEBT COLLECTOR WITHIN THE MEANING OF THE

22  STATUTE.

23          **MS. TERRELL:**  SO I CAN ANSWER THAT WITH RESPECT TO

24  MS. MORIN, FOR INSTANCE.  SO MS. MORIN HAS SAID -- AND

25  DEFENDANTS HAVE QUOTED THIS IN THEIR REPLY BRIEF -- THAT SHE IS

1   CURRENTLY NOT WRITING CHECKS, WHICH WE WOULD CONSTRUE AS AN

2   ONGOING INJURY THAT SHE HAS SUFFERED BECAUSE SHE IS WORRIED

3   ABOUT RECEIVING LETTERS LIKE THE DEFENDANTS ARE SENDING.  AND

4   SO THAT'S AN ONGOING INJURY THAT BEGAN IN 2014, IS CONTINUING

5   ON PAST THE CFPB'S CONSENT DECREE AND CONTINUING TO THIS DAY.

6          **THE COURT:**  BUT WE DON'T KNOW -- I MEAN, IF SHE -- IF

7   SHE DOES WRITE A CHECK AGAIN AND SHE DOES GET PROCESSED BY THE

8   DEFENDANTS AND THE DA'S OFFICE IN A WAY THAT RESULTS IN A

9   DECISION TO SEND HER A LETTER, WE DON'T REALLY KNOW ANYTHING

10  ABOUT WHAT THAT PROCESS IS GOING TO LOOK LIKE BECAUSE IT HASN'T

11  HAPPENED YET, RIGHT?

12         **MR. TOWNSEND:**  SO, YOUR HONOR, I THINK THAT'S

13  ACTUALLY NOT QUITE RIGHT.  I THINK WE ACTUALLY DO KNOW A FAIR

14  AMOUNT OF WHAT'S GOING ON POST CFPB.

15         ONE THING WE KNOW -- AND THIS IS RELEVANT TO THE

16  QUESTION OF WHETHER SOMEONE COUNTS AS A DEBT COLLECTOR UNDER

17  THE FDCPA OR NOT.  1692P SAYS THAT YOU'LL BE TREATED -- YOU

18  WON'T -- YOU WON'T FALL INTO THE EXCEPTION OF 1692P UNLESS YOUR

19  PROGRAM COMPLIES WITH STATE LAW.

20         AND THE C -- EVEN POST CONSENT DECREE -- I DON'T

21  THINK THERE'S ANY DISPUTE THEY'RE STILL COLLECTING SIMILAR FEES

22  AND THOSE FEES ARE UNLAWFUL.  SO THAT IS, BOTH PRE AND POST

23  CFPB, A REASON THAT THEY DON'T QUALIFY FOR THE 1692P EXCEPTION.

24  AND THAT IS TRUE FOR IF MS. MORIN WERE TO RECEIVE A LETTER

25  TODAY OR ANYONE ELSE WOULD RECEIVE A LETTER TODAY.

1    SECOND, WE'VE SEEN THAT IN EXHIBIT, I BELIEVE IT'S

2    33, TO OUR MOTION FOR CLASS CERTIFICATION, THERE IS A LETTER

3    THAT WENT OUT FROM THE DEFENDANTS TO THE DISTRICT ATTORNEYS

4    THROUGHOUT CALIFORNIA, AND THEY SAY THAT THE CHANGES MADE AFTER

5    THE CFPB'S CONSENT DECREE, "WILL NOT MATERIALLY CHANGE YOUR

6    PROGRAM."

7         SO WE HAVE THE DEFENDANT'S REPRESENTATIONS THAT THE

8    CFPB DECREE SHOULDN'T BE CHANGING ANYTHING ON THE DA'S END.  WE

9    ALSO --

10        **THE COURT:**  WELL, EXCEPT FOR THAT LETTER, WHAT I

11   BELIEVE IT SAID IS, OTHERWISE IT WILL NOT MATERIALLY CHANGE

12   YOUR PROGRAM.  ONE OF THE OTHER THINGS WE NEED TO DO IS GET

13   SIGNOFF FROM YOUR OFFICE TO SEND A LETTER TO A PARTICULAR

14   PERSON.

15        **MR. TOWNSEND:**  THAT'S CORRECT.  BUT IF YOU LOOK AT

16   THE INFORMATION THAT THEY'RE SENDING TO THAT OFFICE, THE

17   INFORMATION THAT THE DEFENDANTS HAVE SENT TO THE DA'S IN THOSE

18   INSTANCES ARE NOT -- IS NOT ENOUGH INFORMATION FOR THE DA'S TO

19   BE MAKING THE REQUIRED STATUTORY DETERMINATION.

20        JUST TO NOTE, THIS IS REASON NUMBER TWO NOW THAT THEY

21   DON'T QUALIFY UNDER THE 1692P EXCEPTION.  REASON ONE NUMBER IS

22   THAT THE FEES HAVE NOT BEEN ADDRESSED BY THE CONSENT DECREE,

23   THE UNLAWFUL FEES THAT ARE (INDISCERNIBLE) BY THE CALIFORNIA

24   STATE STATUTE REASON.

25        NUMBER TWO IS THAT --

1           **THE COURT:**  YOU CONTEND IT'S UNLAWFUL.  THEY CONTEND

2      IT'S NOT UNLAWFUL.  IT'S NOT CLEAR WHO'S RIGHT BASED ON THE

3      STATUTE.  THE POINT IS THAT'S AN ISSUE THAT COULD BE -- A CLASS

4      COULD BE CERTIFIED ON.

5           **MR. TOWNSEND:**  THAT'S CORRECT.  AN ISSUE OF CLASS

6      COULD BE CERTIFIED ON.  AND MS. MORIN, I WOULD SAY, FOR

7      INSTANCE, WITH HER ONGOING INJURY WOULD BE AN ADEQUATE

8      PLAINTIFF FOR THAT BASIS.

9           **THE COURT:**  SO HER -- WHAT'S HER NAME AGAIN?

10          **MR. TOWNSEND:**  M-O-R-I-N.

11          **THE COURT:**  SO MS. MORIN SAYS:  I DON'T WRITE CHECKS

12     ANYMORE BECAUSE I'M WORRIED ABOUT BEING SUBJECTED -- I'M

13     WORRIED ABOUT BOUNCING A CHECK, AND I'M WORRIED THAT IF I

14     BOUNCE A CHECK, I WILL BE SUBJECTED -- IT WILL -- A

15     DETERMINATION WILL BE MADE THAT I SHOULD BE IN THIS BAD CHECK

16     DIVERSION PROGRAM.

17          **MR. TOWNSEND:**  HONESTLY, YOUR HONOR, IT'S EVEN A

18     LITTLE SIMPLER THAN THAT.  IT'S NOT REQUIRED FOR MS. MORIN TO

19     DO ANYTHING LIKE BOUNCING A CHECK FOR HER TO RECEIVE A LETTER,

20     AS HER 2010 AND 2014 LETTER BOTH EXHIBIT.  IT WAS A BANK ERROR

21     IN THOSE CASES, AND SHE -- AND SHE THEN REDEPOSITED THOSE

22     CHECKS IMMEDIATELY.  SO SHE HAD TO DO NOTHING.  SHE'S SIMPLY

23     WORRIED BY --

24          **THE COURT:**  IS THERE ANY REASON TO BELIEVE A BANK

25     ERROR WILL HAPPEN IN THE FUTURE?  I MEAN, HOW OFTEN -- YOU

```
 1   KNOW, IS THERE ANY EVIDENCE IN THE RECORD ABOUT HOW COMMON BANK

 2   ERRORS ARE?

 3            SO IT SEEMS TO ME THAT WHAT -- IT'S FINE SHE'S AFRAID

 4   TO WRITE CHECKS, BUT, YOU KNOW, THE PLAINTIFFS IN LOS ANGELES

 5   VERSUS LYONS MAY HAVE BEEN AFRAID TO GO OUTSIDE BECAUSE THEY

 6   WERE AFRAID THEY WERE GOING TO BE SUBJECTED TO A CHOKEHOLD BY

 7   THE LOS ANGELES POLICE DEPARTMENT.  BUT IF THEY HAD A

 8   DECLARATION SAID, I'M AFRAID TO GO OUTSIDE, I'M NOT GOING TO GO

 9   OUTSIDE ANY MORE UNLESS LOS ANGELES CHANGES ITS CHOKEHOLD

10   POLICY, THEY WOULD NOT HAVE STANDING TO SEEK INJUNCTIVE RELIEF.

11   THEY WOULD HAVE HAD SHOW THERE WAS A LIKELIHOOD -- THERE WOULD

12   HAVE HAD TO HAVE BEEN A LIKELIHOOD THAT IF THEY DID GO OUTSIDE,

13   THEY WOULD BE SUBJECT TO THE CHOKEHOLD POLICY.

14            AND SO HERE THE QUESTION, IT SEEMS TO ME AS TO

15   MS. MORIN IS, IF SHE DECIDED SHE WAS GOING TO WRITE CHECKS

16   AGAIN, WHAT IS THE LIKELIHOOD THAT SHE WOULD BE PULLED INTO

17   THIS PROGRAM?

18            MR. TOWNSEND:  SO THERE'S, I THINK, TWO RESPONSES TO

19   THAT, YOUR HONOR.

20            ONE IS THAT THE NINTH CIRCUIT IN A CASE CHAPMAN

21   VERSUS PIER 1 IMPORTS, AND THE CITATION FOR THAT IS 631 F.3D

22   939.

23            THE COURT:  COULD YOU GIVE ME THE CITE ONE MORE TIME?

24            MR. TOWNSEND:  SURE, CHAPMAN VERSUS PIER 1 IMPORTS

25   631 F.3D 939.  DESCRIBES A SITUATION IN WHICH THERE ARE
```

1    MULTIPLE WAYS A DISABLED PLAINTIFF CAN HAVE STANDING TO

2    CHALLENGE A DEFENDANT'S FAILURES UNDER THE ADA.  ONE CAN BE BY

3    DEMONSTRATING AN INTENT TO GO TO A PLACE.  ANOTHER CAN BE BY

4    DEMONSTRATING THAT THE DEFENDANT HAS DETERRED THEM FROM DOING A

5    LAWFUL ACTIVITY THAT THEY'RE ENTITLED TO DO AS A DISABLED

6    INDIVIDUAL.

7              SO HERE THE INJURY IS NOT JUST A FEAR, IT'S THAT SHE

8    IS NOT ENGAGING IN A LAWFUL ACTIVITY THAT SHE SHOULD REASONABLY

9    BE ABLE TO ENGAGE IN.

10             **THE COURT:**  WELL, SO, AND WHAT -- IN THE *CHAPMAN*

11   CASE, WHAT WAS SHE DETERRED FROM DOING?

12             **MR. TOWNSEND:**  THAT WAS A DISABLED PLAINTIFF BEING

13   DETERRED FROM VISITING A PREMISES OF A DEFENDANT.

14             **THE COURT:**  OKAY.  SO SHE WAS DETERRED FROM USING

15   PIER 1 IMPORTS AGAIN BECAUSE THERE WAS AN ACCESSIBILITY PROBLEM

16   AT PIER 1 IMPORTS?

17             **MR. TOWNSEND:**  THAT'S RIGHT.  AND IN TERMS OF WHAT

18   YOUR HONOR SAID ABOUT --

19             **THE COURT:**  RIGHT, BUT -- BUT WE KNEW THERE WAS AN

20   ACCESSIBILITY PROBLEM AT PIER 1 IMPORTS, RIGHT?

21             **MR. TOWNSEND:**  THAT'S RIGHT.

22             **THE COURT:**  AND SO -- BUT WHAT WE DON'T KNOW IS THAT

23   SHE'S GOING TO BOUNCE CHECKS.

24             **MR. TOWNSEND:**  THAT'S CORRECT.  WE DON'T KNOW THAT.

25   THE QUESTION ISN'T WHETHER IT'S SURE OR EVEN WHETHER IT'S MORE

```
 1   LIKELY THAN NOT --
 2            THE COURT:  IF SHE --
 3            MR. TOWNSEND:  THE QUESTION IS --
 4            THE COURT:  IF MS. CHAPMAN WENT TO PIER 1 IMPORTS, WE
 5   KNEW THAT SHE WAS GOING TO EXPERIENCE THE ACCESSIBILITY ISSUE
 6   AGAIN, RIGHT?
 7            MR. TOWNSEND:  SURE.
 8            THE COURT:  AGAIN, I HAVEN'T READ THIS CASE YET.
 9            MR. TOWNSEND:  SURE, SURE, YEAH.
10            THE COURT:  I'M JUST GOING OFF YOUR DESCRIPTION.
11            MR. TOWNSEND:  THAT'S RIGHT, YES.
12            THE COURT:  SO WE KNEW THAT IF SHE DID THAT, SHE WAS
13   GOING TO EXPERIENCE THE LEGAL VIOLATION AGAIN.
14            IF MS. MORIN WRITES CHECKS, WE DON'T KNOW THAT SHE'S
15   GOING TO EXPERIENCE THE LEGAL VIOLATION AGAIN, AND TO THE
16   EXTENT YOU'RE RELYING ON THE POSSIBILITY OF A BANK ERROR, I
17   WOULD THINK YOU WOULD HAVE TO SHOW A LIKELIHOOD THAT A BANK
18   ERROR IS GOING TO OCCUR IN THE FUTURE.
19            MR. TOWNSEND:  WELL, YOUR HONOR, IN TERMS OF THE
20   LIKELIHOOD, WE HAVE PROVIDED A DECLARATION THAT SAYS WE LOOK AT
21   THE DEFENDANT'S DATABASE, AND THERE ARE TENS OF THOUSANDS OF
22   PEOPLE WHO APPEAR MORE THAN ONCE, RECEIVED LETTERS MORE THAN
23   ONCE FOR DIFFERENT VIOLATIONS.  IT'S SOMETHING LIKE 45 PERCENT,
24   WHICH IS A VERY HIGH LIKELIHOOD, THAT IF YOU RECEIVED ONE
25   LETTER FOR ONE VIOLATION, YOU'RE GOING TO RECEIVE ANOTHER
```

1    LETTER FOR ANOTHER VIOLATION LIKE.

2          IN CASES LIKE CHALLENGING ARREST POLICIES OF CITIES,

3    PLAINTIFFS DON'T HAVE TO SHOW THAT IT'S 50 PERCENT LIKELY THAT

4    THEY'RE GOING TO BE ARRESTED AGAIN IN ORDER TO BE ABLE TO

5    CHALLENGE A WRITTEN POLICY.

6          **THE COURT:**  WELL, I MEAN, IN *LYONS*, I MEAN, YOU --

7    UNFORTUNATELY, YOU KNOW, WHERE YOU LIVE IN A COMMUNITY WILL

8    DRAMATICALLY AFFECT, YOU KNOW, THE LIKELIHOOD OF, YOU KNOW, HOW

9    MANY TIMES YOU'RE GOING TO BE ARRESTED.  MANY, MANY PEOPLE ARE

10   ARRESTED MULTIPLE TIMES.  AND AS I RECALL IN *LYONS* -- I MEAN,

11   I'VE READ THE CASE A NUMBER OF TIMES.

12          I WILL ADMIT TO YOU I HAVEN'T READ IT RECENTLY.  BUT

13   AS I RECALL IN *LYONS*, YOU KNOW, THAT ISSUE WAS DISCUSSED,

14   RIGHT?  SO IN *LYONS*, I QUITE STRONGLY SUSPECT THAT THERE WAS

15   EVIDENCE THAT A NUMBER OF PEOPLE WERE SUBJECT TO CHOKEHOLDS

16   MORE THAN ONCE OR WERE SUBJECT TO ARRESTS MORE THAN ONCE,

17   RIGHT?

18          **MR. TOWNSEND:**  THAT'S CORRECT.

19          **THE COURT:**  AND I DON'T THINK ANYBODY WOULD DISPUTE

20   THAT, YOU KNOW, PEOPLE WHO LIVED IN CERTAIN COMMUNITIES AND

21   PROBABLY SOME OF THE PLAINTIFFS THEMSELVES, THERE WOULD BE A

22   RISK THAT THEY WOULD BE ARRESTED.

23          **MR. TOWNSEND:**  SO THAT'S CORRECT, YOUR HONOR.  BUT

24   *LYONS* DID NOTE THAT THERE WAS AN ABSENCE OF AN ALLEGATION THAT

25   THIS WAS A UNIFORM POLICY, AND THE NINTH CIRCUIT HAS SEIZED ON

1    THIS LANGUAGE REPEATEDLY TO SAY THAT, WHEN THERE IS A UNIFORM

2    POLICY, THAT DRASTICALLY CHANGES THE INQUIRY.

3         SO THE NINTH CIRCUIT CASE, *MELENDRES VERSUS ARPAIO*,

4    WHICH YOUR HONOR MAY BE FAMILIAR WITH, DISTINGUISHES *LYONS*

5    SPECIFICALLY BECAUSE OF THE EXISTENCE OF A WRITTEN POLICY.  AND

6    THE NINTH CIRCUIT THERE SAYS THAT THE LIKELIHOOD OF AN INJURY

7    DOESN'T HAVE TO BE HIGH TO BE SUFFICIENTLY LIKELY.

8         SO THE RELEVANT INQUIRY IS WHETHER THE INJURY IS

9    SUFFICIENTLY LIKELY, NOT WHETHER IT'S HIGH, OR WHETHER WE KNOW,

10   OR WHETHER IT'S MORE LIKELY THAN NOT.

11        **THE COURT:**  SO, CAN YOU TELL ME AGAIN WHAT THE

12   EVIDENCE IS OF -- WHAT IS THE STATE OF THE EVIDENCE THAT YOU

13   WERE JUST DESCRIBING ABOUT PEOPLE GETTING LETTERS MULTIPLE

14   TIMES FOR MULTIPLE VIOLATIONS?

15        **MR. TOWNSEND:**  SURE.  WE HAVE A DATABASE THAT

16   DEFENDANTS PROVIDED TO US, AND THIS IS IN MR. ARON'S ATTACHMENT

17   TO OUR RESPONSE ON MOTION TO DISMISS.  AND THE DEFENDANTS HAVE

18   PROVIDED US WITH ABOUT 200,000 DATA POINTS, 200,000 INDIVIDUALS

19   WHO HAVE RECEIVED COLLECTION CHECKS FROM THEM -- OR COLLECTION

20   LETTERS, RATHER, FROM THEM, AND ABOUT 88,000 OF THOSE

21   INDIVIDUALS HAVE BEEN PURSUED FOR MORE THAN ONE ALLEGED

22   VIOLATION.

23        **THE COURT:**  OKAY.

24        **MR. TOWNSEND:**  SO THAT'S QUITE LIKELY, YOUR HONOR.  I

25   MEAN, I WOULD SAY THAT WHEN YOU LOOK AT CASES LIKE *MELENDRES*

1    WHERE THEY'RE CHALLENGING ARREST POLICIES, OF COURSE THERE ARE
2    PLENTY OF PEOPLE WHO LIVE IN VARIOUS COMMUNITIES WHO ARE LIKELY
3    TO BE ARRESTED MORE THAN ONCE OR TWICE.  BUT I WOULD SUBMIT THE
4    SAME IS TRUE OFTEN FOR PEOPLE WHO ARE AT RISK OF INADVERTENTLY
5    BOUNCING A CHECK.  YOU KNOW, THE DEFENDANT'S BUSINESS, AS THEIR
6    OWN DATABASE INDICATES, INVOLVES QUITE A FEW, YOU KNOW, LETTERS
7    SENT TO REPEAT -- REPEAT RECIPIENTS.
8            **THE COURT:**  YOU'RE TALKING ABOUT NOT THE SAME LETTER
9    BEING SENT MULTIPLE TIMES --
10           **MR. TOWNSEND:**  CORRECT.
11           **THE COURT:**  -- FOR THE SAME VIOLATIONS, BUT FOR
12   DIFFERENT VIOLATIONS.
13           **MR. TOWNSEND:**  FOR INSTANCE, MS. MORIN HAD A 2010
14   INCIDENT AND A 2014 INCIDENT.  THAT'S WHAT IT MEANS TO HAVE TWO
15   IN THE DATABASE WE'RE TALKING ABOUT.  SO THAT'S 88,000 PEOPLE
16   OVER A MULTI-YEAR PERIOD.
17           **THE COURT:**  SO IF I WERE TO CONCLUDE THAT THERE IS
18   STANDING TO SEEK INJUNCTIVE RELIEF, DOES IT NEED TO HINGE ON
19   THE ASSUMPTION OR CONCLUSION THAT THE PLAINTIFFS -- THE NAMED
20   PLAINTIFFS ARE LIKELY TO BE SUCKED INTO THIS PROGRAM AGAIN?
21           **MR. TOWNSEND:**  I WOULD SAY THAT IT'S SUFFICIENTLY
22   LIKELY.  SOME MIGHT INTERPRET TO BE MORE LIKELY THAN NOT, FOR
23   INSTANCE, BUT THE NINTH CIRCUIT TELLS US THE RELEVANT INQUIRY
24   IS SUFFICIENTLY LIKELY.
25           **THE COURT:**  AND THESE PLAINTIFFS ARE SUFFICIENTLY

1    LIKELY TO BE SUCKED INTO THIS PROGRAM AGAIN BECAUSE --

2            **MR. TOWNSEND:** BECAUSE THEY'VE RECEIVED LETTERS IN

3    THE PAST AND BECAUSE WE KNOW THAT SOME OF THEM, AT LEAST

4    MS. MORIN HAS RECEIVED MULTIPLE LETTERS FOR MULTIPLE

5    VIOLATIONS.

6            **THE COURT:** HAVE ANY OF THE NAMED PLAINTIFFS RECEIVED

7    MULTIPLE LETTERS?

8            **MR. TOWNSEND:** SHE IS ONE OF THE NAMED PLAINTIFFS.

9            **THE COURT:** OKAY. SO SHE'S RECEIVED MULTIPLE --

10           **MR. TOWNSEND:** YES.

11           **THE COURT:** SO SHE RECEIVED A LETTER IN 2010, WHICH

12   IS THE -- WHICH IS A PRE-SETTLEMENT LETTER.

13           **MR. TOWNSEND:** YES.

14           **THE COURT:** AND SHE RECEIVED A LETTER IN 2014?

15           **MR. TOWNSEND:** YES.

16           **THE COURT:** AND THAT WAS ALSO A PRE-SETTLEMENT

17   LETTER?

18           **MR. TOWNSEND:** THAT'S CORRECT.

19           **THE COURT:** THE CHANGE WAS IN, LIKE, 2015 OR

20   SOMETHING?

21           **MR. TOWNSEND:** I BELIEVE THAT'S CORRECT.

22           **THE COURT:** OKAY. OKAY.

23           AND THEN I GUESS WHAT YOU WOULD SAY IS THAT, YOU

24   KNOW, THERE'S CHALLENGE -- STANDING TO SEEK INJUNCTIVE RELIEF

25   AND STANDING TO CHALLENGE THE POST-CFPB SETTLEMENT LETTER. YOU

```
 1    WOULD SAY THAT THOSE TWO THINGS RISE AND FALL TOGETHER, RISE OR
 2    FALL TOGETHER, RIGHT?  THAT IF YOU -- THAT IF YOU HAVE STANDING
 3    TO SEEK INJUNCTIVE RELIEF, WHAT THAT MEANS IS YOU'VE
 4    ESTABLISHED THAT YOU'RE LIKELY TO GET SUCKED INTO THE PROGRAM
 5    AS RECONSTITUTED FOLLOWING THE CFPB SETTLEMENT?
 6         MR. TOWNSEND:  I THINK THAT'S RIGHT, YOUR HONOR.  THE
 7    ONLY CAVEAT I WOULD GIVE TO THAT IS I DON'T WANT TO GIVE THE
 8    IMPRESSION THAT THERE WEREN'T OTHER WAYS TO CHALLENGE THE CFPB
 9    LETTER OTHER THAN FOR INJUNCTIVE RELIEF.  THERE'S ALSO --
10         THE COURT:  SAY THAT ONE MORE TIME.
11         MR. TOWNSEND:  THERE WOULD ALSO POTENTIALLY BE
12    MEMBERS OF THE CLASS WHO WOULD HAVE DAMAGES CLAIMS RELATED TO
13    THE CFPB LETTER.  I JUST DIDN'T WANT TO MAKE --
14         THE COURT:  DAMAGES RELATED TO THE POST.
15         (SIMULTANEOUS CROSSTALK.)
16         MR. TOWNSEND:  WHEN YOU SAID INJUNCTIVE RELIEF,
17    STANDING FOR INJUNCTIVE RELIEF AND STANDING TO CHALLENGE THE
18    CFPB LETTER RISE OR FALL ON THE SAME BASIS, I WOULD SAY THERE
19    ARE PREVIOUS SITUATIONS IN WHICH CLASS MEMBERS, EVEN IF WE DO
20    NOT HAVE STANDING TO SEEK INJUNCTIVE RELIEF, WE COULD STILL
21    HAVE -- THERE WOULD STILL BE CLASS MEMBERS WHO WOULD HAVE
22    ENTITLEMENT TO DAMAGES FROM LETTERS SENT AFTER THE CONSENT
23    DECREE.
24         THE COURT:  BUT THEN YOU WOULD NEED A NAMED PLAINTIFF
25    WHO RECEIVED THE POST-CFPB SETTLEMENT LETTER, WOULDN'T YOU?
```

1          **MR. TOWNSEND:**  I'M NOT SURE THAT YOU WOULD.  I THINK

2    YOU COULD POTENTIALLY HAVE JUST A SUBCLASS.

3          **THE COURT:**  SUBCLASS REPRESENTED BY WHO?

4          **MR. TOWNSEND:**  YOUR HONOR -- MS. TERRELL, DO YOU WANT

5    TO --

6          **THE COURT:**  WHATEVER YOU WANT.  I DON'T CARE.

7          **MS. TERRELL:**  SO I THINK THE QUESTION IS WHETHER OR

8    NOT THE PROGRAMS WERE SUFFICIENTLY MATERIAL PRE AND POST-CFPB

9    CONSENT DECREE, AND OUR EVIDENCE IS THAT THEY ACTUALLY WERE

10   SUFFICIENTLY MATERIAL, ESPECIALLY GIVEN --

11         **THE COURT:**  "SUFFICIENTLY MATERIAL," WHAT DOES THAT

12   MEAN?  SUFFICIENTLY MATERIAL?  DO YOU MEAN SUFFICIENTLY

13   SIMILAR?

14         **MS. TERRELL:**  I MEAN THEY'RE NOT MATERIALLY

15   DIFFERENT.

16         **THE COURT:**  OKAY.

17         **MS. TERRELL:**  THAT'S ACTUALLY WHAT THE JUDGE LOOKED

18   AT IN *GOLD VERSUS MIDLAND*, WHERE LOOKING AT WHETHER OR NOT WHEN

19   YOU HAVE A VARIETY OF PRODUCTS THAT WERE PURCHASED, COULD YOU

20   HAVE ONE PLAINTIFF REPRESENT MORE THAN ONE PRODUCT, RIGHT?  SO

21   SIMILAR TYPE OF ANALYSIS, AND SO LOOKING TO WHETHER OR NOT

22   THERE REALLY WERE MATERIAL CHANGES ONCE THE CONSENT DECREE WAS

23   IMPLEMENTED BY THE CFPB.

24         AND AS MY -- AS MR. TOWNSEND NOTED, THERE ARE A

25   NUMBER OF VERY IMPORTANT DIFFERENCES THAT WERE NOT MADE

1    POST-CFPB, ESPECIALLY BECAUSE THE CFPB'S INVESTIGATION WAS

2    FOCUSED ON THE FDCPA AND DID NOT AT ALL ADDRESS THE UNLAWFUL

3    FEES, WHICH ARE REALLY UNDER THE STATE STATUTE.

4        AND SO THAT'S KEY TO OUR CASE.  THAT'S ONE OF THE

5    REASONS WHY THE DEFENDANTS ARE NOT ENTITLED TO THE 1692P

6    EXEMPTION, IS THE FACT THAT THE CHECK DIVERSION PROGRAM THE

7    DEFENDANTS HAVE SET UP IN CALIFORNIA, THAT IN ORDER FOR IT TO

8    BE -- IN ORDER FOR THEM TO NOT BE A DEBTOR -- NOT BE A

9    CREDITOR -- EXCUSE ME.

10        **THE COURT:**  I APPRECIATE THAT DISTINCTION --

11        **MS. TERRELL:**  YEAH.

12        **THE COURT:**  -- THAT YOU'RE DRAWING.  SO WHAT I WANT

13    TO ASK YOU TO DO IS LET'S BOOKMARK THE STATE LAW CLAIM FOR A

14    MOMENT.

15        **MS. TERRELL:**  OKAY.

16        **THE COURT:**  LET'S PUT THAT ASIDE.  OBVIOUSLY, WE NEED

17    TO DISCUSS THAT.  WE NEED TO FIGURE OUT WHETHER A CLASS CAN AND

18    SHOULD BE CERTIFIED FOR THE STATE LAW CLAIMS.  BUT LET'S PUT

19    THAT ASIDE FOR A MOMENT AND JUST TALK -- JUST TO AVOID

20    CONFUSION IN MY OWN MIND, LET'S JUST TALK ABOUT THE FDCPA FOR A

21    MOMENT.

22        **MS. TERRELL:**  OKAY.

23        **THE COURT:**  AND LET'S TALK ABOUT IT AS IT RELATES TO

24    THIS ISSUE OF POST-CFPB SETTLEMENT VERSUS PRE-CFPB SETTLEMENT.

25    OKAY?

1          **MS. TERRELL:**  YEP.

2          **THE COURT:**  ALL RIGHT.  SO PLAINTIFFS HAVE RECEIVED

3   LETTERS, SOME OF THE -- THE NAMED PLAINTIFFS HAVE RECEIVED

4   LETTERS -- THE OLD LETTERS, AND SOME OF THEM WENT THROUGH THE

5   PROGRAM BEFORE IT WAS RECONSTITUTED FOLLOWING THE CFPB

6   SETTLEMENT, AND WE CAN DEBATE HOW MUCH IT WAS RECONSTITUTED AND

7   HOW -- WHETHER THE CHANGES WERE SIGNIFICANT OR NOT.  BUT AS IT

8   RELATES TO THE FDCPA CLAIM, I'M HAVING A HARD TIME

9   UNDERSTANDING WHY THE NAMED PLAINTIFF, WHO RECEIVED THE OLD

10  LETTER CAN CHALLENGE THE NEW LETTER.

11         **MS. TERRELL:**  BECAUSE THE NEW --

12         **THE COURT:**  ASSUMING -- LET'S ASSUME FOR THE SAKE OF

13  ARGUMENT THAT I'VE CONCLUDED THAT THEY DON'T HAVE STANDING TO

14  SEEK INJUNCTIVE RELIEF.  OKAY?  HOW CAN THEY -- HOW CAN THE NEW

15  LETTER BE PART OF THIS CASE?

16         **MS. TERRELL:**  BECAUSE THE NEW LETTER IS NOT

17  MATERIALLY DIFFERENT THAN THE OLD LETTER.  THEY CERTAINLY MADE

18  SOME TWEAKS.

19         **THE COURT:**  BUT, I MEAN, YOU SAY "TWEAKS," BUT, YOU

20  KNOW, THE THRESHOLD QUESTION IS CAN THE DEFENDANTS BE HAULED

21  INTO COURT UNDER -- BASED ON AN FDCPA CLAIM AT ALL?  RIGHT?

22  ARE THEY A DEBT COLLECTOR?  THAT'S THE FIRST QUESTION.  ARE

23  THEY A DEBT COLLECTOR WITHIN THE MEANING OF THE FDCPA.

24         ONE QUESTION UNDER THE FDCPA IS WHETHER THEY -- THE

25  PROGRAM OPERATES IN COMPLIANCE WITH STATE LAW.  ANOTHER

1    QUESTION UNDER THE FDCPA IS WHETHER THE PROBABLE CAUSE

2    DETERMINATION, AN INDEPENDENT PROBABLE CAUSE DETERMINATION IS

3    MADE BY A DA'S OFFICE, RIGHT?

4            ONE OF THE CHANGES THAT THEY HAVE MADE IS THEY NEED

5    TO GET A -- YOU KNOW, THEY ARE REQUIRING -- IT'S FUNNY TO SAY

6    IT THIS WAY, BUT THEY'RE REQUIRING OR THEY'RE TELLING THE DA'S

7    OFFICES TO CONDUCT SOME SORT OF INDEPENDENT REVIEW AND GIVE

8    THEM PERMISSION --

9            **MS. TERRELL:**  OPEN THEIR EMAIL.

10           **THE COURT:**  TO LOOK AT IT AND TO GIVE SIGNOFF TO SEND

11   A LETTER TO A PARTICULAR INDIVIDUAL, RIGHT?

12           **MS. TERRELL:**  RIGHT.

13           **THE COURT:**  WHO BOUNCED A CHECK.  AND THERE WILL BE

14   QUESTIONS ABOUT WHETHER, AS PART OF THAT PROCESS, DA'S ARE

15   MAKING PROBABLE CAUSE -- ARE ACTUALLY MAKING PROBABLE CAUSE

16   DETERMINATIONS.

17           **MS. TERRELL:**  AND YOU WON'T BE SURPRISED THAT WE

18   DON'T BELIEVE THAT PROCESS IS SUFFICIENT EVEN UNDER THE NEW --

19           **THE COURT:**  RIGHT.  BUT IT'S A NEW POLICY.  IT'S A

20   NEW APPROACH.  IT MAY VERY WELL BE INSUFFICIENT.  I WOULDN'T BE

21   SURPRISED AT ALL IF IT WERE INSUFFICIENT, RIGHT?  BUT IT'S A

22   NEW -- IT'S A NEW POLICY, IT'S A NEW APPROACH, AND IT'S AN

23   APPROACH THAT THE NAMED PLAINTIFFS HAVE NOT BEEN SUBJECTED TO.

24           AND SO I HAVE A HARD TIME UNDERSTANDING WHY -- AGAIN,

25   IF I CONCLUDE THAT THERE IS NO STANDING TO SEEK INJUNCTIVE

```
 1   RELIEF, I HAVE A HARD TIME UNDERSTANDING -- OR MAYBE EVEN IF I
 2   DO CONCLUDE THAT THERE WOULD BE STANDING TO SEEK INJUNCTIVE
 3   RELIEF, I HAVE A HARD TIME UNDERSTANDING WHY THE NAMED
 4   PLAINTIFFS WOULD BE ABLE TO -- WHY THE NEW LETTER SHOULD BE
 5   PART OF THIS CASE GIVEN WHO THE NAMED PLAINTIFFS ARE.
 6         MS. TERRELL:  AND I UNDERSTAND THE CONCERN.  I DO
 7   THINK THAT THE PRODUCTS CASES ARE A GOOD PLACE TO START BECAUSE
 8   THAT'S WHY I WAS FOCUSING ON THE LACK OF DIFFERENCE BETWEEN --
 9         THE COURT:  I MEAN, THOSE CASES ARE VERY -- THAT'S
10   LIKE YOU GO TO TRADER JOES, AND YOU HAVE COOKIES THAT SAY "ALL
11   NATURAL," BUT THEY HAVE THESE TWO INGREDIENTS IN IT THAT THE
12   PLAINTIFF CONTENDS ARE NOT ALL NATURAL, AND THEN THEY HAVE
13   THESE TEN OTHER INGREDIENTS THAT SAY "ALL NATURAL," BUT THEY
14   HAVE THE SAME TWO INGREDIENTS.  THAT, IT SEEMS TO ME, IS VERY
15   DIFFERENT FROM THIS, WHICH IS TO USE THE ANALOGY, THEY'RE
16   DIFFERENT INGREDIENTS.  IT MAY BE YOU MAY THINK THAT THE
17   INGREDIENTS ARE JUST AS UNNATURAL AS THE PREVIOUS INGREDIENTS
18   BUT THEY'RE DIFFERENT INGREDIENTS, AND SO IT'S A DIFFERENT
19   QUESTION.
20         I WOULD THINK IN THAT TYPE OF FOOD LABELING CASE, FOR
21   EXAMPLE, THAT WE WOULD SAY, NO, THAT THOSE ARE DIFFERENT
22   INGREDIENTS, AND YOU DIDN'T BUY A PRODUCT -- YOU DIDN'T BUY A
23   PRODUCT WITH THOSE DIFFERENT INGREDIENTS WHERE THE LABEL SAYS
24   "ALL NATURAL," AND SO WE'RE NOT GOING TO LET THAT BE PART OF
25   THIS CLASS ACTION LAWSUIT.
```

1          **MS. TERRELL:**  BUT THAT HASN'T BEEN WHAT ALL THE

2    COURTS HAVE DONE.

3          BUT LET ME -- LET ME BACK UP -- AND I KNOW YOU WANTED

4    ME TO SET ASIDE THE STATE LAW CLAIM, BUT THAT'S CRITICAL TO WHY

5    WE BELIEVE OUR CURRENT PLAINTIFFS CAN REPRESENT THE CLASS

6    MEMBERS THAT ONLY RECEIVED THE POST-CFPB LETTERS, BECAUSE IN

7    ORDER -- AS YOUR HONOR SAID, IN ORDER FOR THE FDCPA TO NOT

8    APPLY, RIGHT, TO THE DEFENDANTS AND TO BE OUT FROM UNDER ITS

9    RESTRICTIONS, THEY HAVE TO SHOW THAT THEY'VE COMPLIED WITH THE

10   PENAL CODE, AND KEY AMONG THAT -- OUR BIG ISSUE IS THEY ARE

11   CHARGING FEES THEY'RE NOT ALLOWED TO CHARGE UNDER THE

12   CALIFORNIA STATE PENAL CODE THAT HAS SET UP THESE PROGRAMS.

13          TO ME THAT IS THE CORE OF THE CASE, WHETHER YOU'RE

14   PRE OR POST-CFPB CONSENT DECREE, AND THAT'S WHY IT DOESN'T

15   MATTER WHETHER OUR CURRENT PLAINTIFFS RECEIVED THE OTHER

16   LETTERS.

17          **THE COURT:**  BUT THAT STATEMENT THAT YOU JUST MADE

18   STANDS FOR THE PROPOSITION THAT WE SHOULD CERTIFY A CLASS THAT

19   INCLUDES PEOPLE WHO RECEIVE THE LETTER PRE-SETTLEMENT AND POST

20   SETTLEMENT TO DECIDE THE FEE ISSUE, RIGHT?

21          **MS. TERRELL:**  THAT'S ONE OF THE LEGAL ISSUES THAT WE

22   SHOULD --

23          **THE COURT:**  RIGHT?

24          **MS. TERRELL:**  -- WE SHOULD DECIDE, THAT'S CORRECT.

25          **THE COURT:**  SO FAR WHAT YOU'VE SAID SUGGESTS MAYBE WE

1    COULD CERTIFY A CLASS, PEOPLE WHO RECEIVE BOTH THE OLD AND THE

2    NEW LETTER, TO RESOLVE THIS FEE ISSUE.  AND THE ANSWER MAY VERY

3    WELL BE THAT THEY ARE -- THEY'RE NOT PRECLUDED FROM CHARGING

4    THESE FEES, AND SO THE CLASS LOSES ON THAT QUESTION.  OR MAYBE

5    THE ANSWER WILL BE THAT THEY ARE PRECLUDED FROM CHARGING FEES

6    AND THE CLASS WINS ON THE QUESTION.

7            **MS. TERRELL:**  BUT THE OUTCOME IS NO DIFFERENT FOR

8    EITHER SET OF LETTERS.

9            **THE COURT:**  BUT -- THE OUTCOME IS NO DIFFERENT FOR

10   EITHER SET OF LETTERS.  ALL RIGHT, I UNDERSTAND THAT.

11           BUT THERE ARE A NUMBER OF OTHER ISSUES THAT YOU ARE

12   PURSUING IN THIS CASE.  SO ARE YOU -- ARE YOU SUGGESTING THAT

13   AT LEAST AS IT RELATES TO A CLASS OF, YOU KNOW, PEOPLE WHO

14   RECEIVED EITHER THE OLD LETTER OR THE NEW LETTER, WE SHOULD

15   JUST CERTIFY A CLASS FOR THE PURPOSES OF DECIDING THAT ONE

16   ISSUE, OR ARE THERE OTHER ISSUES THAT COULD BE DECIDED ON

17   BEHALF OF THAT CLASS?

18           OR, TO PUT IT ANOTHER WAY, ARE THE NAMED PLAINTIFFS

19   WHO RECEIVED THE OLD LETTER QUALIFIED OR DO THEY HAVE STANDING

20   TO REPRESENT A NEW CLASS ON ANY OTHER ISSUE?

21           **MS. TERRELL:**  I BELIEVE THE OLD PLAINTIFFS ARE ABLE

22   TO REPRESENT THE NEW CLASS ON ALL OF THE ISSUES.  IF YOU FOCUS

23   AT -- ON THE DIFFERENCES BETWEEN THE LETTERS --

24           **THE COURT:**  HOW COULD THEY REPRESENT THEM ON THE

25   PROBABLE CAUSE ISSUE?  I DON'T UNDERSTAND HOW THEY COULD

```
 1   REPRESENT THEM ON THE PROBABLE CAUSE ISSUES.

 2          MS. TERRELL:  I GUESS I'M STRUGGLING A LITTLE BIT

 3   WITH THE VERY STRICT VERSION OF STANDING THAT YOU'RE APPLYING,

 4   BECAUSE WHEN I LOOK AT IT IN TERMS OF ADEQUACY AND CLASS

 5   CERTIFICATION ISSUES, IS THERE REALLY -- ARE THEIR INTERESTS

 6   ALIGNED ON THAT ISSUE?  THEY ARE.  THE EVIDENCE MAY BE SOMEWHAT

 7   DIFFERENT, BUT THERE ISN'T A CONFLICT BETWEEN AND AMONG THOSE

 8   CLASS MEMBERS AS TO THE OUTCOME; IN OTHER WORDS -- AND IT MIGHT

 9   BE THAT FOR SOME OF THE LETTERS -- SOME OF THE PROGRAM THAT

10   YOU'LL FIND, THAT THERE WASN'T A PROBABLE CAUSE DETERMINATION,

11   AND POST-CFPB THEY CLEANED IT UP AND HAVE TO CHANGE IT, BUT

12   THERE'S NO ANTAGONISM THERE.  IT'S JUST A DIFFERENT --

13          THE COURT:  THAT MIGHT BE TRUE, BUT -- BUT THIS IS A

14   QUESTION OF STANDING.  I MEAN THE QUESTION IS, YOU KNOW, IS,

15   YOU KNOW, THE CONDUCT THAT IS -- IN OTHER WORDS, WE MAY BE --

16   IT MAY BE THAT THEY WOULD HAVE TO HAVE SUBCLASSES, RIGHT, AND

17   YOU SAID THAT -- OR YOUR COLLEAGUE SAID THAT OUT LOUD.  I CAN'T

18   REMEMBER WHO SAID THAT OUT LOUD.

19          BUT THERE WOULD PROBABLY NEED TO BE SUBCLASSES,

20   RIGHT, OF PEOPLE WHO RECEIVED THE OLD LETTER AND PEOPLE WHO

21   RECEIVED THE NEW.  THAT SEEMS SORT OF INTUITIVE TO ME -- I

22   DON'T WANT TO SAY OBVIOUS, BUT AT A MINIMUM IT SEEMS INTUITIVE

23   AND LIKELY THAT YOU WOULD NEED SUBCLASSES, AND THE REASON YOU

24   WOULD NEED SUBCLASSES IS BECAUSE THEY PRESENT A DIFFERENT SET

25   OF ISSUES.
```

1           BUT IF YOU HAVE SUBCLASSES, DON'T YOU NEED TO HAVE A

2     NAMED PLAINTIFF REPRESENTING BOTH SUBCLASSES?

3           **MS. TERRELL:**  IF WE'RE GOING TO HAVE TRUE SUBCLASSES,

4     THEN I WOULD AGREE THAT YOU NEED TO HAVE SEPARATE PLAINTIFFS

5     REPRESENTING EACH SUBCLASS.

6           **THE COURT:**  OKAY.  BUT YOU DON'T HAVE A NAMED

7     PLAINTIFF, AND YOU SAID THESE WOULD NEED TO BE -- OR YOU

8     SUGGESTED THESE NEED TO BE IN SUBCLASSES.

9           **MS. TERRELL:**  I PERSONALLY AM NOT CONVINCED THAT THEY

10    NEED TO BE SUBCLASS, I GUESS, BECAUSE I HAVE CONSTRUCTION

11    DEFECT PRODUCT CLASSES GET CERTIFIED WHERE THE INSTALLATION

12    INSTRUCTIONS AND THE WARRANTIES HAVE CHANGED OVER THE YEARS,

13    AND THE FACT THAT THERE'S GOING TO BE SOME DIFFERENT EVIDENCE

14    OFFERED UP DURING DIFFERENT PERIODS OF TIME DOESN'T GO TO THE

15    DEFECT ISSUE ITSELF, AND SO WE'VE HAD THE ABILITY TO HAVE ONE

16    OR MORE CLASS REPS, NOT ONE FROM EVERYTHING SINGLE TRANCHE THAT

17    IS AFFECTED BY THE PRODUCT.

18          **THE COURT:**  BUT IF THERE IS A SIGNIFICANT POSSIBILITY

19    THAT THE ANSWER COULD BE "YES" AS TO ONE SUBCLASS AND THE

20    ANSWER COULD BE "NO" AS TO ANOTHER SUBCLASS, THEN IT SEEMS TO

21    ME THERE HAS TO BE SOMEBODY REPRESENTING BOTH -- IF THERE'S A

22    SIGNIFICANT POSSIBILITY THAT THE ANSWER COULD BE "YES" IN ONE

23    INSTANCE AND "NO" IN ANOTHER INSTANCE, THEN THERE NEEDS TO BE

24    SUBCLASSES.

25          **MS. TERRELL:**  SO --

1          **THE COURT:**  AND IF THERE NEEDS TO BE SUBCLASSES, AND

2     IF THE ANSWER COULD BE "YES" FOR ONE SUBCLASS AND "NO" FOR THE

3     OTHER SUBCLASS, THEN YOU NEED A PLAINTIFF -- A NAMED PLAINTIFF

4     FOR EACH SUBCLASS.  IF THAT'S YOUR ANSWER, THEN I AGREE WITH

5     THAT.

6          I TEND TO THINK THE ISSUE CAN REALLY BE BOILED DOWN

7     TO THE FEES, BECAUSE THAT REALLY DRIVES THE ENTIRE ANALYSIS,

8     AND THE OTHER ISSUES ARE MINOR ENOUGH THAT THERE ARE

9     DIFFERENCES IN EVIDENCE AS OPPOSED TO --

10         **MS. TERRELL:**  WELL, THEN WE WOULDN'T CERTIFY THOSE --

11    I MEAN, IF THAT'S TRUE AS TO THE PROBABLE CAUSE QUESTION, THEN

12    THAT MEANS WE WOULDN'T CERTIFY A CLASS ON THAT QUESTION, OR AT

13    LEAST WE WOULDN'T CERTIFY A CLASS CONSISTING BOTH OF PEOPLE WHO

14    RECEIVED THE OLD AND THE NEW LETTER.  THAT WOULD OBVIOUSLY NOT

15    BE THE OUTCOME WE WOULD HOPE FOR.  WE HAVE BEEN IN CONTACT WITH

16    NAMED --

17         **THE COURT:**  WHAT YOU HOPE FOR I DON'T THINK MATTERS.

18         **MS. TERRELL:**  WELL.

19         **THE COURT:**  WHAT MATTERS IS LEGALLY WHAT IS

20    APPROPRIATE.  I MEAN --

21         **MS. TERRELL:**  SO THAT WAS A BAD SEGUE TO -- WE HAVE A

22    SOLUTION THAT IS DIFFERENT THAN EITHER DOING A VERY SMALL ISSUE

23    CERTIFICATION CLASS JUST FOCUSED ON THE FEES OR NOT BEING ABLE

24    TO CERTIFY SOME OF THE ISSUES THAT WE THINK ARE IMPORTANT, NOT

25    ONLY TO THE EXISTING CLASS, BUT TO THE POST-CFPB CLASS, AND

1   THAT IS WE DO HAVE PLAINTIFFS WHO ARE WILLING TO COME IN AND

2   SERVE AS CLASS REPRESENTATIVES WHO RECEIVED THE POST-CFPB

3   CONSENT DECREE LETTER.  AND SO WE WOULD OFFER THAT UP AS A

4   SOLUTION.

5           **THE COURT:**  BUT WHY ARE YOU OFFERING THAT UP NOW?  I

6   MEAN THIS CASE -- WHEN WAS THIS CASE FILED?

7           **MS. TERRELL:**  WELL, IT WAS FILED IN 2014.

8           **THE COURT:**  YEAH.  I MEAN, THIS CASE WAS FILED IN

9   2014.  WE'VE HAD SO MUCH MOTION PRACTICE.  I MEAN, WHY -- WHY

10  WOULDN'T -- WHY ARE YOU JUST RAISING THIS NOW?  I MEAN, YOU --

11  I MEAN, IT SEEMS LIKE A FAIRLY -- IT SEEMS LIKE AN ISSUE THAT

12  WOULD JUMP OUT EARLY ON.  YOU KNOW, THEY CHANGED THE POLICY,

13  THEY CHANGED THE LETTER, AND YOU ONLY HAVE NAMED PLAINTIFFS WHO

14  RECEIVED THE OLD LETTER AND WERE RUN THROUGH THE PROGRAM UNDER

15  THE OLD APPROACH.

16          **MS. TERRELL:**  WELL, WE HAVE BEEN ENMESHED IN A LOT OF

17  DISPOSITIVE MOTIONS AND TAKEN A TRIP UP TO THE NINTH CIRCUIT,

18  YOUR HONOR.

19          SO, IT WAS NOT CLEAR AT THE BEGINNING OF THE CASE.

20  WE DIDN'T KNOW THE CFPB WAS GOING TO DO ITS SETTLEMENT.  WE

21  DIDN'T KNOW WHAT THE EFFECT OF IT WAS.  WE'VE ONLY RECENTLY

22  TAKEN THE DISCOVERY, AND THERE ACTUALLY IS SOME MORE DISCOVERY

23  TO BE TAKEN ALONG THOSE LINES.  WE DID ASK YOUR HONOR TO REOPEN

24  DISCOVERY SO WE COULD FINISH THAT UP.

25          WE THOUGHT WE WOULD GET THE MOTION FOR CERTIFICATION

1    ON FILE.  WE APOLOGIZE FOR NOT ANTICIPATING THAT ISSUE.  BUT WE

2    WOULD ASK FOR THE ABILITY TO ADD A NAMED PLAINTIFF WHO CAN

3    REPRESENT THAT POST-CFPB CLASS IF YOUR HONOR BELIEVES THAT'S

4    NECESSARY.

5           **THE COURT:**  I MEAN, MAYBE -- BUT MAYBE THE ANSWER

6    SHOULD BE -- I MEAN, IF THERE'S -- IF THERE'S PLAINTIFF WHO

7    REPRESENTS THE POST CFPB WHO COULD REPRESENT POST-CFPB CLASS,

8    MAYBE THE ANSWER IS, YOU KNOW, WE'VE BEEN GOING ON WITH THIS

9    LAWSUIT FOR SO LONG, AND WE ARE HERE AT A HEARING ON A MOTION

10   FOR CLASS CERTIFICATION, AND THIS PROBLEM HAS NOT BEEN

11   ADDRESSED, MAYBE THE ANSWER IS IF THERE'S SOMEBODY OUT THERE

12   WHAT WANTS TO BE A NAMED PLAINTIFF IN A PROPOSED CLASS ACTION

13   AGAINST THE DEFENDANT OR THE POST-CFPB LETTER AND THE WAY THE

14   PROGRAMS OPERATE POST-CFPB, FILE THAT LAWSUIT, AND WE WILL DEAL

15   HERE WITH WHAT THIS LAWSUIT WAS ORIGINALLY ABOUT AND WHAT THE

16   NAMED PLAINTIFFS IN THIS LAWSUIT ARE ABOUT, WHICH IS THE

17   PRE-CFPB LETTER.

18           **MS. TERRELL:**  WELL, THAT GOES BACK TO MY ORIGINAL

19   POINT, WHICH IS IT'S REALLY ALL ABOUT THE SAME THING, WHICH IS

20   THE DEFENDANTS ARE RUNNING A CHECK DIVERSION PROGRAM THAT

21   DOESN'T COMPLY WITH CALIFORNIA LAW AND THAT VIOLATES THE

22   FEDERAL FDCPA, REGARDLESS OF THE FACT THAT -- I KNOW IT SEEMS

23   LIKE IT'S A MUCH -- I KNOW YOUR HONOR BELIEVES IT'S A MAJOR

24   THING THAT THE CFPB DID, BUT THE CHANGES THAT HAPPENED AFTER

25   THAT CONSENT DECREE ARE NOT MATERIAL ENOUGH TO JUSTIFY CREATING

```
1    ADDITIONAL LITIGATION.

2              THE COURT:  I DON'T KNOW.  IT SEEMS PRETTY

3    SIGNIFICANT -- I MEAN, IT SEEMS SIGNIFICANT TO ME AS A FACTUAL

4    MATTER WHETHER -- YOU KNOW WHETHER -- WHETHER THE CHANGES ARE

5    ENOUGH TO GET, YOU KNOW, THE DEFENDANTS IN COMPLIANCE WITH THE

6    LAW IS ANOTHER QUESTION, BUT IT SEEMS THE CHANGES WERE -- IN

7    YOUR COMPLAINT YOU CAME IN HERE ORIGINALLY -- YOU KNOW, THE

8    THING YOU KEPT YELLING ABOUT WAS THAT THEY WERE DOING IT ON DA

9    LETTERHEAD AND UNDER THE NAME OF THE DA, RIGHT?

10             MS. TERRELL:  AND THEY STILL DO.

11             THE COURT:  THE NEW LETTER -- I THOUGHT THE NEW

12   LETTER DID NOT HAVE THE DA --

13             MS. TERRELL:  NO.  SO LET ME WALK THROUGH THOSE

14   CHANGES, WHICH I THINK IS PROBABLY WHAT MY COLLEAGUE IS HOPING

15   I WOULD DO, AND THE LETTERS ARE IN THE RECORD, AND THAT'S WHY I

16   THINK IT'S JUST NOT MATERIAL.

17             SO WHAT THEY DID IS, IT'S STILL ON THE LETTERHEAD OF

18   THE DA.

19             THE COURT:  I'M LOOKING AT -- SO I'M LOOKING -- I

20   JUST PICKED GLENN COUNTY AS AN EXAMPLE.

21             MS. TERRELL:  THEY'VE ADDED THE REFERENCE TO VSI.

22             THE COURT:  RIGHT.  IT SAYS:

23                  "VICTIM SERVICES, INC., PROGRAM

24             ADMINISTRATOR OF GLENN COUNTY DISTRICT

25             ATTORNEY BAD CHECK RESTITUTION PROGRAM."
```

1          AND THEN, YOU KNOW, THE LANGUAGE OF THE LETTER HAS

2    BEEN CHANGED TO MAKE CLEAR THAT IT'S -- THAT IT'S NOT UNDER THE

3    NAME OF THE DISTRICT ATTORNEY.  PREVIOUSLY IT WAS SIGNED BY THE

4    DISTRICT ATTORNEY.  IT WAS ON THE DISTRICT ATTORNEY LETTERHEAD.

5    I BELIEVE THE PREVIOUS LETTER SAID, YOU KNOW, I HAVE

6    DETERMINED -- OR WE HAVE DETERMINED THAT YOU ARE...

7          NOW IT DOESN'T DO ANY OF THAT.  IT'S NOT ON THE DA'S

8    LETTERHEAD.  IT'S GOT THIS WEIRD PATCH, BUT IT'S GOT, YOU KNOW,

9    (INDISCERNIBLE) LETTER IS PRETTY CLEAR WHO THE LETTER IS FROM.

10   IT'S GOT THIS THING AT THE BOTTOM OF THE FIRST PAGE THAT'S

11   UNDERLINED AND IN BOLD THAT SAYS.

12                     "THIS COMMUNICATION IS FROM VICTIM

13             SERVICES, INC., A PRIVATE ENTITY

14             ADMINISTERING A BAD CHECK RESTITUTION

15             PROGRAM."

16          I MEAN YOU -- UNDER CONTRACT WITH THE GLENN COUNTY

17   DISTRICT ATTORNEY'S OFFICE -- I MEAN, YOU'RE JUST KIND OF

18   WAVING YOUR HAND AT ALL THOSE CHANGES.  AS A FACTUAL MATTER,

19   THOSE ARE SIGNIFICANT CHANGES.  AS A LEGAL MATTER, WHETHER THEY

20   CARRY THE DAY IN THE END, I DON'T KNOW, BUT THEY ARE

21   SIGNIFICANT AS A FACTUAL MATTER.  AND FOR YOU TO SAY -- FOR YOU

22   TO ANALOGIZE THIS LETTER -- YOU KNOW, THE DIFFERENCE BETWEEN

23   THESE TWO LETTERS TO THE DIFFERENCE BETWEEN, YOU KNOW, ONE

24   PRODUCT THAT SAYS "ALL NATURAL" WITH TWO INGREDIENTS AND THEN A

25   DIFFERENT PRODUCT THAT SAYS "ALL NATURAL" WITH THE SAME TWO

```
 1   INGREDIENTS, ABSOLUTELY NOT.  SO -- SO I DON'T -- YOU KNOW,
 2   IT'S NOT ON DA LETTERHEAD, AND IT'S NOT THE SAME LETTER.
 3            MS. TERRELL:  WELL --
 4            THE COURT:  SO WHAT -- LET ME ASK YOU AGAIN.
 5            MS. TERRELL:  YEAH.
 6            THE COURT:  I MEAN, OTHER THAN -- OTHER THAN THE
 7   FEES -- OTHER THAN THE FEE ISSUE, WHAT OTHER ISSUE IS AMENABLE
 8   TO ESSENTIALLY TREATMENT AS PART OF THE SAME CLASS?
 9            MS. TERRELL:  WE BELIEVE THE LANGUAGE, ALTHOUGH IT
10   HAS BEEN CHANGED, STILL HAS AN IMPLIED PROSECUTORIAL THREAT AND
11   THE LANGUAGE IS DIFFERENT AND IT'S NOT AS --
12            THE COURT:  AND THE ANSWER -- AND YOU COULD BE RIGHT
13   ABOUT THAT, OR YOU COULD BE WRONG ABOUT THAT, BUT THEY ARE
14   DIFFERENT ENOUGH THAT YOU COULD BE WRONG ABOUT THAT.  THEY ARE
15   DIFFERENT ENOUGH, THE ANSWER COULD BE "YES" AS TO THE OLD
16   LETTER AND "NO" AS TO THE NEW LETTER, AND, THEREFORE, THEY
17   CAN'T BE PART OF THE SAME CLASS, AND THEY CAN'T HAVE THE SAME
18   CLASS REPRESENTATIVES.  THAT'S THE PROBLEM.  SO SHOULD WE JUST
19   BE -- SO I GUESS MY QUESTION IS:  SHOULD WE SAY -- FOR PURPOSES
20   OF THIS DISCUSSION SHOULD WE SAY:  OKAY, MAYBE WE WILL CERTIFY
21   A BROADER CLASS FOR PURPOSES OF ADJUDICATING THIS FEE QUESTION,
22   MAYBE.  THEY HAVEN'T HAD A CHANCE TO RESPOND ON THAT ISSUE YET.
23   BUT AS FAR AS OTHER ISSUES THAT THE PLAINTIFFS ARE PRESENTING
24   IN THIS CASE IT WOULD -- IT WOULD ONLY POTENTIALLY BE A
25   NARROWER CLASS OF PEOPLE WHO RECEIVE THE OLD LETTER.  IS
```

1   THAT -- DOES IT MAKE SENSE TO PROCEED THAT WAY?

2           **MS. TERRELL:**  YOUR HONOR, I THINK WE COULD PROCEED

3   THAT WAY.  WE COULD CERTAINLY DO NARROWER CLASSES BASED ON THE

4   VARIOUS TYPES OF VIOLATIONS OF THE FDCPA.  I TEND TO THINK IT

5   MAKES MORE SENSE TO GIVE US A SHORT PERIOD OF TIME TO BRING IN

6   A NEW PLAINTIFF SO EVERYTHING IS HERE.  IT WON'T BE THAT MUCH

7   MORE COMPLICATED.  IT'S ONE DEPOSITION FOR THEM TO TAKE.

8           **THE COURT:**  SO WHY NOT JUST -- MAYBE THE NEW -- IF

9   THERE'S A PLAINTIFF OUT THERE, THEY CAN JUST FILE ANOTHER

10  LAWSUIT.  I MEAN, WHAT'S THE -- WHY -- WE HAVE BEEN GOING ON

11  AND ON WITH THIS FOR YEARS, RIGHT?  AND, YOU KNOW, AGAIN, THE

12  PRIMARY THING THAT YOU'VE ALWAYS COMPLAINED OF WAS THE STUFF

13  THAT WAS IN THE OLD LETTER AND THE FEES.  WHY DON'T WE JUST

14  PLOW AHEAD ON THAT STUFF?

15          **MS. TERRELL:**  AND THE LACK OF PROBABLE CAUSE

16  DETERMINATION I UNDERSTAND HAS CHANGED A LITTLE BIT, BUT THE

17  BASIC ANALYSIS OF THE TYPES OF VIOLATIONS THAT WE BELIEVE ARE

18  IN THE LETTERS ARE SIMILAR.  IT'S JUST THE FACTS ARE A LITTLE

19  BIT DIFFERENT.  THEIR PROBABLE CAUSE DETERMINATION HAS BEEN

20  TWEAKED A LITTLE BIT.  WE STILL BELIEVE IT'S INADEQUATE AND

21  DOESN'T GIVE THEM THE RIGHT TO BE OUT FROM UNDER THE CFPB, AND

22  THE FEES IS A BIG ONE.

23          SO, IT SEEMS THAT FROM A JUDICIAL ECONOMY -- THEY

24  HAVEN'T EVEN ANSWERED THE COMPLAINT, YOUR HONOR.  THEY'RE HERE

25  ON TWO 12(B)(6)S.  I UNDERSTAND IT'S A 2014 CASE, BUT THE DELAY

1    HAS NOT BEEN ON OUR PART.

2         **THE COURT:**  BUT THAT'S NOT -- THAT'S NOT THEIR FAULT.

3    I MEAN, YOU WANTED TO ADD NEW DEFENDANTS.  YOU WERE ALLOWED TO

4    ADD NEW DEFENDANTS, AND THEY HAVE A RIGHT TO FILE A MOTION TO

5    DISMISS IT.

6         **MS. TERRELL:**  THEY MOVED TO DISMISS AND FILED A SLAPP

7    MOTION, AND WE HAD TO GO UP TO THE NINTH CIRCUIT.

8         I'M NOT TRYING TO ASSIGN BLAME.  I'M JUST SAYING THE

9    FACT THAT IT'S A 2014 CASE DOESN'T NECESSARILY CHANGE THE

10   ANALYSIS OF WHETHER IT MIGHT BE BETTER FOR JUDICIAL ECONOMY TO

11   LET SOMEONE COME IN AND JOIN THIS CASE, REPRESENT THOSE PEOPLE

12   WHO HAVE ANY MATERIAL DIFFERENT SITUATIONS THAN THOSE WE

13   ALREADY HAVE IN THE CASE, AND WE WOULD JUST ASK THAT YOUR HONOR

14   ALLOW US TO DO THAT.  IT SEEMS TO ME THAT'S THE CLEANEST PATH

15   FORWARD, AND WE WILL DO EVERYTHING WE CAN TO MOVE AS QUICKLY AS

16   WE CAN TO MAKE THAT HAPPEN.

17        **THE COURT:**  OKAY.  LET'S TAKE A FIVE-MINUTE BREAK,

18   AND THEN I'LL HEAR FROM THE DEFENDANTS.

19        (RECESS TAKEN FROM 11:57 A.M. UNTIL 12:07 P.M.)

20        (THE FTR AUDIO RECORDING RESUMED AT 12:07, WHICH

21         APPEARS TO BE AFTER PROCEEDINGS BEGAN.)

22        **THE COURT:**  ...AND WHAT WE REALIZED IS ALL THIS STUFF

23   ABOUT THE WRITTEN POLICY, BASED ON A WRITTEN POLICY, THE POLICY

24   HAS CHANGED SINCE -- SINCE THE NAMED PLAINTIFFS WERE DRAGGED

25   INTO THIS.

1            AGAIN, HAS IT CHANGED IN A WAY THAT IS -- YOU KNOW,

2    MEANS THAT THE LEGAL ANSWER WILL BE DIFFERENT?  I DON'T KNOW.

3    HAS IT CHANGED IN A FACTUAL WAY?  YOU KNOW, IN A REAL WAY, AS

4    OPPOSED TO AN IMMATERIAL WAY?  YES.

5            SO I THINK IT IS, YOU KNOW, VERY, VERY UNLIKELY THAT

6    THERE IS STANDING TO SEEK INJUNCTIVE RELIEF IN THIS CASE.  I

7    WILL THINK ABOUT IT A LITTLE MORE.  I'LL READ THOSE CASES.

8            I ALSO THINK IT WOULD BE VERY IMPRACTICAL TO CERTIFY

9    A CLASS ON THE FDCPA CLAIM JUST ON THE ISSUE OF FEES, BECAUSE

10   IF -- IF YOU CERTIFIED A CLASS OF BOTH PEOPLE WHO RECEIVED THE

11   OLD LETTER AND PEOPLE WHO RECEIVED THE NEW LETTER JUST ON THE

12   ISSUE OF FEES FOR FDCPA PURPOSES, AND YOU ANSWER THAT QUESTION,

13   BUT IT DOESN'T MATERIALLY ADVANCE THE LITIGATION, I SUPPOSE

14   IF -- IF THE ANSWER IS THAT THE FEES ARE BEING COLLECTED

15   UNLAWFULLY, THEN THE DEFENDANT IS NOT A DEBT COLLECTOR AND --

16   SORRY.  IF THE FEES ARE BEING COLLECTED UNLAWFULLY, THEN THE

17   DEFENDANT IS A DEBT COLLECTOR AND COULD POTENTIALLY BE LIABLE

18   UNDER THE FDCPA, BUT WE STILL DON'T KNOW IF THE DEFENDANT IS

19   LIABLE UNDER THE FDCPA BECAUSE THAT WILL DEPEND ON WHETHER THE

20   NEW LETTER IS MISLEADING AND ALL THAT STUFF.

21           **MS. TERRELL:**  THERE IS ONE CAVEAT.  I HATE TO

22   INTERRUPT.

23           **THE COURT:**  NO, IT'S OKAY.

24           **MS. TERRELL:**  BUT ONE CAVEAT IS THERE IS ANOTHER

25   ISSUE THAT'S COMMON BETWEEN THE TWO LETTERS THAT IS CRITICAL,

1    WHICH IS NEITHER ONE OF THEM HAVE AN (E)11 DISCLOSURE, WHICH IS

2    THE DISCLOSURE THAT THE LETTER IS COMING FROM A DEBT COLLECTOR.

3         **THE COURT:**  THAT BEGS THE QUESTION, THOUGH, THAT BEGS

4    THE QUESTION WHETHER IT IS -- WHETHER THE DEFENDANT IS A DEBT

5    COLLECTOR.

6         **MS. TERRELL:**  RIGHT.  BUT IF YOU -- IF YOU ANSWER THE

7    FEE QUESTION, THEN THEY ARE A DEBT COLLECTOR, AND THAT IS A

8    VIOLATION.

9         **THE COURT:**  BUT IF YOU SAY THE FEES ARE PERMISSIBLE

10   UNDER CALIFORNIA LAW -- YOU CERTIFY THAT CLASS AND YOU SAY THAT

11   THE FEES ARE PERMISSIBLE UNDER CALIFORNIA LAW, THEN WE'VE

12   GOTTEN NOWHERE.  THEN WE'VE GOTTEN NOWHERE.  SO IT REALLY

13   DOESN'T MAKE SENSE TO DO THAT.

14        REALLY, THE TWO ALTERNATIVES HERE, ASSUMING I

15   CONTINUE TO BELIEVE WHAT I BELIEVE AS I SIT HERE RIGHT NOW,

16   WHICH IS THERE'S NO STANDING TO SEEK INJUNCTIVE RELIEF, THERE

17   ARE REALLY TWO ALTERNATIVES.  ONE IS TO POTENTIALLY PROCEED

18   WITH A CLASS OF PEOPLE WHO GOT THE OLD LETTER, AND I DON'T SEE

19   ANY SIGNIFICANT REASON NOT TO CERTIFY THAT CLASS, I'LL LET THEM

20   TALK ABOUT THAT.  THAT WOULD BE ONE OPTION.

21        OR THE OTHER OPTION WOULD BE TO ALLOW YOU TO BRING IN

22   A PLAINTIFF -- A NEW PLAINTIFF THAT THE LATE STAGE, AND THAT'S

23   REALLY -- SO THAT'S -- THAT'S THE FIRST QUESTION, I GUESS, FOR

24   THE DEFENDANT IS, YOU KNOW, THEY'VE REQUESTED TO BRING IN A NEW

25   NAMED PLAINTIFF AT THIS LATE STAGE TO PERMIT THEM TO CERTIFY A

1    LARGER CLASS AND BREAK IT UP INTO SUBCLASSES OF PEOPLE WHO

2    RECEIVED THE OLD LETTER AND PEOPLE WHO RECEIVED THE NEW LETTER.

3           WHAT'S YOUR POSITION ON THAT?  I WILL SAY, BY THE

4    WAY, THAT YOU WILL -- YOU'RE GOING TO GET -- IT SOUNDS LIKE YOU

5    MAY GET SUED ON THAT REGARDLESS, RIGHT?

6           **MR. TAITELMAN:**  THAT'S A HARD QUESTION, YOUR HONOR.

7           AND FIRST OF ALL, GOOD MORNING -- GOOD AFTERNOON,

8    ACTUALLY.  IT'S A HARD QUESTION THAT HAS NOT COME UP, AND SO I

9    REALLY HAVE NOT HAD UNTIL NOW THE OPPORTUNITY TO CONSIDER IT.

10          I HAVE, OF COURSE, THOUGHT ABOUT THE FACT THERE ISN'T

11   STANDING TO PURSUE THESE POST-CFPB LETTERS BECAUSE NONE OF THE

12   PLAINTIFFS RECEIVED ANY POST-CFPB LETTER.

13          I MEAN, YOU KNOW, THIS WOULD BE SOMETHING I WOULD

14   HAVE TO TALK TO THE CLIENT ABOUT, TALK TO MY COLLEAGUE ABOUT.

15   THERE ARE POTENTIAL DEFENSES THAT I COULD SEE THAT MIGHT APPLY

16   IN A NEW LAWSUIT THAT WOULD NOT APPLY IF A NEW PLAINTIFF WERE

17   ADDED; IN OTHER WORDS, FOR EXAMPLE STATUTE OF LIMITATIONS, A

18   NEW PLAINTIFF CAME IN (INDISCERNIBLE).  I'D HAVE TO REALLY

19   CONSIDER IT.  I'M NOT SUGGESTING I NEED WEEKS TO DO THAT.

20          BUT MY REACTION IS SORT OF LIKE THE COURT'S REACTION:

21   WHY DIDN'T THAT HAPPEN SOONER?  WE HAVE TALKED ABOUT THE FACT

22   THAT THE CFPB LETTERS ARE MARKEDLY DIFFERENT, AND IT'S NOT FAIR

23   AT ALL TO SAY -- I THINK THE COURT WOULD AGREE ON THAT -- IT'S

24   NOT FAIR AT ALL TO SAY THAT THERE ARE MINOR DIFFERENCES.  I

25   MEAN, THE DIFFERENCES ARE OUTLINED IN BULLET POINTS IN THE

1  OPPOSITION.  THERE'S NO COMMUNICATION THAT BEARS THE SIGNATURE

2  OF THE DA.

3  　　　　　THE COURT:  YOU DON'T NEED TO CONVINCE ME --

4  　　　　　MR. TAITELMAN:  FAIR ENOUGH.

5  　　　　　THE COURT:  -- THAT THEY ARE FACTUALLY DIFFERENT.

6  　　　　　MR. TAITELMAN:  FAIR ENOUGH.  AND I AGREE WITH YOU ON

7  THE ISSUE OF CERTIFYING A SUBCLASS THAT -- WITH RESPECT TO THE

8  FEE ISSUE BECAUSE THERE MAY BE OTHER REASONS --

9  　　　　　THE COURT:  YEAH.

10  　　　　　MR. TAITELMAN:  THERE WAS ACTUALLY EVEN A DIFFERENT

11  REASON I HAD ON THAT.

12  　　　　　THE WHOLE POINT HERE ON WHY IT WOULDN'T MAKE SENSE TO

13  CERTIFY ON JUST THAT ISSUE IS THIS ALLEGED COERCION.  THE

14  ARGUMENTS IN THE COMPLAINT, THE ALLEGATIONS ARE THAT THESE

15  LETTERS ARE COERCIVE.  THE CLASS FEE ISSUE, PEOPLE CHOOSE NOT

16  TO COMPLY WITH THE PROGRAM.  IT'S VOLUNTARY.  THE LETTERS STATE

17  THAT.  AND THE DIFFERENCES IN A LETTER POST-CFPB MAKE

18  SOMEONE'S -- THEIR FEELING OF COERCION, IT'S MARKEDLY DIFFERENT

19  WHEN YOU RECEIVE A LETTER THAT SPELLS OUT WHO'S PROVIDING IT,

20  WHAT THE OPTIONS ARE, THAT IT'S VOLUNTARY, ALL THOSE --

21  　　　　　THE COURT:  SO IT SOUNDS LIKE YOU MAY BE ARGUING

22  AGAINST ALLOWING THESE PLAINTIFFS TO PURSUE CLAIMS BASED ON THE

23  NEW LETTER?

24  　　　　　MR. TAITELMAN:  CORRECT.

25  　　　　　THE COURT:  I DON'T THINK YOU NEED TO BE SPENDING

```
 1    YOUR TIME --

 2              MR. TAITELMAN:  FAIR ENOUGH.

 3              THE COURT:  -- ARGUING THAT.

 4          SO THE UPSHOT THAT YOU'RE GIVING ME IS THAT YOU MIGHT

 5    VERY WELL OPPOSE THEIR REQUEST TO BRING IN A NEW PLAINTIFF AT

 6    THIS STAGE WHO RECEIVED THE NEW LETTER, BUT IT'S SOMETHING THAT

 7    YOU WOULD WANT TO THINK ABOUT.

 8              MR. TAITELMAN:  I WOULD WANT TO THINK ABOUT IT.

 9              THE COURT:  OKAY.

10              MR. TAITELMAN:  AND I MIGHT NOT.  I HAVE TO CONSIDER,

11    BECAUSE ANOTHER LAWSUIT DOESN'T NECESSARILY MAKE SENSE UNLESS

12    THERE'S SOME MATERIAL DEFENSE OR OTHER AVENUE THAT WOULD BE A

13    BENEFIT TO MY CLIENT.

14              THE COURT:  OKAY.  RIGHT.

15              MR. TAITELMAN:  I MEAN, WE HAVE BEEN GOING AT THIS

16    FOR A WHILE.

17              THE COURT:  FAIR ENOUGH.  SO I'LL LET YOU THINK ABOUT

18    THAT.  AND REMIND ME, IF I FORGET, WE'LL SET A DEADLINE FOR YOU

19    TO MAKE A SUBMISSION ABOUT THAT.

20          SO LET'S -- LET'S CONTINUE THIS DISCUSSION ON THE

21    ASSUMPTION THAT THE ONLY THING THAT WE'RE CONTEMPLATING AT THIS

22    POINT IS CERTIFYING A CLASS OF PEOPLE WHO RECEIVED THE OLD

23    LETTER.  OKAY?  I DIDN'T REALLY SEE ANY REASON NOT TO CERTIFY

24    THAT CLASS.

25              MR. TAITELMAN:  WELL, MY COLLEAGUE, ACTUALLY, IS THE
```

1    ONE WHO'S HANDLING THAT MOTION, SO I WILL ALLOW MR. HARDY

2    (INAUDIBLE).

3         **MR. HARDY:**  GOOD MORNING, YOUR HONOR.  SEAN HARDY --

4    GOOD AFTERNOON.

5         AGAIN, YOUR HONOR, AT THE OUTSET OF THE CLASS

6    CERTIFICATION ISSUE, I DO THINK IT'S IMPORTANT TO NOTE THAT THE

7    PLAINTIFFS ARE MOVING TO CERTIFY UNDER RULE 23(B)(3).  ALTHOUGH

8    THE COMPLAINT ALLEGED THAT THEY WOULD BE SEEKING TO CERTIFY A

9    CLASS UNDER RULE 23(B)(2) AND A HYBRID CLASS COMBINING THE TWO,

10   THEY HAVEN'T.

11        THEY'VE ADMITTED THAT THEIR REQUEST FOR INJUNCTIVE

12   AND/OR DECLARATORY RELIEF DOES NOT PREDOMINATE HERE.  AND I

13   WOULD JUST REQUEST, PURSUANT TO THE AUTHORITIES STATED IN THE

14   BRIEF, THAT THOSE -- THAT THAT REQUEST BE STRICKEN FROM THE

15   BRIEF SO THEY CAN'T CHANGE THEIR MIND.

16        BUT I DO THINK THE KEY ISSUE FOR THE COURT TO DECIDE

17   IN WHETHER TO CERTIFY A CLASS BASED ON THE PRE-CFPB LETTERS IS

18   THE NINTH CIRCUIT DECISION IN *KAMM V. CALIFORNIA CITY*

19   *DEVELOPMENT*.  THAT GOES TO THE ISSUE OF WHETHER THE CLASS

20   ACTION MECHANISM IS THE SUPERIOR -- IS THE SUPERIOR METHOD OF

21   ADJUDICATING THIS DISPUTE, AND THAT CASE DEALT WITH A VERY --

22        **THE COURT:**  OKAY.  TELL ME WHY IT'S NOT.

23        **MR. HARDY:**  SURE.

24        **THE COURT:**  YOU'RE SAYING SUPERIORITY IS YOUR BEST

25   ARGUMENT?

1             **MR. HARDY:**  I THINK WE SHOULD START THERE, YOUR

2     HONOR.

3             **THE COURT:**  WHAT'S YOUR BEST ARGUMENT FOR WHY THIS

4     NARROWER CLASS THAT WE'RE TALKING ABOUT SHOULD NOT BE

5     CERTIFIED?

6             **MR. HARDY:**  FIRST OFF, I DON'T THINK THE UNFAIR --

7     THERE'S A NUMBER OF SUBCLASSES THAT THEY SEEK TO CERTIFY THAT

8     WEREN'T ALLEGED IN THE COMPLAINT.  BASED ON THE MOTION --

9             **THE COURT:**  YOU DON'T HAVE TO ALLEGE SUBCLASSES IN

10    THE COMPLAINT.

11            **MR. HARDY:**  YEAH.

12            IN TERMS OF THE UNFAIR COMPETITION AND FRAUD

13    SUBCLASSES, THEY HAVEN'T SUFFICIENTLY SHOWN EVIDENCE OF

14    RELIANCE BY THE PUTATIVE CLASS ON THE REPRESENTATIONS IN THE

15    LETTER.  THEY JUST PRESUME IT.

16            **THE COURT:**  WELL, I MEAN, THE PEOPLE -- THE PEOPLE

17    WHO PARTICIPATED IN THE -- IN THE PROGRAM, IF I RECALL

18    CORRECTLY, THERE'S ONE PLAINTIFF WHO PARTICIPATED IN THE

19    PROGRAM.  NAME WAS BONAKDAR?  IS THAT HOW YOU PRONOUNCE HER

20    NAME?

21            **MS. TERRELL:**  THAT'S CORRECT.

22            **THE COURT:**  AND THEN THE OTHER TWO PLAINTIFFS, DIDN'T

23    RIGHT?

24            **MR. HARDY:**  THAT'S CORRECT.

25            **THE COURT:**  SO THOSE TWO PLAINTIFFS -- THOSE TWO

```
1   PLAINTIFFS -- THERE COULD BE.  LET'S TAKE THEM ONE AT A TIME.

2   SO BONAKDAR, SHE GOT THE LETTER, SHE WAS AFRAID OF BEING

3   PROSECUTED, SO SHE PARTICIPATED IN THE CLASS.  SHE PAID THE

4   FEES AND ALL THAT STUFF, AND SHE SPENT HER TIME PARTICIPATING

5   IN THE PROGRAM.  ALL THAT STUFF.  WHAT IS IT ABOUT THAT THAT IS

6   NOT RELIANCE?

7            MR. HARDY:  WELL, YOUR HONOR, SHE RECEIVED SOMETHING

8   IN EXCHANGE FOR HER PARTICIPATION IN THE PROGRAM.  SHE RECEIVED

9   A NON-PROSECUTION AGREEMENT.

10           THE COURT:  YEAH, BUT THE WHOLE POINT OF THIS LAWSUIT

11  IS THAT SHE WOULDN'T HAVE GOTTEN PROSECUTED ANYWAY.

12           MR. HARDY:  SURE.  AND WHILE THAT PERTAINS TO

13  MS. BONAKDAR'S INDIVIDUAL CLAIM, THE PLAINTIFFS ARE PRESUMING

14  RELIANCE ON THE ENTIRE PUTATIVE CLASS.

15           THE COURT:  THEY TOOK THE CLASS.  THAT MEANS THEY

16  PARTICIPATED IN THE BAD CHECK DIVERSION PROGRAM.

17           MR. HARDY:  YES, YOUR HONOR.  BUT THERE IS --

18           THE COURT:  AND, BY THE WAY, YOU DON'T HAVE TO SHOW

19  RELIANCE ON THE PART OF UNNAMED CLASS MEMBERS, BUT IN THIS CASE

20  IT SEEMS OBVIOUS IF YOU PARTICIPATED IN THE BAD CHECK DIVERSION

21  PROGRAM, IT MEANS YOU, YOU KNOW, YOU WERE SUFFICIENTLY

22  THREATENED BY THE LETTER TO DO SO.  SO THAT ARGUMENT IS NOT

23  GOING TO FLY.  DO YOU HAVE ANYTHING ELSE?

24           MR. HARDY:  YES, YOUR HONOR.

25                IN TERMS OF THE METHODOLOGY OF MEASURING THE
```

1  RESTITUTION, THERE, AGAIN, THOSE PERSONS THAT COMPLETED THE

2  CLASS RECEIVED SOMETHING, RECEIVED A NON-PROSECUTION AGREEMENT.

3  THERE'S NO EVIDENCE ON THE RECORD --

4          **THE COURT:**  THAT -- THAT MAY BE WORTH SOMETHING, AND

5  IT MAY NOT BE WORTH ANYTHING, AND WE -- YOU CAN HAVE EXPERTS

6  TESTIFY ABOUT WHAT IT'S WORTH.

7          **MR. HARDY:**  WELL --

8          **THE COURT:**  SO I DON'T SEE HOW THAT PRECLUDES -- I

9  DON'T SEE HOW THAT PRECLUDES CLASS CERTIFICATION.

10          **MR. HARDY:**  WELL, THEN WE GO TO TYPICALITY, YOUR

11  HONOR.  THIS RATHER PUTS THE CART BEFORE THE HORSE IN THAT SOME

12  OF THE DISCUSSIONS CONCERNING THE PARTICULAR DEFENSES TO

13  MS. BONAKDAR ARE ADDRESSED IN THE MOTION TO DISMISS, BUT IT'S

14  THE DEFENDANT'S POSITION THAT MS. BONAKDAR IS NOT AT ALL A

15  TYPICAL CLASS REPRESENTATIVE IN THAT SHE DID NOT INCUR A DEBT.

16  THE UNDERLYING OBLIGATION WAS EVASION OF A BUS FAIR.

17          **THE COURT:**  SHE INCURRED A DEBT, BUT YOU'RE -- BUT

18  WHAT YOU'RE -- I MEAN, THERE'S A RELATED -- THERE'S AN ISSUE

19  RELATED TO THE POINT THAT YOU MAKE, WHICH IS, YOU KNOW, IS

20  SHE -- IS SHE TYPICAL BECAUSE SHE INCURRED THE DEBT TO THE

21  COUNTY, AS OPPOSED TO INCURRING THE DEBT TO A PRIVATE ENTITY

22  AND THAT SHE RECEIVED -- YOU KNOW, SHE -- AND THE DEFENDANT

23  RECEIVED HER NAME DIRECTLY FROM THE DISTRICT ATTORNEY'S OFFICE,

24  AS OPPOSED TO THE DEFENDANT RECEIVING HER NAME FROM A PRIVATE

25  ENTITY.

1          **MR. HARDY:**  THAT'S EXACTLY RIGHT.

2          **THE COURT:**  THIS BUSINESS ABOUT SHE DIDN'T INCUR A

3     DEBT BECAUSE IT WAS FARE INVASION -- FARE EVASION, THAT DOESN'T

4     MAKE ANY SENSE TO ME.  SHE INCURRED A DEBT.  BUT WHAT

5     MATTERS -- WHAT MATTERS MORE IS, IS THERE ANYTHING ABOUT THE

6     CIRCUMSTANCES UNDER WHICH SHE CAME -- HER NAME WAS GIVEN BY THE

7     EL DORADO COUNTY DISTRICT ATTORNEY'S OFFICE TO YOUR CLIENT THAT

8     MAKES HER ATYPICAL?

9          **MR. HARDY:**  YES, YOUR HONOR, THERE IS.

10         **THE COURT:**  AND WHAT -- WHAT IS THE EVIDENCE THAT --

11    I MEAN, IN OTHER WORDS, IS THERE SOME INDICATION THAT SOME SORT

12    OF DIFFERENT DETERMINATION WAS MADE AS TO HER AS COMPARED TO

13    OTHER PEOPLE WHO CAME FROM -- WHOSE NAMES CAME FROM PRIVATE

14    ENTITIES?  IS THERE ANY EVIDENCE IN THE RECORD THAT, YOU KNOW,

15    THE DA'S OFFICE TOOK A CLOSER LOOK AT HER THAN -- THAN WAS

16    TAKEN -- THAN THE DEFENDANTS -- THAN THE DEFENDANT TOOK -- THAN

17    THE LOOK THE DEFENDANT'S TOOK AT OTHER PEOPLE WHO CAME FROM

18    PRIVATE ENTITIES?  I HOPE THAT MAKES SENSE.

19         **MR. HARDY:**  I FOLLOW, YOUR HONOR.

20         AND YES.  FOR INSTANCE, IF YOU CONTRAST HOW

21    MS. BONAKDAR CAME INTO THE PROGRAM TO HOW THE TWO OTHER

22    REMAINING NAMED PLAINTIFFS, MS. MORIN AND MS. SOLBERG, ARRIVED

23    IN THE PROGRAM, BOTH OF THOSE PLAINTIFFS, BASED ON THE

24    AVAILABLE EVIDENCE, WERE REFERRED BY A MERCHANT DIRECTLY.

25         **THE COURT:**  YEAH, I UNDERSTAND THAT.  BUT I'M ASKING

```
1    IS THERE ANY -- IS THAT A DIFFERENCE THAT MATTERS?  AND SO IS

2    THERE ANY EVIDENCE THAT SUGGESTS THAT THAT IS A DIFFERENCE THAT

3    MATTERS IN TERMS OF WHETHER THE FDCPA WAS VIOLATED, IN TERMS OF

4    WHETHER THE DEFENDANT WAS A DEBT COLLECTOR FOR PURPOSES OF THIS

5    PARTICULAR COMMUNICATION WITH THIS PARTICULAR INDIVIDUAL OR IN

6    TERMS OF THE, YOU KNOW, THE STATE LAW CLAIMS?

7              MR. HARDY:  YES, AND THAT'S PRESENT IN THE RECORD

8    THAT WAS PRESENTED TO MY CLIENT BY THE EL DORADO DISTRICT

9    ATTORNEY.

10             THE COURT:  WHERE'S THAT IN THE RECORD?

11             MR. HARDY:  CERTAINLY.  THAT IS EXHIBIT --

12             THE COURT:  THIS WAS FILED IN CONNECTION WITH THE

13   MOTION FOR -- IN OPPOSITION TO THE MOTION?

14             MR. HARDY:  YES.  THIS IS IN CONNECTION WITH THE

15   OPPOSITION TO THE MOTION FOR CLASS CERTIFICATION --

16             THE COURT:  OKAY.

17             MR. HARDY:  -- YOUR HONOR.  AND THAT WOULD BE EXHIBIT

18   33, YOUR HONOR, EXHIBIT 33 TO THE DECLARATION OF THOMAS

19   JONSSON.

20             THE COURT:  OKAY.  I GOT IT RIGHT HERE.  HOLD ON.

21   IT'S LEADING.

22             OKAY.  SO THAT IS THE GLENN COUNTY DISTRICT ATTORNEY

23   BAD CHECK RESTITUTION PROGRAM PROBABLE CAUSE DETERMINATION

24   INTAKE CRITERIA?

25             MR. HARDY:  NO, YOUR HONOR.  I APOLOGIZE.  IT IS
```

```
1   EXHIBIT -- EXHIBIT 33 IS DOCUMENT NUMBER 242-34.
2           THE COURT:  SO IT'S 243-34?
3           MR. HARDY:  YES, YOUR HONOR.
4           THE COURT:  I THINK THAT'S EXHIBIT 34.  I'M PULLING
5   UP.
6           MR. HARDY:  DECLARATION ITSELF WAS -1, SO IT
7   FOLLOWED --
8           THE COURT:  (INDISCERNIBLE) DOCUMENT 243-34, I HAVE
9   IT RIGHT HERE.  THIS IS BAD CHECK CRIME REPORT, EL DORADO
10  COUNTY DISTRICT ATTORNEY; IS THAT RIGHT?
11          MR. HARDY:  YES, YOUR HONOR.
12          THE COURT:  OKAY.  AND SO TALK -- EXPLAIN THIS TO ME.
13          MR. HARDY:  CERTAINLY, YOUR HONOR.  THIS WAS THE
14  EVIDENCE OF THE VICTIM OF MS. BONAKDAR'S, YOU KNOW, BOUNCED
15  CHECK -- BAD CHECK CRIME.  THERE WAS AN ACTUAL CRIME REPORT
16  SUBMITTED TO THE EL DORADO DISTRICT ATTORNEY.  THE -- AND IT
17  SHOWS THE NUMEROUS EFFORTS MADE.
18          THE COURT:  SO THIS FORM WAS FILLED OUT BY THE --
19  WHAT WAS IT?  LIKE THE EL DORADO COUNTY TRANSIT AUTHORITY OR
20  SOMETHING LIKE THAT?
21          MR. HARDY:  YES.
22          THE COURT:  OKAY.
23          MR. HARDY:  IT WAS FILLED OUT BY THE DISTRICT -- BY
24  THE TRANSIT AUTHORITY.
25          THE COURT:  OKAY.
```

1         **MR. HARDY:**  AND SUBMITTED TO THE DISTRICT ATTORNEY'S

2    OFFICE ITSELF.

3         **THE COURT:**  OKAY.  AND HOW -- AND WHAT USUALLY

4    HAPPENS?  BECAUSE THIS FORM SAYS "VICTIM/MERCHANT NAME," AND

5    IT'S A FORM THAT SAYS, "BAD CHECK CRIME REPORT, EL DORADO

6    COUNTY DISTRICT ATTORNEY," AND IT HAS THE ADDRESS FOR THE BAD

7    CHECK PROGRAM.  DO MERCHANTS USUALLY NOT FILL OUT THIS FORM?

8         **MR. HARDY:**  YOUR HONOR, THE PLAINTIFFS ALLEGE THAT --

9         **THE COURT:**  LET ME ASK YOU THIS:  DO MERCHANTS

10   USUALLY NOT FILL OUT THIS FORM?

11        **MR. HARDY:**  YOUR HONOR, I CAN'T SPEAK AS TO ANY

12   SPECIFIC COUNTY.  AS TO EL DORADO COUNTY --

13        **THE COURT:**  OKAY.

14        **MR. HARDY:**  IT HAD A SPECIFIC SET OF INTAKE CRITERIA,

15   AND BASED ON THOSE AVAILABLE CRITERIA, THE DISTRICT ATTORNEY'S

16   OFFICE REFERRED THE ENTIRE MATTER TO MY CLIENT.

17        **THE COURT:**  OKAY.  BUT I'M ASKING A DIFFERENT

18   QUESTION.  THE DISTINCTION I'M TRYING DRAW IS BETWEEN PEOPLE

19   WHO WRITE A BAD CHECK TO A PRIVATE MERCHANT AND PEOPLE WHO

20   WRITE A BAD CHECK TO THE COUNTY, AND WHAT ROUTE -- IS THERE A

21   DIFFERENT ROUTE THAT THOSE PEOPLE TAKE TO GET TO YOUR CLIENT,

22   AND IS THERE A DIFFERENT FORM THAT IS FILLED OUT?

23        SO THIS FORM THAT I'M LOOKING AT APPEARS TO BE A FORM

24   THAT ANY MERCHANT WOULD FILL OUT TO REPORT -- I'M LOOKING AT IT

25   FOR THE FIRST TIME, SO I DON'T KNOW, BUT I'M JUST DRAWING SOME

1  INFERENCES FROM READING IT.

2          THIS FORM APPEARS TO BE THE KIND OF FORM THAT ANY

3  MERCHANT WOULD FILL OUT AND THEN SEND TO THE BAD CHECK PROGRAM

4  FOR THE DEFENDANT TO START PROCESSING.  AND SO IT SEEMS LIKE

5  MAYBE THAT'S WHAT HAPPENED HERE, TOO, THAT THE EL DORADO COUNTY

6  TRANSIT AUTHORITY FILLED THIS OUT AND THEN IT GOT SENT TO THE

7  DEFENDANT.

8          SO THE QUESTION IS:  DOES THIS REFLECT ANY SORT OF --

9  ANY DIFFERENT TREATMENT OF BONAKDAR COMPARED TO OTHER BAD CHECK

10 WRITERS?

11         **MR. TAITELMAN:**  YOUR HONOR, LET ME ADDRESS THAT.  NOW

12 WE'RE TALKING SOLELY ABOUT PRE-CFPB.

13         **THE COURT:**  YEAH.

14         **MR. TAITELMAN:**  AND THE ANSWER IS YES.

15         **THE COURT:**  OKAY.

16         **MR. TAITELMAN:**  IN THIS INSTANCE BONAKDAR WOULD BE

17 PART OF A VERY SMALL GROUP OF PEOPLE.  WHERE CRIME REPORTS WERE

18 FILED DIRECTLY WITH THE DISTRICT ATTORNEY'S OFFICE, THE

19 DISTRICT ATTORNEY THEN REFERRED THE CASE TO MY CLIENT --

20         **THE COURT:**  BUT WHAT IS IT ABOUT -- WHAT IS IT ABOUT

21 THIS DOCUMENT THAT I'VE BEEN POINTED TO THAT SUGGESTS THAT THIS

22 WAS FILED WITH THE DISTRICT ATTORNEY AND THE DISTRICT ATTORNEY

23 REFERRED IT TO THE DEFENDANT?  BECAUSE WHAT I'M LOOKING AT IS A

24 LETTER FROM EL DORADO TRANSIT TO THE BAD CHECK PROGRAM.

25         **MR. TAITELMAN:**  I UNDERSTAND.

1           **THE COURT:**  CARRIE MCKINNEY, ACCOUNTING TECHNICIAN AT

2   EL DORADO TRANSIT.

3           **MR. TAITELMAN:**  I UNDERSTAND IF YOU LOOK AT 234-34 --

4           **THE COURT:**  YEAH, I HAVE THAT DOCUMENT.

5           **MR. TAITELMAN:**  PAGE 12 OF 14, EXCUSE ME.

6           YOU WILL SEE THE LETTER FROM THE DISTRICT ATTORNEY'S

7   OFFICE TO MY CLIENT REFERRING THIS PERSON, MS. BONAKDAR'S BAD

8   CHECK.  THIS IS THE EVIDENCE THAT IS UNIQUE TO HER THAT SHE WAS

9   REFERRED TO THE PROGRAM BY THE DA AFTER A CRIME REPORT IS FILED

10  WITH THE DA.

11          IN CONTRAST, PRE-CFPB, THE DA WOULD ESTABLISH INTAKE

12  CRITERIA, AND THAT WOULD BE ATTACHED AS AN EXHIBIT TO THE

13  CONTRACT.  AND PRIVATE MERCHANTS COULD REFER CHECKS DIRECTLY TO

14  THE PROGRAM.  AS LONG AS THE INFORMATION MET THE CRITERIA, THEN

15  LETTERS WOULD BE SENT.

16          NOW THAT OBVIOUSLY HAS CHANGED POST CFPB --

17          **THE COURT:**  CORRECT.

18          **MR. TAITELMAN:**  -- BUT THAT IS A VERY MATERIAL

19  DISTINCTION WITH RESPECT TO MS. BONAKDAR.  PERHAPS SHE WOULD

20  REPRESENT A SUBCLASS -- AND IT IS RELEVANT THE QUESTION OF

21  FDCPA COMPLIANCE BECAUSE THEIR MANTRA HAS ALWAYS BEEN REALLY

22  TWO THINGS -- THREE THINGS.

23          **THE COURT:**  BEFORE YOU GIVE ME THE MANTRA, COULD I

24  ASK YOU A CLARIFICATION QUESTION ABOUT THIS DOCUMENT?

25          I MEAN, THIS LETTER THAT YOU POINTED ME TO FROM NANCY

1   ANDERSON OF THE DISTRICT ATTORNEY'S OFFICE TO

2   CORRECTIVESOLUTIONS, SAYS, "ENCLOSED PLEASE FIND THE FOLLOWING

3   BAD CHECK CRIME REPORTS RECEIVED BY THIS OFFICE."

4             SO THESE BAD CHECK CRIME REPORTS.

5             SO MY FIRST QUESTION IS:  IS THIS THE SAME TYPE OF

6   BAD CHECK CRIME REPORT THAT A MERCHANT FILLS OUT AND SUBMITS

7   DIRECTLY TO CORRECTIVESOLUTIONS?

8             **MR. TAITELMAN:**  NOT TO -- PRE-CFPB NOT TYPICALLY.

9             **THE COURT:**  OKAY.

10            **MR. TAITELMAN:**  IN FACT, I DON'T THINK I'M AWARE OF

11  EVIDENCE OF PEOPLE FILLING OUT THESE REPORTS WHO -- PRIVATE

12  MERCHANTS FILLING OUT THESE REPORTS TO SUBMIT TO MY CLIENT.

13            **THE COURT:**  BECAUSE IT SEEMS LIKE THAT'S WHAT THE

14  REPORT IS DESIGNED FOR.  IT SEEMS LIKE THE REPORT IS PRECISELY

15  DESIGNED FOR PRIVATE MERCHANTS TO FILL OUT THE FORM AND SUBMIT

16  IT TO YOUR CLIENT.  JUST FROM THE WAY IT'S WORDED.

17            **MR. TOWNSEND:**  WITH MR. TAITELMAN'S INDULGENCE, I'D

18  LIKE TO CLARIFY SOMETHING.

19            **THE COURT:**  HOLD ON A SECOND.  IT'S CERTAINLY WHAT

20  THE DOCUMENT IMPLIES, RIGHT?  ISN'T IT -- WHOEVER YOUR CLIENT

21  IS CALLED CREATED THIS DOCUMENT FOR MERCHANTS TO FILL OUT AND

22  SUBMIT DIRECTLY TO THEM?

23            **MR. HARDY:**  YOUR HONOR, THE FORM WAS SUBMITTED

24  DIRECTLY TO EL DORADO --

25            **THE COURT:**  I'M NOT ASKING ABOUT WHAT HAPPENED IN

1    THIS CASE.  I'M ASKING ABOUT THE PURPOSE OF THE FORM, AND I'M

2    READING THE FORM AND IT LOOKS LIKE THE FORM WAS DESIGNED BY

3    YOUR CLIENT FOR MERCHANTS TO FILL OUT AND SEND TO YOUR CLIENT.

4    IS THAT NOT WHY THIS FORM WAS DESIGNED?

5              **MR. HARDY:**  YOUR HONOR, THAT'S NOT INCORRECT AS TO

6    THE USE OF THE FORM.  I CAN'T SPEAK AS TO THE INTENT BEHIND THE

7    FORM WHEN IT WAS CREATED.

8              **THE COURT:**  THAT'S HOW THE FORM WAS USED, IS THAT

9    WHAT YOU'RE SAYING?

10             **MR. HARDY:**  NO, NO, YOUR HONOR.

11             **THE COURT:**  NOT IN THIS CASE, BUT THAT FORM WAS USED

12   BY PRIVATE MERCHANTS TO FILL OUT AND SEND TO THE -- TO YOUR

13   CLIENT.

14             **MR. HARDY:**  TO THE DISTRICT ATTORNEY'S OFFICE.

15             IN OTHER CASES, YOUR HONOR, SUCH AS MS. SOLBERG AND

16   MS. MORIN, NO REPORT WAS FILLED OUT.  IT WAS SUBMITTED

17   ELECTRONICALLY VIA EMAIL DATA TO MY CLIENT, AND THERE WAS NO

18   FORM OF THIS KIND.

19             **THE COURT:**  OKAY.  SO THERE'S THIS BAD CHECK PROGRAM

20   ADDRESS OF 515 MAIN STREET IN PLACERVILLE, CALIFORNIA.  WHOSE

21   ADDRESS IS THAT?

22             **MR. HARDY:**  THAT'S THE DISTRICT ATTORNEY'S OFFICE.

23             **THE COURT:**  OKAY.  SO THIS IS A FORM FOR MERCHANTS TO

24   FILL OUT AND SEND TO THIS ADDRESS, AND THEN THE DISTRICT

25   ATTORNEY SUBMITS IT TO YOUR CLIENT UNDER THE OLD REGIME?

1          **MR. HARDY:**  YES, YOUR HONOR.

2          **THE COURT:**  IN SOME CASES, OKAY.

3          **MR. HARDY:**  AFTER REVIEWING THE EVIDENCE THAT'S BEEN

4     SUBMITTED.

5          **THE COURT:**  OKAY.  AND IN THIS CASE IS THERE EVIDENCE

6     THAT THE DISTRICT ATTORNEY REVIEWED THE EVIDENCE THAT HAD BEEN

7     SUBMITTED?

8          **MR. HARDY:**  YES, YOUR HONOR.  I BELIEVE THE

9     PLAINTIFFS PRESENTED THE DEPOSITION TRANSCRIPT OF -- OF MS.--

10    MS. ANDERSON, THE EXECUTIVE SECRETARY FOR THE DISTRICT ATTORNEY

11    ITSELF.

12         **THE COURT:**  OKAY.  AND WHERE IS THAT?  AND WHAT DOES

13    IT SAY ABOUT THE DISTRICT ATTORNEY'S REVIEW OF THE EVIDENCE IN

14    THIS CASE?

15         **MR. HARDY:**  EXCERPTS OF MS. ANDERSON'S TRANSCRIPT

16    WERE PRESENTED IN CONNECTION WITH THE MOVING PAPERS.

17         **THE COURT:**  OKAY.  YOU WANT TO TELL ME WHERE IT IS?

18         **MR. HARDY:**  SURE.  IT'S DOCUMENT NUMBER 226-46,

19    EXHIBIT 47 TO THE DECLARATION OF PAUL ARONS.

20         **THE COURT:**  FORTY WHAT?  EXHIBIT WHAT?

21         **MR. HARDY:**  EXHIBIT 47 TO THE DECLARATION OF

22    MR. ARONS.

23         **THE COURT:**  OKAY.

24         **MR. HARDY:**  IT'S DOCUMENT NUMBER 226-46.

25         **THE COURT:**  OKAY.  ONE SEC.  OKAY.  WHAT PAGE?  OH,

 1  WAIT.  THIS IS NOT DEPOSITION TESTIMONY.  226-46?

 2          **MR. HARDY:**  YES, YOUR HONOR.

 3          **THE COURT:**  OKAY.  WAIT.  HOLD ON A SEC.  I PULLED UP

 4  THE WRONG ONE.  226-46?

 5          **MR. HARDY:**  YES, YOUR HONOR.

 6          **THE COURT:**  OKAY.  HERE.  GOT IT.  SORRY.

 7          ALL RIGHT.  WHAT PAGE?

 8          **MR. HARDY:**  YOUR HONOR, I DON'T HAVE THE -- THIS IS

 9  AN INCOMPLETE VERSION OF THE TRANSCRIPT.  I DON'T SEE A SECTION

10  IN THIS EXCERPT --

11          **THE COURT:**  OKAY.  SO IT SEEMS LIKE WHAT WE'VE

12  ESTABLISHED SO FAR IS THAT THE PERSON TO WHOM BONAKDAR WROTE

13  THE BAD CHECK FILLED OUT A FORM THAT WAS DESIGNED TO BE FILLED

14  OUT BY PEOPLE TO WHOM SOMEBODY WROTE A BAD CHECK.  THAT FORM

15  WAS SENT TO THE ADDRESS LISTED ON THE FORM WHERE YOU'RE

16  SUPPOSED TO SEND IT, AND THEN THE DA FORWARDED IT TO THE

17  DEFENDANT.  THAT'S THE EVIDENCE WE HAVE SO FAR.

18          AND THEN -- AND SO THAT IS DIFFERENT FROM THE TYPICAL

19  BAD CHECK WRITER HOW?

20          **MR. HARDY:**  THE TYPICAL BAD CHECK WRITER PRE-CFPB

21  WOULD NOT HAVE BEEN REFERRED DIRECTLY TO THE DISTRICT ATTORNEY.

22          **THE COURT:**  BUT THERE'S THIS FORM THAT MERCHANTS --

23  CALLS FOR A MERCHANT TO FILL OUT THE FORM AND CALLS FOR THE

24  FORM TO BE SENT TO THIS ADDRESS ON THE FORM, WHICH IS THE

25  ADDRESS THAT THE EL DORADO TRANSIT AUTHORITY SENT THIS FORM TO,

1    WHICH IS AT THE DA'S OFFICE.

2            SO I'M TRYING TO FIGURE OUT FROM THIS EVIDENCE HOW AM

3    I SUPPOSED TO CONCLUDE THAT THERE WAS SOME -- THAT BONAKDAR'S

4    SITUATION WAS TREATED DIFFERENTLY FROM ANY OTHER BAD CHECK

5    WRITER?  BECAUSE I'M GATHERING, FROM LOOKING AT THE FORM, THAT

6    BONAKDAR WAS FAR FROM THE ONLY ONE WHO WAS PROCESSED IN THIS

7    WAY; NAMELY, A MERCHANT GETS A BAD CHECK, THEY FILL OUT THIS

8    FORM, THEY SEND IT TO THE ADDRESS ON THE FORM, AND THEN THE

9    DA'S OFFICE PASSES IT ALONG TO YOUR CLIENT.

10           I DON'T SEE ANY INDICATION IN ANYTHING YOU'VE SHOWN

11   ME SO FAR THAT MS. BONAKDAR'S DEBT OR ER SITUATION WAS TREATED

12   DIFFERENTLY FROM ANYBODY ELSE'S?  SO DO YOU HAVE ANYTHING ELSE?

13   DO YOU HAVE ANY OTHER EVIDENCE ON THAT?

14           **MR. HARDY:**  YOUR HONOR, THE CLAIM IS THAT THE

15   PUTATIVE CLASS CONSISTS OF PERSONS WHOSE CLAIMS WERE NEVER EVEN

16   REVIEWED BY A DISTRICT ATTORNEY.  THEY WERE SUBMITTED, YOU

17   KNOW, DIRECTLY TO MY CLIENT FROM THE MERCHANT.

18           **THE COURT:**  DIRECTLY -- OKAY.  SO -- SO THE CLAIM IS

19   THAT THEY WERE SUBMITTED DIRECTLY TO THE MERCHANT AND DIDN'T

20   PASS THROUGH THIS ADDRESS, THIS P.O. BOX?

21           **MR. HARDY:**  YES, YOUR HONOR, AND THAT IS THE CASE

22   BASED ON EVERYTHING I'VE SEEN.

23           **THE COURT:**  OKAY.  IF IT DID PASS THROUGH THE P.O.

24   BOX, BUT THERE'S NO INDICATION IT WAS GIVEN ANY INDIVIDUAL

25   CONSIDERATION, THEN WHAT'S THE DIFFERENCE FOR PURPOSES OF THE

1   CLASS MEMBER, ASSUMING THAT NOBODY ELSE HAS PASSED THROUGH THIS

2   P.O. BOX?

3         **MR. HARDY:**  SURE.  WELL, THE DIFFERENCE IS BASED ON

4   MS. BONAKDAR'S -- WHY SHE CHOSE TO PARTICIPATE IN THE PROGRAM

5   AND THE --

6         **THE COURT:**  BECAUSE SHE GOT A LETTER FROM THE -- FROM

7   YOUR CLIENT, RIGHT?

8         **MR. HARDY:**  YES.  AND HER FIRST REACTION WAS NOT TO

9   SIGN UP FOR THE PROGRAM OUT OF FEAR OF PROSECUTION, IT WAS --

10         **THE COURT:**  HER FIRST REACTION WAS, OH, THIS WAS

11   ROUTED THROUGH THE DA'S OFFICE, AND, THEREFORE, I NEED TO SIGN

12   UP FOR THE PROGRAM.

13         **MR. HARDY:**  NO.  SHE CALLED AN ATTORNEY.

14         **THE COURT:**  OKAY.

15         **MR. HARDY:**  AND CONSULTED WITH THAT ATTORNEY FOR AT

16   LEAST AN HOUR, ACCORDING TO HER DEPOSITION.

17         **THE COURT:**  BUT I THOUGHT WE WERE TALKING ABOUT THE

18   FACT THAT THIS CAME FROM THE DISTRICT ATTORNEY'S OFFICE.  I

19   THOUGHT WE WERE TALKING ABOUT WHETHER THIS MADE BONAKDAR

20   DIFFERENT FROM OTHER PROPOSED CLASS -- OTHER CLASS MEMBERS, THE

21   FACT THAT IT CAME THROUGH THE DISTRICT ATTORNEY'S OFFICE, IT

22   WENT TO THIS P.O. BOX, AND THE DISTRICT ATTORNEY'S OFFICE SENT

23   IT TO YOUR CLIENT, THAT MAKES -- THAT MAKES HER DIFFERENT HOW?

24         **MR. HARDY:**  IT MAKES HER DIFFERENT IN THAT WE --

25   DECLARATIONS OF THE DISTRICT ATTORNEY AND THE ASSISTANT

1    DISTRICT ATTORNEY AT EL DORADO COUNTY WERE ALREADY SUBMITTED TO

2    THIS COURT ATTESTING TO THE FACT THAT THEY COULD HAVE

3    PROSECUTED MS. BONAKDAR.

4              **THE COURT:**  THAT WHAT?

5              **MR. HARDY:**  THAT IS THAT THEY COULD HAVE PROSECUTED

6    MS. BONAKDAR.

7              **THE COURT:**  YEAH, BUT DID THEY SAY ANYTHING ABOUT

8    WHAT THEY DID WITH MS. BONAKDAR'S REFERRAL FROM THE TRANSIT

9    AUTHORITY AT THE TIME?

10             **MR. HARDY:**  NO, YOUR HONOR.

11             **THE COURT:**  OKAY, OKAY.

12             DO YOU HAVE ANYTHING TO SAY ON THIS POINT BEFORE WE

13   MOVE ON?

14             **MS. TERRELL:**  I DON'T, OTHER THAN THE PROCESS WAS

15   REALLY THE SAME AS IT OTHERWISE WOULD BE; IT JUST WENT DIRECTLY

16   TO THE DISTRICT ATTORNEY'S OFFICE.  THERE'S NO EVIDENCE OF A

17   FURTHER REVIEW.  IN OTHER WORDS, SHE WAS TREATED THE SAME WAY

18   AS ANY OTHER CLASS MEMBER THAT GOT THE LETTER AND DECIDED TO

19   PARTICIPATE.

20             **THE COURT:**  BUT THE OTHER TWO NAMED PLAINTIFFS -- I

21   MEAN, WAS THERE ANY INDICATION THAT THIS -- WAS THIS FORM

22   FILLED OUT FOR THE OTHER TWO NAMED PLAINTIFFS?

23             **MR. TAITELMAN:**  YOUR HONOR, CHECK INFORMATION IS

24   SUBMITTED TO THE DEFENDANTS IN TWO WAYS, ELECTRONICALLY AND

25   MANUALLY THROUGH THIS FORM, A VERSION OF WHICH HAS BEEN IN

1    EXISTENCE FOR YEARS AND WHICH IS AVAILABLE IN EVERY COUNTY.

2              WHETHER IT IS SUBMITTED ELECTRONICALLY OR THROUGH

3    THIS FORM, ONCE IT GETS TO DEFENDANT, THEY TREAT IT THE SAME.

4    THEY ENTER IT INTO THEIR DATABASE AND PROCEED WITH THE

5    COLLECTION PROCESS.

6              **THE COURT:**  OKAY.  AND SO IS IT -- IS THAT TO SAY

7    THAT SOME MERCHANTS REPORT -- SOME MERCHANTS FILL OUT THE FORM

8    AND MAIL THE FORM IN --

9              **MR. TAITELMAN:**  RIGHT.

10             **THE COURT:**  -- TO THE ADDRESS LISTED ON THE FORM?

11             **MR. TAITELMAN:**  RIGHT.

12             **THE COURT:**  AND OTHER AGENTS SUBMIT THE INFORMATION

13   ELECTRONICALLY?

14             **MR. TAITELMAN:**  RIGHT.

15             **THE COURT:**  AND ONCE IT'S SUBMITTED ELECTRONICALLY,

16   WHO DOES IT GO TO?

17             **MR. TAITELMAN:**  SAME ENTITIES.  IT GOES TO

18   DEFENDANTS.  THE INFORMATION THAT IS ON THE FORM IS ENTERED --

19   ON THE FORM OR IN THE ELECTRONIC DATABASE IS ENTERED INTO

20   DEFENDANT'S COMPUTER SYSTEM.

21             **THE COURT:**  ANY IDEAS THAT -- YOU KNOW, THAT IF IT'S

22   -- IF THE FORM IS FILLED OUT AND MAILED IN, IT GOES TO THE

23   DISTRICT ATTORNEY'S OFFICE, BUT NOTHING HAPPENS OTHER THAN THE

24   DISTRICT ATTORNEY'S OFFICE PASSING IT ON TO DEFENDANT, AND

25   CERTAINLY THERE HASN'T BEEN ANY EVIDENCE TO THE CONTRARY AT

1    LEAST AS TO MS. BONAKDAR.

2           **MR. TAITELMAN:**  THERE'S NO EVIDENCE THAT ANYONE IN

3    THE DISTRICT ATTORNEY'S OFFICE CONDUCTED ANY FURTHER REVIEW.

4           **THE COURT:**  OKAY.  ALL RIGHT.  SO DO YOU HAVE OTHER

5    ARGUMENTS FOR WHY THIS NARROW CLASS THAT WE'RE DISCUSSING

6    SHOULD NOT BE CERTIFIED?

7           **MR. HARDY:**  GOING BACK TO MS. BONAKDAR, YOUR HONOR,

8    BOTH SHE AND MS. SOLBERG TESTIFIED THAT THEY DID NOT READ THE

9    ENTIRETY OF THE LETTER.  THEY READ AT BEST THE FIRST PARAGRAPH

10   OR TWO --

11          **THE COURT:**  OKAY.  I UNDERSTAND THAT ARGUMENT.  DO

12   YOU HAVE ANY OTHER ARGUMENTS FOR WHY -- WHY THIS NARROWER CLASS

13   SHOULD NOT BE CERTIFIED?

14          **MR. HARDY:**  AND YOUR HONOR DOESN'T WANT TO ADDRESS

15   THE SUPERIORITY FACTORS UNDER *KAMM*?

16          **THE COURT:**  GO AHEAD.

17          **MR. HARDY:**  CERTAINLY.

18          **THE COURT:**  I'VE ASKED YOU FOR WHAT'S YOUR BEST

19   ARGUMENT, AND NOW I'VE ASKED YOU FOR -- NOW YOU'VE MADE, LIKE,

20   FIVE OR SIX ARGUMENTS.  IT SOUNDS LIKE YOU WANT TO ADDRESS

21   THAT.  GO AHEAD.

22          **MR. HARDY:**  I WOULD, YOUR HONOR, AND I THINK THIS

23   GOES BACK TO THE ISSUE OF WHY IT WAS SO IMPORTANT TO ADDRESS

24   THE CFPB SETTLEMENT AT THE OUTSET, AND THAT'S BECAUSE IT HAS

25   CHANGED THE LANDSCAPE.  I THINK IT'S IMPORTANT TO NOTE THAT IN

1   THE --

2           **THE COURT:**  BUT CAN YOU TELL ME WHAT THAT HAS TO DO

3   WITH WHETHER WE WOULD CERTIFY A CLASS OF PEOPLE WHO RECEIVED

4   LETTERS PRE-CFPB SETTLEMENT, CFPB SETTLEMENT?

5           **MR. HARDY:**  YES, BECAUSE IT WOULD -- ONE, IT WOULD

6   WASTE JUDICIAL ECONOMY AND DUPLICATE THE WORK ALREADY DONE IN

7   THE CFPB ACTION.

8           THE DEFENDANTS SPENT TWO YEARS BEING INVESTIGATED BY

9   THE CFPB, OPENED THEIR BOOKS AND RECORDS, AND RESULTED IN THIS

10  BINDING CONSENT DECREE IN THE DISTRICT OF MARYLAND.  I MEAN,

11  THIS WAS NO SMALL ORDER.  IT WAS A STIPULATED JUDGMENT.  THE

12  MARYLAND DISTRICT COURT RETAINS CONTINUING JURISDICTION TO

13  ENFORCE VIOLATIONS OF THIS ORDER.

14          AND SO, FOR INSTANCE, A DECISION BY THIS COURT THAT

15  DEFENDANTS HAVE VIOLATED THE FDCPA WOULD THEN IMPINGE ON THE

16  CONTINUING JURISDICTION OF THE MARYLAND DISTRICT COURT, BECAUSE

17  THE DEFENDANTS ARE PROHIBITED FROM ENGAGING IN ANY UNFAIR OR

18  UNLAWFUL ACTIVITY IN THEIR --

19          **THE COURT:**  BUT I MEAN, LET'S -- HOLD ON A SECOND.

20  WE'RE TALKING -- WE'RE OPERATING UNDER THE ASSUMPTION THAT THEY

21  DO NOT HAVE STANDING TO SEEK INJUNCTIVE RELIEF.  WE'RE

22  OPERATING UNDER THE ASSUMPTION THAT THE CLASS THAT WOULD BE

23  CERTIFIED WOULD BE A CLASS OF PEOPLE WHO RECEIVED THE OLD

24  LETTER, NOT THE NEW ONE.  OKAY?  AND IT WOULD BE A CLASS OF

25  PEOPLE JUST IN CALIFORNIA, I ASSUME, RIGHT?  AND IT WOULD BE A

1    CLASS OF PEOPLE WHO WERE -- WHO RECEIVED THE LETTERS IN

2    CALIFORNIA.

3           SO WHAT -- SO YOU NEED TO EXPLAIN TO ME HOW -- THIS

4    IS THE SITUATION WE'RE TALKING ABOUT.

5           **MR. HARDY:**  SURE.

6           **THE COURT:**  AND SO I DON'T UNDERSTAND THE POINT

7    YOU'RE TRYING TO MAKE ABOUT THE RELATIONSHIP BETWEEN THIS CASE

8    TO THE CFPB SETTLEMENT.

9           **MR. HARDY:**  AND THAT'S BECAUSE THE RELIEF THAT THE

10   PLAINTIFFS SEEK IN THIS ACTION HAS ALREADY BEEN ACHIEVED BY THE

11   CFPB SETTLEMENT, AND THAT IS THE THIRD FACTOR IN *KAMM V.*

12   *CALIFORNIA CITY DEVELOPMENT*.  IT PROVIDED RELIEF IN THE FORM OF

13   A PERMANENT INJUNCTION WHICH --

14          **THE COURT:**  BUT YOU HAVEN'T PAID ANYTHING TO THE

15   POTENTIAL CLASS MEMBERS, RIGHT?

16          **MR. HARDY:**  WE PAID A 50,000-DOLLAR FINE TO THE CFPB.

17          **THE COURT:**  MY QUESTION IS:  YOU HAVEN'T PAID

18   ANYTHING TO THE POTENTIAL CLASS MEMBERS; IS THAT CORRECT?

19          **MR. HARDY:**  NO, BUT THAT'S --

20          **THE COURT:**  OKAY.  AND THEIR THEORY, WHICH MAY OR MAY

21   NOT BE CORRECT, IS THAT YOU WRONGFULLY TOOK MONEY FROM THE

22   CLASS MEMBERS, AND YOU'RE SAYING WE SHOULD BE ABLE TO KEEP THAT

23   MONEY BECAUSE WE ALREADY PAID A FINE TO THE CFPB.  THAT'S YOUR

24   ARGUMENT?

25          **MR. HARDY:**   THE ARGUMENT IS THAT THE PUTATIVE CLASS

1  HAS ALREADY RECEIVED REFUNDS FROM THE CFPB TO A TUNE OF OVER

2  $6 MILLION.  THAT IS -- AND *KAMM* IS NOT DEPENDENT ON THE FACT

3  OF WHETHER THE REFUND COMES DIRECTLY FROM THE DEFENDANT OR THE

4  GOVERNMENT.  THE FACT IS THAT THE GOVERNMENT --

5          **THE COURT:**  WELL, IF THE CFPB WANTS TO INTERVENE IN

6  THIS CASE AND SAY THAT IT SHOULD BE ENTITLED TO SOME OF THE

7  MONEY THAT WOULD ULTIMATELY BE PAID TO CLASS MEMBERS SINCE THE

8  CFPB PAID SOME OF ITS PENALTY MONEY TO CLASS MEMBERS, CFPB CAN

9  DO THAT, AND THEY CAN MAKE THAT ARGUMENT, AND MAYBE IT WILL

10 MAKE SENSE, AND MAYBE IT WILL NOT.  BUT I DON'T SEE HOW THAT

11 RELATES TO -- ANY OF THAT RELATES TO THIS CLASS CERTIFICATION

12 MOTION.

13         OKAY.  SO I THINK WE'VE DISCUSSED THE CLASS

14 CERTIFICATION MOTION ENOUGH, AND WE -- SO WHAT I WOULD LIKE TO

15 DO IS GET A LETTER FROM THE DEFENDANTS BY TOMORROW CLOSE OF

16 BUSINESS, TAKING A POSITION ON THE PLAINTIFF'S REQUEST TO ADD

17 ADDITIONAL NAMED PLAINTIFFS.  AND I'D LIKE A RESPONSE FROM THE

18 PLAINTIFFS ON MONDAY.  AND I WILL GIVE THE MATTER FURTHER

19 THOUGHT AND ISSUE A RULING AFTER THAT.

20         **MR. TAITELMAN:**  AND IN CONSIDERATION OF THIS, IF WE

21 WERE TO AGREE, I THINK IT WOULD BE HELPFUL TO UNDERSTAND WHAT

22 WOULD THEN OCCUR THERE.  WOULD THERE BE DISCOVERY PERMITTED --

23 I MEAN --

24         **THE COURT:**  WELL, I THINK THERE WOULD HAVE TO BE.

25 AND I THINK THAT THAT -- YOU KNOW, YOU HAVE TO BE ABLE TO TAKE

1  THE PLAINTIFF'S DEPOSITION.  AND SO THE IDEA THERE WOULD BE,

2  YOU KNOW, I GUESS, THAT THE MOTION FOR CLASS CERTIFICATION

3  WOULD BE DENIED WITHOUT PREJUDICE TO REFILING IT, AND YOU COULD

4  TAKE THE NEW NAMED PLAINTIFF'S DEPOSITION, AND OTHER DISCOVERY

5  WOULD BE DONE AND --

6           **MR. TAITELMAN:**  RIGHT.

7           **THE COURT:**  AND THEN THEY WOULD REFILE THEIR MOTION

8  FOR CLASS CERTIFICATION.

9           **MR. TAITELMAN:**  RIGHT, BECAUSE OF SOME OF THE REASONS

10  THE COURT OUTLINED, THERE MAY BE CONSIDERATIONS, LIKE PARTIAL

11  SUMMARY ADJUDICATION, THINGS LIKE THAT, WITH RESPECT TO ISSUES

12  POST-CFPB, BECAUSE THINGS ARE SO MATERIALLY DIFFERENT.  WE

13  WOULD NOT WANT TO FOREGO ANY OPPORTUNITY WE WOULD HAVE IF A

14  NEWLY FILED CASE HAPPENED TOMORROW.

15           SO, I MEAN, WITH THAT --

16           **THE COURT:**  IN OTHER WORDS, LIKE GOING BACK TO A

17  DISCUSSION WE HAD LONG, LONG AGO WHERE I SAID, AS I DO IN ALL

18  MY CLASS ACTIONS, YOU KNOW, WOULD THE DEFENDANT LIKE TO FILE A

19  MOTION FOR SUMMARY JUDGMENT, WOULD THE DEFENDANT LIKE FOR THERE

20  TO BE CROSS MOTIONS FOR SUMMARY JUDGMENT AS TO LIABILITY

21  FROM -- AS TO THE NAMED PLAINTIFF BEFORE CLASS CERTIFICATION

22  PROCEEDINGS.

23           I ASKED YOU THAT, AND YOU SAID, NO, YOU DIDN'T WANT

24  THIS ADJUDICATED BEFORE CLASS CERTIFICATION.  YOU'RE SAYING IF

25  A NEW PLAINTIFF CAME IN, YOU WOULD WANT THE OPPORTUNITY TO DO

1    THAT.

2            **MR. TAITELMAN:**  AGAIN, YOUR HONOR, IT WOULD BE

3    SOMETHING TO CONSIDER.

4            **THE COURT:**  RIGHT.

5            **MR. TAITELMAN:**  BECAUSE THE FACTS ARE SO DIFFERENT.

6            **THE COURT:**  RIGHT.

7            **MR. TAITELMAN:**  WE THINK THERE IS COMPLIANCE WITH

8    RESPECT TO THE EXEMPTION.

9            **THE COURT:**  RIGHT.

10           **MR. TAITELMAN:**  AND THE CLASS FEE PART WE'RE MORE

11   THAN HAPPY TO BRIEF.  WE THINK THE CLASS FEE IS LEGAL.  WE'VE

12   GOT LEGISLATIVE HISTORY.  WE'VE GOT EVERYTHING THAT WOULD

13   SUPPORT THAT.

14           **THE COURT:**  RIGHT.

15           **MR. TAITELMAN:**  SO THAT MIGHT BE A DISCRETE ISSUE

16   WHERE WE WOULD SAY, YES, WE WOULD LIKE TO TEE THAT UP.

17           **THE COURT:**  WELL, NO, I THINK YOU CAN'T.  I MEAN,

18   THAT'S WHAT WE DISCUSSED BEFORE.  YOU CAN'T TEE -- YOU CAN'T

19   CERTIFY A CLASS ON THE FEE ISSUE.

20           **MR. TAITELMAN:**  I AGREE.  I AGREE.

21           **THE COURT:**  AT LEAST IF YOU'RE TALKING ABOUT THE

22   FDCPA CLAIM, YOU CAN'T CERTIFY A CLASS ON THE FEE ISSUE.

23           **MR. TAITELMAN:**  I AGREE WITH YOU, I DO.  I MEAN, THAT

24   WOULD BE INEFFICIENT.

25           **MS. TERRELL:**  THE CLOSING OF THE FEE ISSUE ALONE

1    DOESN'T DISPOSE OF ALL THE REASONS WHY WE BELIEVE THE EXEMPTION

2    DOESN'T APPLY.

3              **THE COURT:**  RIGHT.

4              **MR. TAITELMAN:**  THAT'S TRUE.

5              **THE COURT:**  WHICH IS WHY IT WOULD BE INEFFICIENT TO

6    DO IT THAT WAY.

7              **MR. TAITELMAN:**  RIGHT.  BUT HAVING SAID THAT -- THIS

8    IS SOMETHING I TALKED TO COUNSEL AT OUR BREAK EARLIER -- THE

9    CLASS FEE IS THE VAST AMOUNT -- THAT IS THE BULK OF THE MONIES

10   THAT THEY SEEK IN TERMS OF RESTITUTION.

11             **THE COURT:**  THEN MAYBE YOU SHOULD HAVE TEED UP CROSS

12   MOTIONS FOR SUMMARY JUDGMENT FOR THE FEE AT THE OUTSET OF THE

13   CASE.

14             **MR. TAITELMAN:**  WELL, IT WAS INTERESTING, BECAUSE

15   WHEN YOUR HONOR WAS SUGGESTING THAT A NEW PLAINTIFF SHOULD COME

16   IN, I ACTUALLY PULLED COUNSEL ASIDE AND SAID, MAYBE WE WITHDRAW

17   THE MOTION AND TEE THAT ISSUE UP NOW, BECAUSE IF THAT ISSUE

18   WERE DECIDED IN THEIR FAVOR OR OUR FAVOR, IT IS A MATERIAL

19   DIFFERENCE IN TERMS OF WHAT THIS CASE LOOKS LIKE.

20             IT IS SOMETHING I RAISED.  I'M NOT SURE COUNSEL HAS

21   GIVEN IT ANY CONSIDERATION.  I KNOW IT WAS ON THE FLY.

22             **THE COURT:**  RIGHT.

23             **MR. TAITELMAN:**  MAYBE WE CAN TALK ABOUT THAT.

24             **THE COURT:**  AND THAT BRINGS IN ANOTHER ISSUE THAT I

25   WOULD WANT TO HAVE FURTHER DISCUSSION ABOUT.  I'M NOT SURE NOW

1    IS THE TIME.

2            I MEAN, YOU KNOW, ONE OPTION FOR US IS TO COME BACK

3    IN A WEEK AND HAVE A CASE MANAGEMENT CONFERENCE OR SOMETHING

4    AND TALK ABOUT HOW WE WANT TO PROCEED.

5            BUT THE OTHER CONCERN I HAVE IS SORT OF -- I MEAN, I

6    THOUGHT THE 12(B)(7) MOTION -- NOT THE 12(B)(7) -- THE 12(B)(1)

7    MOTION, THE MOTION ABOUT HOW THE NINTH CIRCUIT DECISIONS

8    SOMEHOW MEANS THIS CASE HAS TO BE DISMISSED IS RIDICULOUS.  AND

9    I DON'T WANT TO HEAR ARGUMENT ON IT.

10           BUT IT DOES -- THERE IS AN ISSUE OF FEDERALISM IN

11   THIS CASE, AND IT CONTINUES TO BOTHER ME, WHICH IS WHY, IF WE

12   WERE GOING TO TEE UP ONLY THE ISSUE OF WHETHER THE FEE IS

13   LEGAL, WHY ARE WE DECIDING THAT IN FEDERAL COURT?  I MEAN,

14   THERE'S BEEN NO LITIGATION, AS FAR AS I KNOW, ON WHETHER THE

15   FEE IS LEGAL.  THE FEE -- THE QUESTION IS WHETHER THE FEE IS

16   LEGAL UNDER THIS PENAL CODE PROVISION.

17           **MR. TAITELMAN:**  CORRECT.

18           **THE COURT:**  AND THIS IS A PROGRAM, AS WE'VE TALKED

19   ABOUT IN OTHER CONTEXTS, THIS IS A PROGRAM THE STATE HAS

20   DESIGNED TO ALLOW DISTRICT ATTORNEYS' OFFICES TO EXERCISE THEIR

21   POLICE POWER AND IT -- AND WHETHER A FEE -- PARTICULAR FEE IS

22   AUTHORIZED PURSUANT TO THIS PROGRAM SEEMS LIKE IT IS SOMETHING

23   THAT IS MUCH BETTER DECIDED BY A STATE COURT THAN A FEDERAL

24   COURT.

25           MAYBE THE FEDERAL COURT IS FORCED TO DECIDE IT IF

1   IT'S PACKAGED UP IN THE FDCPA CLAIM.  I DON'T KNOW.  BUT IF WE

2   WERE SAYING, LET'S STRIP EVERYTHING ELSE ASIDE AND JUST TALK

3   ABOUT THE FEE, I WOULD SAY, YOU WANT TO DO THAT, LIKE, MY

4   INCLINATION MIGHT BE -- I'M THINKING OUT LOUD HERE.  I DON'T

5   KNOW WHAT THE ANSWER IS.  BUT I MIGHT SAY:  GO TO STATE COURT

6   AND DO THAT; I'M GOING TO ABSTAIN FROM THAT QUESTION, OR I'M

7   GOING TO DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION ON THAT

8   QUESTION.

9          IF THAT'S THE SOLE ISSUE YOU WANT TO TEE UP, GO TO

10  STATE COURT AND LET THE STATE COURT DECIDE WHETHER THE STATE'S

11  OWN PROGRAM IS BEING VIOLATED OR NOT.

12          **MR. TAITELMAN:**  WE'RE FINE WITH THAT.  I UNDERSTAND

13  COUNSEL WOULD PROBABLY SAY OTHERWISE, BUT IT IS PACKAGED UP

14  WITHIN THE BROADER CONTEXT OF --

15          (SIMULTANEOUS CROSSTALK.)

16          **MS. TERRELL:**  IT IS.  I DON'T SEE HOW IT CAN BE

17  STRIPPED OUT.

18          **THE COURT:**  THAT IS A CONCERN THAT I HAVE WITH -- YOU

19  KNOW, THAT'S A CONCERN I HAVE WITH THIS CASE OVERALL, AND

20  IT'S -- YOU KNOW, IT'S A CONCERN THAT I WOULD HAVE WITH SORT OF

21  TEEING UP JUST THE FEE ISSUE.

22          ALL OF THIS IS TO SAY -- I MEAN, THIS DISCUSSION IS

23  MAKING ME THINK THAT PROBABLY THE MOST APPROPRIATE WAY TO

24  HANDLE THIS CASE IS TO SIMPLY -- FOR ME TO CONSIDER THE CASE

25  THAT IS IN FRONT OF ME.  AND TO ME -- I SAID I WILL GO BACK AND

1   I WILL LOOK AT THOSE CASES THAT YOU CITED TO ME.

2           BUT TO ME THE CASE THAT IS IN FRONT OF ME IS A CASE

3   ABOUT THE OLD LETTER AND THE OLD SYSTEM, TO THE EXTENT THERE'S

4   A DIFFERENCE, AND THAT WE SHOULD BE -- MY TENTATIVE VIEW IS

5   THAT WE SHOULD -- I SHOULD CERTIFY A CLASS OF PEOPLE WHO GOT

6   THE OLD LETTER, AND WE CAN ADJUDICATE WHETHER THE FDCPA WAS

7   VIOLATED OR WHETHER -- AND/OR WHETHER STATE LAW WAS VIOLATED AS

8   TO THE PEOPLE WHO RECEIVED THE OLD LETTER.  I MEAN, THAT'S -- I

9   AM THINKING THE MORE WE TALK ABOUT IT, THAT MAY BE THE BEST

10  APPROACH.

11          BUT, IN ANY EVENT, I WILL RECEIVE YOUR LETTER ON

12  FRIDAY.  I WILL RECEIVE YOUR LETTER ON MONDAY.  PERHAPS I'LL

13  CALL YOU IN FOR A FURTHER CASE MANAGEMENT CONFERENCE TO DISCUSS

14  IT A LITTLE BIT MORE.  BUT YOU SHOULD TAKE A POSITION ON ALL

15  THIS STUFF, AND PERHAPS IT SHOULD INCLUDE -- IF THERE'S GOING

16  TO BE -- YOU KNOW, FLOATING THIS IDEA OF JUST TEEING UP THE

17  FEE, YOU KNOW, I -- YOU SHOULD KNOW THAT I'M CONCERNED ABOUT

18  WHY IS A FEDERAL COURT DECIDING THIS QUESTION ABOUT THIS ISSUE

19  AND I -- YOU KNOW, I WANT YOUR VIEWS ON WHETHER I CAN AND

20  SHOULD DO THAT, AS OPPOSED TO STATE COURTS DOING IT.

21          **MR. TAITELMAN:**  YOUR HONOR, WITH RESPECT TO ANOTHER

22  STATUS CONFERENCE, I'M MORE THAN HAPPY TO COME UP HERE, BUT I'M

23  OUT OF THE COUNTRY NEXT WEEK.  OTHER THAN THAT, I'M AROUND

24  GENERALLY.

25          **THE COURT:**  OKAY.

1          **MR. TAITELMAN:**  BUT I DID WANT TO ALERT THE COURT TO

2    THAT.

3          **THE COURT:**  WELL, IF WE CALL YOU IN, IT WILL BE THE

4    WEEK AFTER NEXT.

5          **MR. TAITELMAN:**  THAT'S FINE.  OTHER THAN FRIDAY.  I

6    HAVE TO GO SEE MY SON IN COLLEGE.

7          **THE COURT:**  ALL RIGHT.

8          **MR. TOWNSEND:**  SO, YOUR HONOR, WITH RESPECT TO THE

9    MOTIONS TO DISMISS --

10          **THE COURT:**  YEAH.

11          **MR. TAITELMAN:**  -- WHAT DOES THE COURT WISH TO DO

12    WITH THOSE MOTIONS?  THE FEDERALISM CONCERN, I APPRECIATE THE

13    COURT'S POINT, BECAUSE I THINK IN LIGHT OF THE DECISION WITH

14    RESPECT TO THE FAA, I THINK THE FEDERALISM CONCERN IS

15    HEIGHTENED, AND IN MY VIEW, I THINK, BASED ON SOME OF THE

16    FINDINGS YOUR HONOR MADE THE CONNECTION THAT --

17          **THE COURT:**  THE MOTION TO DISMISS IS DENIED.

18          **MR. TAITELMAN:**  BOTH MOTIONS TO DISMISS?

19          **THE COURT:**  YES.  AND THE -- AND I THINK THERE

20    COULD -- MAYBE THERE'S SERIOUS ISSUE ON THE 12(B)(7) MOTION IF

21    THIS INVOLVED INJUNCTIVE RELIEF, BUT IF IT DOESN'T INVOLVE

22    INJUNCTIVE RELIEF, THERE'S NO SERIOUS ISSUE AS IT RELATES TO

23    THE 12(B)(7).

24          **MR. TAITELMAN:**  I UNDERSTAND THAT.

25          **THE COURT:**  SO I DON'T THINK WE NEED TO DISCUSS THAT

1    AT THIS POINT.

2                **MR. TAITELMAN:**  OKAY.

3                **THE COURT:**  AND BY DENYING YOUR MOTION TO DISMISS,

4    THAT'S NOT TO SAY I DON'T THINK THERE ARE SERIOUS FEDERALISM

5    ISSUES.  IT'S JUST THE ARGUMENT YOU MADE HAS NO MERIT.  THE

6    PARTICULAR ARGUMENT YOU MADE HAS NO MERIT.

7                **MR. TAITELMAN:**  MR. HARDY MADE THAT ARGUMENT, YOUR

8    HONOR.

9                **MR. ARONS:**  YOUR HONOR, THERE WAS A MOTION TO REOPEN

10   DISCOVERY.

11               **THE COURT:**  OH, YEAH.  I DIDN'T LOOK AT THAT.  WHAT'S

12   THAT ABOUT?

13               **MR. ARONS:**  WE WANTED TO REOPEN DISCOVERY TO TAKE

14   DISCOVERY AGAINST THE NEW DEFENDANTS AND --

15               **THE COURT:**  OH, YEAH.  YOU KNOW WHAT?  I DIDN'T LOOK

16   AT THAT, BUT MY REACTION WAS:  WHY?  I MEAN, YOU'VE HAD AN

17   OPPORTUNITY TO DO DISCOVERY AGAINST THESE NEW DEFENDANTS.

18               **MR. ARONS:**  WELL, THE DISCOVERY HAS BEEN CLOSED SINCE

19   BEFORE THE SECOND AMENDED COMPLAINT WAS FILED, BEFORE THEY WERE

20   DEFENDANTS, AND THAT'S THE REASON.

21               THERE'S ALSO ONE ENTITY THAT REFERS (INDISCERNIBLE)

22   WE WANTED TO DO DISCOVERY AGAINST.  WE RAN OUT OF TIME BECAUSE

23   OF THE JANUARY 31ST CUTOFF DATE.

24               AT SOME POINT, I IMAGINE, IN THIS CASE, DEFENDANTS

25   ARE GOING TO FILE AN ANSWER, AND THERE MAY BE SOMETHING IN THAT

```
 1    ANSWER THAT REQUIRES DISCOVERY.  WE HAVEN'T SEEN THEIR
 2    AFFIRMATIVE DEFENSES.  WE DON'T KNOW WHAT THEY ARE.  AND
 3    THERE'S ABSOLUTELY NO PREJUDICE.  THIS CASE IS --
 4          THE COURT:  ANSWER IS DUE IN SEVEN DAYS.  I'LL THINK
 5    ABOUT THE -- I'LL THINK ABOUT THE MOTION TO REOPEN DISCOVERY.
 6    I'M SORRY.  JUST PREPARING FOR ALL THE OTHER STUFF, I DIDN'T
 7    FOCUS --
 8          MR. HARDY:  YOUR HONOR, RESPECTFULLY GIVEN
 9    MR. TAITELMAN'S VACATION, COULD WE MAKE THAT 14 DAYS FOR THE
10    ANSWER?
11          THE COURT:  SURE.
12          MS. TERRELL:  WOULD IT MAKE MORE SENSE FOR US JUST TO
13    CONFER AND GIVE YOU A JOINT STATUS REPORT IN ADVANCE OF A
14    HEARING?
15          THE COURT:  IN ADVANCE OF WHAT HEARING?
16          MS. TERRELL:  A CASE MANAGEMENT CONFERENCE.
17          THE COURT:  OH, AS OPPOSED TO THOSE LETTERS?
18          MS. TERRELL:  YEAH.
19          THE COURT:  YEAH.
20          MS. TERRELL:  WHY DON'T WE DO THAT?  THEN WE CAN
21    ADDRESS -- WE CAN -- IF WE CAN REACH AGREEMENT ON ANY
22    DISCOVERY, YOU'LL KNOW THAT.  WE'LL SEE WHETHER WE CAN REACH
23    AGREEMENT ON ANYTHING.
24          THE COURT:  SO LET'S SEE.  I WAS GOING TO PLUG YOU IN
25    ON TUESDAY THE 13TH, BUT I THINK KRISTIN MIGHT KILL ME IF I DO
```

1   THAT.  WHAT ABOUT -- WHAT ABOUT THE 15TH FOR A CMC?  LET'S SEE.

2           **MR. TAITELMAN:**  THAT WOULD WORK, YOUR HONOR.

3           **THE COURT:**  SHOULD WE DO IT IN THE MORNING OR

4   AFTERNOON?

5           **MS. TERRELL:**  AFTERNOON ALLOWS US TO DO IT IN ONE DAY

6   FROM SEATTLE.

7           **THE COURT:**  OKAY.  LET'S DO IT AT 2:00 O'CLOCK.

8           **MR. TAITELMAN:**  YOUR HONOR, CAN WE THEN SUBMIT THE

9   JOINT REPORT -- I MEAN, WHAT'S THE TIMING ON THAT?

10          **THE COURT:**  YOU CAN SUBMIT THE JOINT -- YOU CAN

11  SUBMIT THE CASE MANAGEMENT SEVEN DAYS PRIOR.

12          **MR. TAITELMAN:**  PERFECT.

13          **THE COURT:**  NOVEMBER 8TH.  SO THEN FORGET ABOUT YOUR

14  LETTER -- YOUR LETTERS ON FRIDAY AND MONDAY.  THAT'S A GOOD

15  IDEA.

16          **MR. TAITELMAN:**  THANK YOU, YOUR HONOR.

17          **MR. TOWNSEND:**  THANK YOU, YOUR HONOR.

18          **THE COURT:**  SOUNDS LIKE A GOOD IDEA.

19          **MR. HARDY:**  THANK YOU, YOUR HONOR.

20          **THE COURT:**  OKAY.  THANK YOU.

21          (PROCEEDINGS ADJOURNED AT 12:09 P.M.)

22

23

24

25

1                **CERTIFICATE OF TRANSCRIBER**

2

3     I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

4 TRANSCRIPT, TO THE BEST OF MY ABILITY, OF THE ABOVE PAGES OF

5 THE OFFICIAL ELECTRONIC SOUND RECORDING PROVIDED TO ME BY THE

6 U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OF THE

7 PROCEEDINGS TAKEN ON THE DATE AND TIME PREVIOUSLY STATED IN THE

8 ABOVE MATTER.

9     I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR,

10 RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN

11 WHICH THIS HEARING WAS TAKEN; AND, FURTHER, THAT I AM NOT

12 FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THE

13 ACTION.

14

15

16          JOAN MARIE COLUMBINI

17          NOVEMBER 14, 2018

18

19

20

21

22

23

24

25