Michael F. Ram, CSB #104805
Email: mram@robinskaplan.com
ROBINS KAPLAN LLP
2440 West El Camino Real, Suite 100
Mountain View, California 94040
Telephone: (650) 784-4040
Facsimile: (650) 784-4041

[Additional Counsel Appear on Signature Page]

*Attorneys for Plaintiffs*

U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| KAREN SOLBERG, NANCY MORIN, and NARISHA BONAKDAR, on their own behalf and on behalf of others similarly situated,<br><br>                    Plaintiffs,<br><br>       v.<br><br>VICTIM SERVICES, INC., d/b/a CorrectiveSolutions, NATIONAL CORRECTIVE GROUP, INC., d/b/a CorrectiveSolutions, AMERICAN JUSTICE SOLUTIONS, INC., d/b/a CorrectiveSolutions, BIRCH GROVE HOLDINGS, INC., MATS JONSSON and KARL THOMAS JONSSON,<br><br>                    Defendants. | NO. 3:14-cv-05266-VC<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Honorable Vince Chhabria<br><br><u>CLASS ACTION</u><br><br>**DEMAND FOR TRIAL BY JURY**<br><br>DATE:          July 11, 2019<br>TIME:          10:00 a.m.<br>LOCATION:  Courtroom 4 - 17th Floor |

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on July 11, 2019 at 10 a.m. in Courtroom 4, 17th Floor, of this honorable court located at 450 Golden Gate Avenue, San Francisco, California, 94102, before the Honorable Vince Chhabria, Plaintiffs, individually and on behalf of the Class, will move this Court for an order granting Plaintiffs' Motion for Summary Judgment. Plaintiffs bring this Motion pursuant to Federal Rule of Civil Procedure 56. This motion is based on this Notice of Motion, the following Memorandum of Points & Authorities, the records and files in this action, and on such other matters as may be presented before or at the hearing of the motion.

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................ 1

II.     STATEMENT OF FACTS ....................................................................... 1

        A.      Defendants sent false and deceptive form collection
                letters to Class Members ............................................................ 1

        B.      Defendants designed and operated the bad check diversion programs .............. 2

        C.      Defendants routinely accepted casino cash
                advances – not checks – the program ........................................... 5

        D.      Defendants' changes in corporate structure did not change
                their business model ..................................................................... 6

        E.      Defendants sent threatening collection demands to Plaintiffs ........................... 6

III.    AUTHORITY AND ARGUMENT ......................................................... 7

        A.      Defendants are debt collectors under the FDPCA .......................................... 7

                1.      NCG, VSI and AJS are debt collectors under the FDCPA .................... 8

                2.      Mats and Thomas Jonsson are debt collectors under the FDCPA ......... 9

                3.      Birch Grove is a debt collector under the FDCPA ........................... 11

                4.      Defendants are not exempt from FDCPA liability under
                        Section 1692p ........................................................................ 12

                        a.      The collection letters did not include the
                                dispute procedure notice ........................................... 12

                        b.      Defendants failed to comply with the district
                                attorneys' contracts .................................................. 13

                        c.      The program does not require a probable cause
                                determination ......................................................... 14

                        d.      Defendants do not comply with California's penal law .......... 14

                        e.      District attorneys do not direct, supervise or
                                control the program .................................................. 15

B.    Defendants' debt collection programs violated multiple provisions of the FDCPA ................................................................ 15

    1.    Defendants falsely represented that their letters were sent by a district attorney ..................................................... 16

    2.    The letters made false threats of prosecution ....................................... 16

    3.    Defendants attempt to collect fees that are not permitted by law ......... 18

    4.    The letters omit required notices and disclosures ................................. 21

C.    Defendants' programs are unlawful, unfair, or fraudulent under the UCL ...... 21

    1.    Defendants' practices were "unlawful" under the UCL ....................... 21

    2.    Defendants' practices were "unfair" under the UCL ........................... 22

    3.    Defendants' practices were "fraudulent" under the UCL ..................... 23

    4.    All Defendants' are liable for violations of the UCL ........................... 24

D.    Plaintiffs are entitled to summary judgment of their negligent misrepresentations and fraudulent misrepresentation claims .......................... 24

E.    The Class paid Defendants $6,076,051 in unlawful fees ................................. 25

IV.    CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Afewerki v. Anaya Law Grp.*,
868 F.3d 771 (9th Cir. 2017) .......................................................................... 15

*Alonso v. Blackstone Fin. Grp. LLC*,
962 F. Supp. 2d 1188 (E.D. Cal. 2013) ........................................................... 9

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................ 7

*Bowerman v. Field Asset Servs., Inc.*,
242 F. Supp. 3d 910 (N.D. Cal. 2017) ............................................................. 7

*Cavnar v. BounceBack, Inc.*,
No. 2:14-CV-235-RMP, 2015 WL 4429095 (E.D. Wash. July 17, 2015) ................. 13

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................................................ 7

*Charles v. Lundgren & Assocs., P.C.*,
119 F.3d 739 (9th Cir. 1997) ........................................................................... 8

*Cruz v. Int'l Collection Corp.*,
673 F.3d 991 (9th Cir. 2012) ................................................................. 8, 9, 18

*Davis v. HSBC Bank Nev., N.A.*,
691 F.3d 1152 (9th Cir. 2012) ....................................................................... 23

*Del Campo v. Am. Corr. Counseling Serv. Inc.*,
718 F.Supp.2d 1116 (N.D. Cal. 2010) ..................................................... 12, 16

*EEOC v. Kamehameha Sch./Bishop Estate*,
990 F.2d 458 (9th Cir. 1993) ......................................................................... 12

*Elias v. Hewlett- Packard Co.*,
903 F. Supp. 2d 843 (N.D. Cal. 2012) ........................................................... 21

*Gold v. Midland Credit Mgmt., Inc.*,
82 F. Supp. 3d 1064 (N.D. Cal. 2015) ........................................................... 11

*Gonzales v. Arrow Fin. Servs., LLC*,
660 F.3d 1055 (9th Cir. 2011) ......................................................................... 8

*Harrison v. NBD Inc.*,
   968 F. Supp. 837 (E.D.N.Y. 1997) ................................................................. 11

*Irwin v. Mascott*,
   96 F. Supp. 2d 968 (N.D. Cal. 1999) ...................................................... 16, 17

*Pirozzi v. Apple, Inc.*,
   966 F. Supp. 2d 909 (N.D. Cal. 2013) ............................................................ 22

*Rubio v. Capital One Bank*,
   613 F.3d 1195 (9th Cir. 2010) ....................................................................... 21

*Schwarm v. Craighead*,
   552 F. Supp. 2d at 1056 (E.D. Cal. 2008) ........................................... 9, 16, 17

*Terran v. Kaplan*,
   109 F.3d 1428 (9th Cir. 1997) ....................................................................... 15

*Tourgeman v. Collins Fin. Servs., Inc.*,
   755 F.3d 1109 (9th Cir. 2014) ....................................................................... 15

*United States v. ACB Sales & Serv., Inc.*,
   590 F. Supp. 561 (D. Ariz. 1984) .................................................................. 12

## STATE CASES

*Cel-Tech Commc'ns v. L.A. Cellular Tel. Co.*,
   973 P. 2d 527 (1999) ...................................................................................... 21

*Chapman v. Skype, Inc.*,
   162 Cal. Rtpr. 3d 864 (Cal. Ct. App. 2013) ................................................... 24

*DiCampli-Mintz v. County of Santa Clara*,
   289 P.3d 884 (2012) ....................................................................................... 18

*Graham v. Bank of Am., N.A.*,
   172 Cal. Rptr. 3d 218 (2014) ......................................................................... 25

*Imperial Merch. Servs., Inc. v. Hunt*,
   212 P.3d 736 (2009) ....................................................................................... 18

*In re Tobacco II Cases*,
   207 P.3d 20 (2009) ................................................................................... 21, 23

*Lavie v. Proctor & Gamble Co.*,
 129 Cal. Rptr. 2d 486 (Cal. Ct. App. 2003)................................................................ 23

*McKell v. Washington Mut., Inc.*,
 49 Cal. Rptr. 3d 227 (Cal. Ct. App. 2006)................................................................ 22

*People v. Toomey*,
 203 Cal. Rptr. 642 (1984)........................................................................................ 24

*People ex rel. Harris v. Sarpas*,
 172 Cal. Rptr. 3d 25 (Ct. App. 2014) ...................................................................... 24

*Randall v. Ditech Fin., LLC*,
 233 Cal. Rptr. 3d 271 (Cal. Ct. App. 2018)............................................................. 21

*South Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
 85 Cal. Rptr. 2d 301 (Cal. Ct. App. 1999)............................................................... 22

*Tindell v. Murphy*,
 232 Cal. Rptr. 3d 448 (2018)................................................................................... 25

## FEDERAL STATUTES

12 U.S.C. § 5002(6)(A) ................................................................................................. 14

15 U.S.C. § 1692a(5) ....................................................................................................... 8

15 U.S.C. § 1692a(6) ....................................................................................................... 8

15 U.S.C. § 1692e...................................................................................................... 8, 15

15 U.S.C. § 1692f ............................................................................................................ 8

15 U.S.C. § 1692k ......................................................................................................... 25

15 U.S.C. § 1692p .................................................................................................. *passim*

## FEDERAL RULES

Fed. R. Civ. P. 56(a) ........................................................................................................ 7

## OTHER AUTHORITIES

Cal. Bus. & Prof. Code § 17200 .................................................................................... 21

Cal. Com. Code § 3104(3)(f)......................................................................................... 14

Cal. Penal Code § 1001.60 ................................................................... 18

Cal. Penal Code §1001.62 ................................................................ 2, 14

Cal. Penal Code § 1001.64 ................................................................... 22

Cal. Penal Code § 1001.65 ................................................................... 22

# I.  INTRODUCTION

Defendants mailed each Class member letters printed on prosecutor letterhead, falsely implying that the Class member was accused of a crime and risked prosecution, fine, and imprisonment unless the Class member paid over $200 in fees. Plaintiffs and the Class move for an order establishing each Defendant's liability for using false and misleading letters to collect unpaid debts. There is no genuine issue of material fact with respect to whether Defendants' check collection programs violated the Fair Debt Collection Practices Act and the California Unfair Competition Law, or whether Defendants made negligent and fraudulent misrepresentations to the Class. Defendants' check collection program failed to comply with state law. California's Bad Check Diversion Act ("BCDA") requires that a district attorney consider at least five factors before referring a check to a diversion program. Cal. Penal Code § 1001.62. None of this was done. Instead, Defendants received check data from Merchants, sent an email with check data to district attorneys, then "auto opened" the checks for collection. Defendants collected from the Class millions of dollars in fees, the vast majority of which were not authorized by the BCDA. Defendants are not protected by the FDCPA's narrow exemption for certain check-collection programs because they charged unauthorized fees, operated with minimal district attorney oversight, and failed to provide statutorily required notices. Plaintiffs and the Class ask the Court to award actual damages of $6,076,051.[1]

## II.  STATEMENT OF FACTS

### A.    Defendants sent false and deceptive form collection letters to Class members.

During the Class period, from September 1, 2011 to May 7, 2015, Defendants collected dishonored checks by sending form collection letters on district attorney letterhead to check writers throughout California. ECF No. 226-1–226-31 (Initial Notice for every county except

---

[1] Plaintiffs and the Class also seek statutory damages under the FDCPA but believe there are disputed factual issues regarding Defendants' net worth.

Santa Cruz); Ex. 1[2] (Initial Notice for Santa Cruz). The form letters Defendants sent in each county were materially the same. *Id.* They were printed on the letterhead of the county district attorney, included a signature block for the district attorney and often a copy of the district attorney's signature. *Id.* The letters identified neither VSI nor NCG by name. *Id.* They did not say they were sent by a debt collector. *Id.* The letters directed the recipient to mail payments to P.O. boxes maintained by Defendants and call a telephone line staffed by Defendants' employees in their San Clemente office who answered, "Bad Check Restitution Program." *Id.*; Ex. 2 (McClung Dep. (VSI)) at 47:18-48:2.

The initial letter, titled "**OFFICIAL NOTICE –IMMEDIATE ATTENTION REQUIRED,**" included a statement that the check writer had been accused of a crime and could be fined, and jailed or imprisoned, but could avoid a court appearance or further action by the district attorney by participating in the district attorney's "Diversion" or "Bad Check Restitution" program. ECF Nos. 226-1–226-31; Ex. 1.

The letters demanded that a check writer pay restitution on checks and all program fees and attend a Financial Accountability class. *Id.* The fees include a Financial Accountability Class Fee that ranged between $160 and $200, a $50 administrative fee, and a "Return Item Fee." *Id.* Defendants demanded the same categories of illegal fees from all Class members. Ex. 2 (McClung Dep. (VSI)) at 19:20-23; Ex. 3 (T. Jonsson Dep. (VSI)) at 135:6-137:16.

**B.     Defendants designed and operated the bad check diversion programs.**

NCG and VSI entered into form contracts with California district attorneys. Exs. 4–6; Ex. 7 (McClung Dep. (NCG)) at 52:7-58:13; Ex. 2 (McClung Dep. (VSI)) at 56:4-21. Under the contracts, Defendants' responsibilities included all program operations. Ex. 4-6 at § 4.a, 4.b; Ex. 8 at Attachment A, § 2, 2.M. Each contract permitted Defendants to collect standard fees, including a class fee, an administrative fee, a fee for credit or debit card payments, a late

---

[2] Unless otherwise noted, all exhibits are to the Declaration of Beth Terrell in support of Plaintiffs' Motion for Summary Judgment.

fee for late payment plan payments, a class rescheduling fee and an "overpayment/handling fee." Under each contract, Defendants paid the district attorney's office a part of the administrative fee and Defendants kept the class fee, part of the administrative fee, and the other fees. Exs. 4–5 at Schedule I, § G; Ex. 8 at Attachment B.

Defendants provided district attorneys' offices a standard "start-up" packet that supplied the program structure, check intake criteria, and separate "prosecution review" criteria used to determine whether to forward the check to the district attorney if the check writer failed to pay all the fees Defendants demanded, and form collection letters. Ex. 9; Ex. 3 (T. Jonsson Dep. (VSI)) at 29:17-20. After a district attorney signed off on the criteria and the form collection letters, Defendants programmed the criteria and letters into their Super System software. Ex. 10 (Noland Dep. (VSI)) at 39:7-40:13, 42:2-17; Ex. 9 at PRR-GLENN_00973–74; Ex. 11 (Jurisdiction Detail Report for each county including fees charged, criteria for intake and prosecution, types of checks allowed, and county contact information).

Merchants and debt collectors submitted dishonored check and ACH accounts directly to Defendants. Most creditors submitted electronic data files. Ex. 3 (T. Jonsson Dep. (VSI)) at 87:6–11 (90% of checks submitted electronically); Ex. 12 (M. Jonsson Dep. (NCG)) at 35:24-37:15 (the majority of checks submitted electronically). Defendants required the check writer's name, address, and driver's license number, the check number, date, and amount, the bank routing number and account number, the amount of any returned item fee and name or number of the store where the check was passed. Ex. 13 at DEF 043848.10; Ex. 14; Ex. 10 (Noland Dep. (VSI)) at 17:6–19:8 (describing the information required when checks submitted electronically). The reason the check was dishonored is not required information. *Id.* Some merchants submitted checks with a "Crime report" form created and distributed by Defendants. Ex. 15; Ex. 9 at PRR-GLENN_00976. Defendants imported the information from merchants into the Super System, which automatically screened against the intake criteria programmed for each county. Ex. 9 at PRR-GLENN_000973–74; Ex. 10 (Noland Dep. (VSI)) at 21:3-22:12,

24:16-26:10; Ex. 12 (M. Jonsson Dep. (NCG)) at 35:24-37:15; Ex. 16 (Boyd Dep. (VSI)) at 26:8-27:2; Ex. 17 (Boyd Dep. (NCG)) at 22:18-24:1.

Most counties were on "auto open," which meant Defendants generated an "Eligible Check Report" for the county from the Super System and emailed it to the district attorney's office. If the district attorney did not respond by pulling checks from the list within forty-eight to seventy-two hours, Defendants automatically began collection. Ex. 3 (T. Jonsson Dep. (VSI)) at 96:25-99:19; Ex. 10 (Noland Dep. (VSI)) at 31:14–32:13; Declaration of Gerald Fineman ¶¶ 2–5. In some counties, Defendants skipped even this step. Ex. 12 (M. Jonsson Dep. (NCG)) at 46:17-47:13. District attorneys acknowledge the Eligible Check Reports did not include sufficient information to make a probable cause determination. Ex. 18 (Fineman Dep.) at 29:3-31:1; Ex. 19 (Wilson Dep.) at 39:13-41:15. None of the district attorneys deposed in this case routinely reviewed information other than the report of eligible checks before Defendants initiated collection. *See e.g.*, Ex. 20 (Anderson Dep.) at 34:7-38:18; Fineman Decl. ¶¶ 2-5. There is no evidence that district attorneys conducted the review of five statutory factors required by the BCDA. Cal. Penal Code § 1001.62. And Defendants have no knowledge of the review, if any, that district attorneys conducted before Defendants attempted to collect a dishonored check. Ex. 3 (T. Jonsson Dep. (VSI)) at 196:21-197:3.

Defendants implied they were the district attorneys' office in phone calls with Class members. In many counties, a Class Member who called the number listed in the collection letters heard a prerecorded message from the local district attorney. Ex. 21; Ex. 9 at PRR-GLENN_000999. Defendants' call center employees followed scripts requiring them to say, "Thank you for calling the Bad Check Restitution Program" and avoid disclosing the company name or location. Ex. 22 at 5; Ex. 3 (T. Jonsson Dep. (VSI)) at 185:25-187:15. Defendants, not district attorneys, addressed disputes raised by Class members. Ex. 3 (T. Jonsson Dep. (VSI)) at 158:24-159:5. And Defendants, not district attorneys, received the payments made by Class members. Exs. 4-6 at § 4(b); Ex. 8 at 18.

If a check remained unpaid after Defendants had exhausted their collection efforts, the Super System screened the check against the "prosecution review" criteria, to determine whether to request the Class Member's bank records and send the file to the district attorney. Ex. 10 (Noland Dep. (VSI)) at 39:7–50:19. In many counties, the intake criteria allowed into the program and collection of checks that were not eligible for prosecution review. Ex. 11 (reflecting criteria not required for intake but required for prosecution review). Defining successful completion of the "diversion program" as including attending the Financial Accountability class, over 80% of check writers failed to complete the program. Terrell Decl. ¶¶ 39-46. Of these, only 1.4% had their files sent to the district attorneys' office, but Defendants have no information on whether any of those were actually prosecuted. *Id.*; Ex. 38; Ex. 3 (T. Jonsson Dep. (VSI)) at 201:23-202:13, 222:7-15. Defendants did not provide district attorneys with lists of people who had successfully completed diversion. Ex. 18 (Fineman Dep.) at 64:16–64:7. Although Defendants sent "Monthly Activity Reports," the district attorneys rarely took action based on them. Ex. 19 (Wilson Dep. at 61:19–62:18).

**C.   Defendants routinely accepted casino cash advances—not checks—the program.**

Defendants accepted into their programs at least hundreds of Class members referred by Global Payments Check Services, Inc. ("GPCSI"). Terrell Decl. ¶ 47. GPCSI operates a VIP Preferred program that provides cash to casino patrons. Ex. 23 (Gardeck Dep.) at 30:22–31:25. The majority of accounts GPSCI referred to Defendants were part of the VIP Preferred program. *Id.* at 66:19–67:1. These were not "payable on demand" transactions. GPCSI advanced money to casino players who agreed to have money in their checking account to cover the advance, anywhere from one to twenty-eight days later. *Id.* at 55:16–25, 65:5–66:12, 75:3–20. When GPSCI transmitted non-check accounts to Defendants, GPSCI's system generated a "check number" using the last four digits of the customer's phone number. *Id.* at 69:23–71:8.

**D.      Defendants' changes in corporate structure did not change their business model.**

NCG is liable for fees paid by the Class from September 1, 2011 until June 5, 2014, when it sold the business to VSI. *See* Ex. 24. VSI took over the contracts with the district attorneys and continued to collect checks submitted to the program. *Id.* at § 2.2, 37–42 (Schedule 2.2(f)). VSI continued to use the Super System's automated processes, and inherited the intake and prosecution criteria, the form letters, and the fee structure from NCG. Ex. 2 (McClung Dep. (VSI)) at 44:21-25, 54:14–55:14; Ex. 10 (Noland Dep. (VSI)) at 91:15-17. VSI, AJS, Thomas Jonsson and Birch Grove Holdings are liable for fees paid by the Class from June 6, 2014 to May 7, 2015, the last date of the class period. Mats Jonsson's liability spans the entire class period. The Class's expert used Defendants' data to calculate amounts the Class paid Defendants in illegal fees during each relevant time period. Expert Report of Jeffrey Munson ("Munson Report").

**E.      Defendants sent threatening collection demands to Plaintiffs.**

Karen Solberg wrote a $75 check to Freeway Insurance, in Sacramento, in order to add her daughter to her car insurance. Declaration of Karen Solberg ("Solberg Decl."), ¶¶ 2–3. Freeway Insurance previously told her there would be no charge for the additional insured. *Id.* ¶¶ 3–4. The day after writing the check, Ms. Solberg disputed the charge and the following business day, cancelled the policy and stopped payment on the check. *Id.* ¶¶ 5–6. In October 2013, NCG sent Ms. Solberg the first of five threatening collection demands on the letterhead of the Orange County District Attorney. *Id.* ¶¶ 8–17. She contacted what she thought was the district attorney's office and explained the dispute to no avail. *Id.* ¶ 11, 13, 15. She paid for use of a fax and postage in order to investigate Defendants' threats. *Id.* ¶ 17. Ms. Solberg did not pay any program fees and was not prosecuted. *Id.* ¶¶ 18–19.

Nancy Morin is a disabled single parent of a disabled daughter and lives in Auburn, California. Declaration of Nancy Morin ("Morin Decl."), ¶ 2. In 2010 she paid $66.25 in fees to NCG as part of its "Check Restitution Program" in connection with a check that was

dishonored due to a bank error. *Id.* ¶¶ 18–20. In 2014, Ms. Morin wrote a check to her local

Safeway. *Id.* ¶ 3. The check was initially dishonored, but it cleared on redeposit. *Id.* ¶ 6. More

than two months later, Ms. Morin received the first of four of VSI's form letters threatening

"further action" by the district attorney if she failed to pay the check and $241.25 in fees. *Id.* ¶

4. She was terrified by the letter. *Id.* ¶ 5. Although she provided proof the check had been paid

ten weeks earlier, the threats continued. *Id.* ¶¶ 7–16. Ms. Morin did not pay any money and was

not prosecuted. *Id.* ¶ 17.

Narisha Bonakdar works for the California Legislature in Sacramento. Ex. 25

(Bonakdar Dep.) at 11:9–15. In March 2014, she wrote a $200 check for a monthly bus pass

that did not clear. *Id.* at 26:23–31:24. Although she received a notice about the check, she

thought it was about a prior $200 check that had not initially cleared but which she then paid.

*Id.* VSI first contacted her in June 2014, demanding payment of the check amount plus $248.50

in fees. *Id.* at 32:6–33:3; Ex. 37. She paid all of Defendants' fees and attended the financial

accountability class. *Id.* at 68:17–74:2.

### III.  AUTHORITY AND ARGUMENT

Summary judgment must be granted to a moving party who demonstrates "that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the

absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). The burden then shifts to the non-moving party to identify specific facts showing there

is a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256

(1986). The familiar Rule 56 standards apply when a certified class has received class notice

and seeks summary judgment on its claims. *See Bowerman v. Field Asset Servs., Inc.*, 242 F.

Supp. 3d 910, 927–28, 938 (N.D. Cal. 2017).

**A.    Defendants are debt collectors under the FDPCA.**

"The FDCPA comprehensively regulates the conduct of debt collectors, imposing

affirmative obligations and broadly prohibiting abusive practices." *Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1060–61 (9th Cir. 2011). It is a strict liability statute. *Cruz v. Int'l Collection Corp.*, 673 F.3d 991, 997 (9th Cir. 2012). Plaintiffs may establish that Defendants violated the FDCPA by proving that each Defendant is a "debt collector" that collects or attempts to collect debts using "false, deceptive, or misleading representations" or "unfair or unconscionable means." *See* 15 U.S.C. §§ 1692e, 1692f.

Under the FDCPA, a "debt collector" is a person who regularly uses the mails or any instrumentality of interstate commerce in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. 15 U.S.C. § 1692a(6). A debt arising from a dishonored check written for personal, family, or household use is a "debt" within the meaning of the FDCPA. *Charles v. Lundgren & Assocs., P.C.,* 119 F.3d 739, 742 (9th Cir. 1997); 15 U.S.C. § 1692a(5). "A dishonored check written on a personal checking account is *prima facie* evidence that the check was written for personal purposes." *Irwin v. Mascott*, 96 F. Supp. 2d 968, 972 (N.D. Cal. 1999). Most of the checks that Defendants collect are personal checks written to retail merchants. Ex. 16 (Boyd Dep. (VSI)) at 76:20-23.

    1.    <u>NCG, VSI and AJS are debt collectors under the FDCPA.</u>

NCG, VSI, and AJS are debt collectors. NCG operated the bad check program until June 2014. Ex. 24. In 2014, NCG sold the assets of the check collection business to VSI. *See* Ex. 24. VSI took over NCG's contracts with the district attorneys, continued to collect checks and use the same form collection letters and other program documents. Ex. 24 at § 2.2, 37–42 (Schedule 2.2(f)). VSI was essentially a shell company. AJS employees operated the program. AJS provided case management, accounting, compliance, information technology, and business systems services. Ex. 2 (McClung Dep. (VSI)) at 16:19–21; Ex. 26; *see also* Ex. 27 (M. Jonsson Dep. (VSI)) 59:2–24, 62:8–63:5. AJS employees staffed the program's call center, communicated with check writers, provided the financial accountability class, and were

responsible for "restitution recovery" and "fee collection." Ex. 26 at 1–2. AJS employed Mats and Thomas Jonsson. Ex. 3 (T. Jonsson Dep. (VSI)) at 20:18-20; Ex. 28 (M. Jonsson Dep. (individual)) at 24:15-18. AJS employees managed the contracts with the district attorneys' offices. Ex. 2 (McClung Dep. (VSI)) at 8:6–10, 11:9–12:1. AJS provided the facilities for the bad check program and paid the program's operating expenses. Ex. 26 at 2; Ex. 27 (M. Jonsson Dep. (VSI)) 36:10– 38:6. VSI paid 96% of its gross revenue to AJS. Ex. 26 at 2.

      2.    <u>Mats and Thomas Jonsson are debt collectors under the FDCPA.</u>

Mats and Thomas Jonsson are also "debt collectors." An individual may be held personally liable for violation of the FDCPA if "(1) the individual qualifies as a debt collector and (2) the individual has taken an action that violates the FDCPA." *Cruz*, 673 F.3d at 1000. The sole officer, owner, and director of a collection agency may qualify as a debt collector. *Id.* An individual may be personally liable as a debt collector when he "exercises control over the affairs of the collection business or was regularly engaged, directly or indirectly, in the collections of debts." *Alonso v. Blackstone Fin. Grp. LLC*, 962 F. Supp. 2d 1188, 12052 (E.D. Cal. 2013) (collecting cases). Corporate officers with the authority to establish collection procedures, negotiate and oversee contracts, and manage relationships with district attorneys and merchants may be individually liable under the FDCPA. *Schwarm v. Craighead*, 552 F. Supp. 2d at 1056, 1073 (E.D. Cal. 2008); *Alonso*, 962 F. Supp. 2d at 1204-06.

Mats Jonsson is liable for NCG, VSI, and AJS's violations of the FDCPA because he exercised control over the affairs of the check collection business. He was the COO of NCG from January 2010 until June 2013 when he became the CEO. Ex. 12 (M. Jonsson Dep. (NCG)) at 12:7-21; Ex. 29. At NCG he was responsible for negotiating, approving, and signing contracts with district attorneys, sales, marketing, and providing input on collection procedures. Ex. 12 (M. Jonsson Dep. (NCG)) at 67:2–4, 107:12–111:23; Ex. 29; Ex. 30 (responses to Interrogatory Nos. 7 and 17). NCG employees responsible for promoting the program to district attorneys' offices reported to Mats Jonsson. Ex. 12 (M. Jonsson Dep. (NCG)) at 112:11–19.

Mats Jonsson made the decision to purchase the bad check business and other assets from NCG and to form the various corporate entities that operated the check collection business between June 2014 and May 2015, including VSI, AJS, and Birch Grove. Ex. 28 (M. Jonsson Dep. (individual)) at 9:13-21; Ex. 27 (M. Jonsson Dep. (VSI)) 23:2–25:3. For one year after the sale, he consulted with VSI on behalf of NCG, including on pending legal actions against NCG. Ex. 27 (M. Jonsson Dep. (VSI)) at 26:25–31:18. He was the sole owner of VSI and AJS, treasurer of VSI, and president and CEO of AJS. Ex. 27 (M. Jonsson Dep. (VSI)) at 23:14–25:3; Ex. 12 (M. Jonsson Dep. (NCG) at 13:5–14:14; Ex. 28 (M. Jonsson Dep. (individual)) at 5:23-25; Ex. 29 (answer to Interrogatory No. 2). He is responsible for managing company finances. Ex. 31 (T. Jonsson Dep. (VSI Vol. 2)) at 50:4–11; 53:12–55:7; Ex. 27 (M. Jonsson Dep. (VSI)) at 134:19–135:6, 137:18–22. He had the authority to negotiate and make decisions regarding negotiating fees with the district attorneys' offices. Ex. 27 (M. Jonsson Dep. (VSI) at 142:18–143:14. He, along with Thomas Jonsson, decided how much VSI would pay AJS in exchange for operating the check collection business. Ex. 12 (M. Jonsson Dep. (NCG)) 12:15–13:4. Mats Jonsson also materially participated in the collection of Class members' debts. As owner of Birch Grove, he managed the check collection business in accordance with the Management Services Agreement between Birch Grove and VSI. Ex. 32.

Thomas Jonsson is liable for VSI and AJS's violations of the FDCPA because he exercised control over the affairs of the check collection business. Thomas Jonsson was the president, COO, and general counsel of VSI. Ex. 3 (T. Jonsson (VSI)) at 15:23–16:8; Ex. 33 (Supplemental responses to Interrogatory Nos. 7 and 17). In his role as company president, he oversaw daily operations, ensured compliance with regulations and statutes affecting the check collection business, and oversaw the transition of the business from NCG to VSI. Ex. 3 (T. Jonsson Dep. (VSI) at 16:11-16, 23:6-24:8; Ex. 28 (M. Jonsson Dep.) at 7:8–8:1. He was responsible for handling and ensuring performance of VSI's contracts with district attorneys, including revising, reviewing, and approving the contracts. Ex. 3 (T. Jonsson Dep. (VSI)) at

24:18-27:11, 31:19-32:2; Ex. 28 (M. Jonsson Dep.) at 7:8-8:1; Ex. 7 (McClung Dep. (NCG)) at 55:10-18. His participation in the upper level management of VSI subjects him to personal liability.

Thomas Jonsson also materially participated in collecting the debts at issue. He authorized revisions to the start-up packet that Defendants provided to district attorneys and revised the employee manual that established VSI's collection procedures. Ex. 3 (T. Jonsson Dep. (VSI)) at 29:17-30:6, 110:15-112:5. He also had the authority to approve changes to the form letters. *Id.* at 40:15-41:14. And he supervised AJS employees, overseeing the call center and the department responsible for the financial accountability class. Ex. 3 (T. Jonsson Dep. (VSI)) at 16:19-18:21, 46:8-48:3; Ex. 2 (McClung Dep. (VSI) at 27:6-10.

 3. Birch Grove is a debt collector under the FDCPA.

Birch Grove is liable for FDCPA violations committed between June 2014 and May 2015 because of its indirect involvement in collection activities and management of the debt collection business. A parent company engages in debt collection and may be held liable as an "indirect" debt collector where the parent company and the direct debt collector constitute a "single economic enterprise." *Gold v. Midland Credit Mgmt., Inc.*, 82 F. Supp. 3d 1064, 1072 (N.D. Cal. 2015) (citation omitted); *see also Harrison v. NBD Inc.*, 968 F. Supp. 837, 845 (E.D.N.Y. 1997). "Critical" to the FDCPA's definition of debt collector "is the notion that a debt collector is one who *directly or indirectly* engages in collection activity." *Gold*, 82 F. Supp. 3d at 1070 (emphasis added).

Birch Grove actively participated in the check collection business by providing management services to VSI. *See* Ex. 32; Ex. 27 (M. Jonsson Dep. (VSI)) at 38:22-39:11; Ex. 31 (T. Jonsson Dep. (VSI Sept. 2017)) at 43:23-46:13. Birch Grove was responsible for "[s]upervising all employees or independent contractors" of VSI, developing a strategic plan, "providing financial, accounting, executive and administrative expertise," and monitoring and evaluating business performance. *Id.* at 1-2. Birch Grove was responsible for all high-level

business decisions. *See* Exhibit 32; Ex. 31 (T. Jonsson Dep. (VSI Vol. 2)) at 49:4-50:3. Birch

Grove profited from this arrangement and earned two percent of VSI's gross revenue. *Id.* at 2-

3; Ex. 27 (M. Jonsson Dep. (VSI)) at 42:25-43:7. Mats Jonsson and Thomas Jonsson provided

management services to the check collection business on behalf of Birch Grove. Ex. 31 (T.

Jonsson Dep. (VSI Sept. 2017)) at 43:23-46:25. *See United States v. ACB Sales & Serv., Inc.*,

590 F. Supp. 561, 576 (D. Ariz. 1984) (holding that parent company of subsidiary collection

agencies was a debt collector under the FDCPA because it provided management, accounting,

purchasing, and administrative services for subsidiaries and all companies were managed by

"an interlocking directorate" of three individuals).

4. <u>Defendants are not exempt from FDCPA liability under Section 1692p.</u>

The FDCPA excludes private entities operating bad check diversion programs from the

definition of "debt collector" if they meet the exemption's statutory requirements. 15 U.S.C.

§ 1692p. Private entities may nonetheless be liable for violating the FDCPA if they fail to

satisfy a strict set of statutory safeguards. *Del Campo v. Am. Corr. Counseling Serv. Inc.*, 718

F.Supp.2d 1116, 1125–26 (N.D. Cal. 2010). Statutory exemptions are to be narrowly construed

and the party seeking the benefit of the exemption bears the burden of proof. *EEOC v.

Kamehameha Sch./Bishop Estate*, 990 F.2d 458, 460 (9th Cir. 1993). Defendants are not

entitled to the exemption because they cannot prove compliance with the exemption's statutory

safeguards. Defendants did not provide a required dispute notice and procedure, failed to

comply with their contracts with district attorneys, failed to comply with the BCDA, and had

no real district attorney oversight of their programs.

a. *The collection letters did not include the dispute procedure notice.*

To be exempt under 1692p, a private entity must include in the first communication to

an alleged offender a "clear and conspicuous statement" that "if the alleged offender notifies

the private entity or the district attorney in writing, not later than 30 days after being contacted

for the first time" that there is a dispute, "before further restitution efforts are pursued, *the*

*district attorney or an employee of the district attorney* authorized to make such a determination makes a determination that there is probable cause to believe that a crime has been committed . . . " 15 U.S.C. § 1692p(2)(C)(v)(III); *see also Cavnar v. BounceBack, Inc.*, No. 2:14-CV-235-RMP, 2015 WL 4429095, at *3 (E.D. Wash. July 17, 2015) (denying defendant's motion for summary judgment because its collection letters did not included the dispute provision). Defendants' initial collection letter stated that the dispute would be reviewed by "the authorized administrator," meaning the Defendants, and did not state that collection activities would be suspended pending completion of the review. ECF No. 226-1–226-31 at 2; *see also* Ex. 3 (T. Jonsson Dep. (VSI)) at 158:24-159:5 (testifying that Defendants were not required to refer disputes to the district attorneys' offices until the CFPB consent order).

>    b.    *Defendants failed to comply with the district attorneys' contracts.*

To be exempt from FDCPA coverage, Defendants must comply with the terms of their contracts with district attorneys. 15 U.S.C. § 1692p(2)(C)(ii). The district attorney's intake requirements preclude inclusion of checks that are partially paid or post-dated. Ex. 11. Defendants cannot identify partially paid or post-dated checks from the spreadsheets of check data submitted by merchants. Ex. 34 (Noland Dep. (NCG)) at 87:14-95:12. Many counties preclude inclusion of stop payment checks, payments on account, or checks for a real estate rental. Defendants' computerized screening does not catch these checks. Ex. 34 (Noland Dep. (NCG)) at 87:14-95:12; Ex. 12 (M. Jonsson Dep. (NCG)) at 52:8-15.

Defendants also regularly attempted to collect debts that were not eligible for collection under the district attorney-approved intake criteria because they were not checks. For the majority of the accounts GPSCI submitted to Defendants, GPSCI had advanced money to casino patrons who agreed to have money in their checking account to cover the advance within one to twenty-eight days later. Ex. 23 (Gardeck Dep.) at 55:16–25, 65:5–66:12, 75:3–20. These accounts are agreements for deferred payment. They are not checks payable on

demand. *See* Cal. Com. Code § 3104(3)(f) (Check means a draft payable on demand); 12

U.S.C. § 5002(6)(A) ("The term 'check' (A) means a draft, payable on demand . . . ."). Neither

their contracts with district attorneys, nor the BCDA, authorize inclusion of casino cash

advance accounts in Defendants' programs.

> c.    *There was no probable cause determination before collection.*

Section 1692p(a)(2)(C)(iv)(I) requires that private entities contact alleged offenders

"only as a result of" a probable cause assessment and referral by the district attorney. But

Defendants attempted to collect checks without a district attorney determining that there is

probable cause that the check writer violated Penal Code § 476a. In counties using Defendants'

"auto open" procedure Defendants sent an email and then proceeded with collection unless

they were told not to. Some counties even skipped the email. Ex. 3 (T. Jonsson Dep. (VSI)) at

96:25-99:19; Ex. 10 (Noland Dep. (VSI)) at 31:14–32:13; Fineman Decl. ¶¶ 2–5. The

information on the Eligible Check Report was not sufficient to make a probable cause

determination. Ex. 18 (Fineman Dep.) at 29:3-31:1; Ex. 19 (Wilson Dep.) at 39:13-41:15.

> d.    *Defendants do not comply with California's penal laws.*

Section 1692p requires Defendants to comply with the state penal laws, including the

BCDA. 15 U.S.C. § 1692p(a)(2)(c)(i). Under the BCDA, the district attorney "shall" consider

five factors, including the amount of the bad check, the person's prior criminal record (if any),

the number of bad check grievances previously filed against the person, whether there are other

bad check grievances pending against the person, and "the strength of the evidence, if any, of

intent to defraud the victim." Cal. Penal Code § 1001.62. Defendants designed a system where

they sent district attorneys with basic check information insufficient to consider most of the

five factors, and then auto opened collection cases when they received no response. And, as

discussed below, Defendants charged fees that are not authorized by the BCDA or any other

statute.

e.      *District attorneys do not direct, supervise or control the program.*

Section 1692p(a)(2)(B) requires that the district attorneys direct, supervise and control Defendants' program. Defendants, not the district attorneys, received dishonored checks from merchants and screened them for collection eligibility. Ex. 9 PRR-GLENN_00973–74; Ex. 10 (Noland Dep. (VSI)) at 21:3-22:12, 24:16-26:10; Ex. 12 (M. Jonsson Dep. (NCG)) at 35:24-37:15; Ex. 16 (Boyd Dep. (VSI)) at 26:8-27:2; Ex. 17 (Boyd Dep. (NCG)) at 22:18-24:1. In some counties, the district attorneys allowed Defendants to begin collection without even receiving a list of eligible checks. In most counties, Defendants "auto opened" the collection process when they received no response to an email providing an Eligible Check Report. Ex. 3 (T. Jonsson Dep. (VSI)) at 96:25-99:19; Exs. 35-36; Ex. 12 (M. Jonsson Dep. (NCG)) at 46:17-47:13. In at least one office, a secretary, not a district attorney, received the Eligible Check Report and approved checks for collection. Ex. 20 (Anderson Dep. at 9:9–22, 32:22–25).

**B.      Defendants' debt collection programs violated multiple provisions of the FDCPA.**

The FDCPA prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e; *see also id.* § 1692e(10). Whether a collection letter is false, deceptive, or misleading is a question of law. *Tourgeman v. Collins Fin. Servs., Inc.*, 755 F.3d 1109, 1118 (9th Cir. 2014); *Terran v. Kaplan*, 109 F.3d 1428, 1432 (9th Cir. 1997). The court asks the "objective question" of "whether the hypothetical least sophisticated debtor would likely have been misled" by the communication. *Afewerki v. Anaya Law Grp.*, 868 F.3d 771, 775 (9th Cir. 2017).

The least sophisticated debtor reading Defendants' initial notice letter would conclude that: (1) the letter is from the district attorney; (2) the person had been accused of a crime; and (3) the person had to pay the demanded fees to avoid being charged by the district attorney and imprisoned for up to one year. In fact, the letters were from a private company and a person who simply ignored the letter faced virtually no risk of prosecution. Defendants' letters violate

Section 1692e's general prohibition on false, deceptive, and misleading communications. Defendants also engaged in conduct specifically prohibited by the statute.

        1.      <u>Defendants falsely represented that their letters were sent by a district attorney</u>

        Section 1692e(14) prohibits the "use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization. Section 1692e(9) prohibits the "use or distribution of any written communication . . . which creates a false impression as to its source, authorization, or approval." Defendants' letters used the district attorney's name, title, and letterhead, without any reference to Defendants, violating section 1692e(9) and (14). *Del Campo*, 718 F. Supp. 2d at 1134; *see also Schwarm*, 552 F. Supp. 2d at 1076.

        Section 1692e(3) prohibits the "false representation or implication that any individual is an attorney or that any communication is from an attorney." "A debt collector violates this section of the FDCPA when a letter appears to be sent by an attorney without the attorney's having both reviewed the debtor's file and gained some knowledge about the specific debt." *Irwin*, 112 F. Supp. 2d at 948–49. Defendants' letters look like they are from the district attorney but are actually sent by Defendants' non-attorney collection business.

        2.      <u>The letters made false threats of prosecution.</u>

        A debt collector cannot make any "threat to take any action that cannot legally be taken or is not intended to be taken" or representing or implying "that nonpayment of any debt will result in the arrest or imprisonment of any person . . . unless such action is lawful and the debt collector or creditor intends to take such action." 15 U.S.C. §§ 1692e(4) & (5). "A statement in a debt collection letter may constitute a threat to take legal action if it is 'calculated to intimidate the least sophisticated consumer into believing that legal action against her is imminent' and 'that the debtor's only options are either payment or being sued.'" *Del Campo*, 718 F. Supp. 2d 1116 at 1134 (citation omitted). "A false threat to take action may be established by showing that no assessment has been made as to whether the threat will be

carried out." *Schwarm,* 552 F. Supp. 2d at 1079; *see also Irwin*, 112 F. Supp. 2d at 952.

Defendants' collection letters threatened prosecution and imprisonment. ECF No. 226-1–226-31; Ex. 1. The initial letter stated that the recipient had been accused of a crime punishable by incarceration in the county jail or state prison and that the check writer could avoid "further action against the accused by the district attorney's office" by participating in the district attorney's diversion program and paying all demanded fees. *Id.* Defendants' use of district attorney letterhead lent credibility to these threats and created the impression that the district attorney had reviewed the case and was prepared to prosecute if the check writer did not comply with the demands. The least sophisticated debtor receiving one of Defendants' collection letters would believe that they would be criminally prosecuted and potentially imprisoned if they did not pay the fees demanded and attend the Defendants' class.

Defendants had neither the intent nor the authority to prosecute anyone when they sent these collection letters. Defendants had no knowledge of whether the district attorneys' offices would pursue prosecution of any specific case if Defendants' collection attempts failed. Ex. 3 (T. Jonsson Dep. (VSI)) at 201:23-202:13, 222:7-15. Some counties had threshold dollar amounts, below which checks were not eligible for prosecution review, but Defendants included checks in their collection program that fell below those amounts. The Orange County District Attorney's minimum threshold for prosecution review was $200, but NCG sent Karen Solberg a letter saying the Orange County District Attorney might prosecute her over a $75 check. Ex. 40. Similarly, in Glenn County, there was no minimum amount for a check to be eligible for collection, but a check had to exceed $100 to be referred to the district attorney for prosecution review. Ex. 9 (*Compare* PRR-GLENN_000973–74 (checks eligible for intake) *with* PRR-GLENN_001006 (checks eligible for prosecution review). Defendants own reports show that checks may satisfy the criteria for intake into the program but do not qualify to be forwarded to the district attorney to consider prosecution. Ex. 22. Data compiled by Defendants shows that only 1.4% of non-complying check writers were forwarded to a district attorney for

prosecution review. Terrell Decl. ¶¶ 39-46; Ex. 38; Ex 10 (Noland Dep. (VSI)) at 99:18-102:15. More than 98% of the time, any implication that a letter recipient would be prosecuted was false.

> 3. <u>Defendants attempt to collect fees that are not permitted by law.</u>

Section 1692e(2)(A) prohibits the false representation of "the character, amount, or legal status of any debt." Section 1692f prohibits the collection of an amount that is not expressly authorized by the agreement creating the debt or permitted by law. 15 U.S.C. § 1692f(1); *see also Cruz v. Int'l Collection Corp.*, 637 F.3d 991, 997 (9th Cir. 2012) (communications demanding payment of fees that state law does not permit are false and misleading and violate the FDCPA). There are no agreements with check writers authorizing the fees Defendants collect, so Defendants must show they are permitted by statute.

Defendants argue that California's BCDA authorizes the fees they charge. Cal. Penal Code § 1001.60–.67. Under the BCDA, a county's board of supervisors may authorize the district attorney to establish a bad check diversion program. The resolution authorizing the program must find "that there are sufficient funds available to operate the program." *Id.* § 1001.60. The BCDA is limited to cases in which there is probable cause to believe that the check writer violated California Penal Code § 476a by passing a check knowing it will not clear and with the intent to defraud the merchant. *See id.* If a district attorney determines there is probable cause, he or she must then assess five statutorily mandated factors to determine whether to refer a case to the diversion program. *Id.* § 1001.62 ("[T]he district attorney shall consider, but is not limited to, all of the following . . ."). Those factors include "[t]he strength of the evidence, if any, of intent to defraud the victim." *Id.*

Defendants' program fails to meet these threshold requirements under California's BDCA for at least two reasons: first, there were no probable cause determinations made by the district attorneys, and second, no district attorney assessed the factors that Section 1001.62 requires. In most cases, Defendants structured their programs in a way that would have made

the probable cause determinations and Section 1001.62 considerations impossible—they submitted very little information to the district attorneys, waited a few days, then "auto opened" the checks and began collection without requiring affirmative approval from district attorneys. Ex. 3 (T. Jonsson Dep. (VSI)) at 96:25-99:19; Ex. 10 (Noland Dep. (VSI)) at 31:14–32:13; Declaration of Gerald Fineman ¶¶ 2–5. The BCDA permits diversion programs to require only two kinds of payment as a condition of participation: (1) restitution, and (2) the "payment of the diversion fees, if any, specified in Section 1001.65." Cal. Penal Code. § 1001.64. In turn, Section 1001.65 authorizes only two types of charges, each of which is strictly limited. If a program participant has not been convicted by a court of failing to comply with the terms of the diversion program, the only fee that is authorized is a processing fee that "shall not exceed fifty dollars ($50) for each bad check in addition to the actual amount of any bank charges, including the returned check fee, if any, incurred by the victim as a result of the offense." Cal. Penal Code § 1001.65(a). As an additional limitation, no bank fee shall be collected in excess of fifteen dollars per check. *Id.* § 1001.65(c). The only other payments authorized by Section 1001.65 are those made by individuals who have been convicted in court of "fail[ing] to comply with the terms of the bad check diversion program." *Id.* § 1001.65(b). Those individuals may be required *by the court* to pay all or part of the expense of completing a check writing education class, but only after the court makes an inquiry into their financial condition and finds that they are able to pay. *Id.*

In short, the BCDA only authorizes an administration fee and bank fees, and in no event permits the collection of payments for classes from anyone who has not been convicted in court and had an inquiry into their ability to pay. Cal. Penal Code §§ 1001.64–65.

Defendants' program violates these specific limitations. They assessed and collected from Class members a "Financial Accountability Class Fee" of up to $185, a $10 "credit/debit card fee," a $25 "class rescheduling fee," and a $10 "Payment Plan late fee." ECF No. 226-1–226-31; Ex. 1. Defendants do not refund "overpayments" of less than $5 and withhold $5 from

any overpayment refund they issue. Ex. 27 (M. Jonsson 2/23/17 Dep.) at 89:1–90:6.

These fees are not permitted by the BCDA. In interpreting a California statute, a court looks "first to its language." *DiCampli-Mintz v. County of Santa Clara*, 289 P.3d 884, 889 (Cal. 2012). Nothing in the language of the statute suggests that the class fees a "court" may impose can also be charged as part of a pre-charge diversion program. The language of the statute is not open to that interpretation.

Additionally, permitting Defendants' fees would be inconsistent with the BCDA's structure and purpose. It would make no sense for the Legislature to carefully cabin a court's ability to impose a fee for a check writing education class while allowing those same fees to be collected from every diversion program participant by the entity running the program, regardless of participants' ability to pay. *Cf. Imperial Merch. Servs., Inc. v. Hunt*, 212 P.3d 736, 737 (Cal. 2009) ("[T]he fact that the Legislature expressly designated specific damage remedies while omitting others, such as prejudgment interest, reflects that it intended the prescribed remedies to be exclusive."). Finally, there is nothing in the statute purporting to authorize the other fees Defendants charge, such as the $10 "credit/debit card fee," the $25 "class rescheduling fee," and the $10 "Payment Plan late fee." These fees run afoul of Section 1001.64, which limits the kinds of diversion payments that may be a condition of participation, "if any," to those "specified in Section 1001.65." Cal. Penal Code § 1001.64(c).

The language of the statute is unambiguous, so there is no need to look to legislative history or any other source to determine legislative intent regarding class fees, payment card fees, rescheduling fees, or payment plan fees. But the legislative history confirms that the Legislature did not intend to authorize charging pre-charge diversion program participants class fees. In the 2005-2006 session of the California Legislature, a proposed bill, AB-1022, would have amended the BCDA to require check writers to pay for the education class as part of a diversion program. That bill was withdrawn. In the 2008 session, Defendants' predecessors advocated for another bill, AB-2606, that would have amended multiple provisions of the

BCDA and required that the check writer pay for the education class as part of a diversion program. The bill approved by the Legislature increased the statutorily-authorized fees but did not provide for payment of the class by the check writer.

4.      The letters omit required notices and disclosures.

Section 1692e(11) requires a debt collector to disclose "in the initial written communication with the consumer . . . that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and . . . in subsequent communications that the communication is from a debt collector." Section 1692g(a) requires a debt collector to notify consumers of the right to dispute the debt and to request verification within five days of the initial communication with the consumer. None of Defendants' collection letters included these required notices or disclosures. *See* ECF No. 226-1–226-31; Ex. 1.

**C.      Defendants' programs are unlawful, unfair, or fraudulent under the UCL.**

California's Unfair Competition Law (UCL) prohibits business practices that are unlawful, unfair, or fraudulent. Cal. Bus. & Prof. Code §§ 17200, *et seq.*; *In re Tobacco II Cases*, 207 P.3d 20, 29 (Cal. 2009). Each of these three "prongs" creates a distinct theory of liability. *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010).

1.      Defendants' practices were "unlawful" under the UCL.

"The unlawful prong of the UCL borrows violations of other laws and treats them as unlawful practices which the UCL then makes independently actionable." *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 858 (N.D. Cal. 2012) (quoting *Cel-Tech Commc'ns v. L.A. Cellular Tel. Co.*, 973 P. 2d 527 (Cal. 1999)). Defendants' violations of the FDCPA are the predicate for a UCL cause of action under the unlawful prong. *See Randall v. Ditech Fin., LLC*, 233 Cal. Rptr. 3d 271, 277 (Ct. App. 2018).

Defendants' "bad check restitution program" also violated the unlawful prong of the UCL because it did not comply with the requirements of the BCDA. Defendants charged fees

not authorized by the BCDA and ignored the Act's procedural safeguards. Cal. Penal Code §§ 1001.62, 1001.64(b), (c), 1001.65(a), (c). Defendants attempted to collect on checks without providing district attorneys enough information to make a probable cause determination. *See* Ex. 18 (Fineman Dep.) at 29:3-31:1; Ex. 19 (Wilson Dep.) at 39:13-41:15. They attempted to collect on checks without a district attorney considering mandatory statutory referral criteria. *Id.* § 1001.62; Ex. 3 (T. Jonsson Dep. (VSI)) at 96:25-99:19; Ex. 10 (Noland Dep. (VSI)) at 31:14–32:13; Declaration of Gerald Fineman ¶¶ 2–5. And Defendants' check collection business is not a real diversion program as contemplated by the BCDA because all a Class member needs to do to avoid the threatened prosecution is to pay money; participation in a diversion class is not required. Ex. 3 (T. Jonsson Dep. (VSI)) at 134:3-5.

      2.    <u>Defendants' practices were "unfair" under the UCL.</u>

Courts use several tests to determine whether a business practice is unfair. One test considers whether the practice "violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits." *McKell v. Washington Mut., Inc.*, 49 Cal. Rptr. 3d 227, 240 (Ct. App. 2006). A practice is also unfair if its utility is outweighed by a victim's harm. *South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 85 Cal. Rptr. 2d 301, 316 (Ct. App. 1999). Courts also define an unfair practice as one that is "(i) substantially injurious to the consumer, where (ii) the injury is not outweighed by countervailing benefits to consumers or competition, and (iii) the injury is not one that consumers themselves could reasonably have avoided." *Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 922 (N.D. Cal. 2013). The "unfair" standard is intentionally broad so that courts can prohibit new schemes to defraud. *South Bay Chevrolet*, 85 Cal. Rptr. 2d at 316.

Defendants' practices were "unfair" under any of these standards. Defendants threatened to prosecute Class members unless they paid the unlawful fees. ECF Nos. 226-1–226-31; Ex. 1. In fact, Defendants had no power to prosecute anyone and actual prosecutions were rare. And Defendants did not disclose their identity to Class Members, instead leading

Class Members to believe the letters were sent from district attorneys' offices. Ex. 22 at 47; Ex. 3 (T. Jonsson Dep. (VSI)) at 185:25-187:15; Ex. 21. Class Members were substantially harmed because they paid millions of dollars in unlawful fees. Munson Report ¶ 34. There is no utility or benefit to Defendants' unfair conduct that outweighs the substantial harm to Class Members, and Class Members could not have avoided it.

       3.      <u>Defendants' practices were "fraudulent" under the UCL.</u>

A business practice is fraudulent under the UCL if members of the public are likely to be deceived by it. *In re Tobacco II* , 207 P.3d at 29. A "fraudulent" business practice is distinct from a common law fraud claim and a plaintiff does not need to prove the elements of common law fraud to obtain relief. *Id.* Rather than requiring proof of falsity, knowledge, and reliance, the fraudulent prong of the UCL focuses on the defendant's conduct "in service of the statute's larger purpose of protecting the general public against unscrupulous business practices." *Id.* A practice's "deceptiveness" is governed by an objective standard and requires only that a "reasonable consumer" could be misled. *Lavie v. Proctor & Gamble Co.*, 129 Cal. Rptr. 2d 486 (Ct. App. 2003). "A reasonable consumer is 'the ordinary consumer acting reasonably under the circumstances.'" *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1162 (9th Cir. 2012) (citation omitted).

A reasonable consumer could be misled by Defendants' multiple false representations: that their collection letters were communications from the district attorneys, that the fees Defendants demanded were authorized by law, and that failure to pay all the fees Defendants demanded would likely result in criminal prosecution. ECF Nos. 226-1–226-31; Ex. 1. Plaintiffs were misled by these misrepresentations. Ex. 25 (Bonakdar Dep. at 32:22–34:12); Morin Decl. ¶ 5; Solberg Decl. ¶ 10. Moreover, the fact that Plaintiffs incurred costs after receiving Defendants' false threats of prosecution proves that the misrepresentations caused their injuries. *In re Tobacco II*, 207 P.3d at 39. As a direct result of Defendants' false threats of prosecution, each Plaintiff entered into otherwise unnecessary transactions, costing them

money. Ms. Solberg consulted with an attorney and paid to mail the attorney relevant documents. Solberg Dep. ¶ 17. Ms. Morin paid for certified mail to send Defendants proof that the relevant check had cleared months before Defendants sent their threatening letter. Morin Decl. ¶ 12. Ms. Bonakdar paid Defendants a $50 administrative fee, a $7.50 returned item fee and a $191 fee for their Financial Accountability Class and spent time travelling to and attending the class. Ex. 39; Ex. 25 (Bonakdar Dep.) at 68:17-74:2.

Class members need not prove causation on an individualized basis since their reliance is inferred from the materiality of the misrepresentations. *Chapman v. Skype, Inc.*, 162 Cal. Rtpr. 3d 864, 874 (Ct. App. 2013). "A misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'" *Id.* (citation omitted). The materiality of the representations to Class members is established by Class members' participation in the bad check restitution program and payment of millions of dollars in fees.

    4.    <u>All Defendants are liable for violations of the UCL.</u>

A defendant may be held liable for violating the UCL if it participated in or controlled the unlawful practices. *People ex rel. Harris v. Sarpas*, 172 Cal. Rptr. 3d 25, 48–50 (Ct. App. 2014). Liability may also "be imposed against those who aid and abet the violation." *Sarpas*, 172 Cal. Rptr. at 48. The liability of an individual who is the owner or manager of a business "must be predicated on his personal participation in the unlawful practices" and is "personally responsible for acts of subordinates done in the normal course of business." *People v. Toomey*, 203 Cal. Rptr. 642, 651 (Ct. App. 1984). These standards parallel those for liability as "debt collectors" under the FDCPA and Defendants are therefore liable for violations of the UCL for the same reasons they are liable for violations of the FDCPA.

**D.**    **Plaintiffs are entitled to summary judgment of their negligent misrepresentation and fraudulent misrepresentation claims.**

Plaintiffs are also entitled to summary judgment of their negligent misrepresentation claim because, as discussed above, the evidence establishes (1) Defendants' misrepresentations

of past or existing facts, (2) without reasonable ground for believing them to be true, (3) with intent to induce Class members' reliance on the facts misrepresented, (4) Class members' justifiable reliance on the misrepresentations, and (5) resulting damage. *Tindell v. Murphy*, 232 Cal. Rptr. 3d 448, 458 (Ct. App. 2018). The evidence establishes all of the elements of Plaintiffs' fraudulent misrepresentation claim: (1) Defendants represented to Class members that an important fact was true; (2) that representation was false; (3) Defendants knew the representation was false when they made it or Defendants made the representation recklessly and without regard for its truth; (4) Defendants intended that Class members rely on the representation; (5) Class members reasonably relied on the representation; (6) Class Members were harmed; and (7) Class members' reliance on Defendants' representation was a substantial factor in causing that harm. *Graham v. Bank of Am., N.A.*, 172 Cal. Rptr. 3d 218, 228 (Ct. App. 2014). Every aspect of Defendants' programs was misleading. Defendants entire collection program relied on convincing Class members that they had been accused of a crime and faced a real probability of prosecution if they failed to pay Defendants exorbitant fees. Defendants knew or had reason to know those representations were false and the misrepresentations caused Class members to pay millions in unlawful fees.

**E.     The Class paid Defendants $6,076,051 in unlawful fees.**

The Class seeks actual damages for Defendants' violations of the FDCPA, *see* 15 U.S.C. § 1692k(1) and restitution of the amounts paid to Defendants in unlawful fees. The Class' expert has calculated that the Class paid Defendants $6,076,051 in fees during the Class period. Munson Report. ¶ 34. NCG and Mats Jonsson are liable for the $4,544,939 collected from September 1, 2011 to June 5, 2014. VSI, AJS, Birch Grove, and Mats and Thomas Jonsson are liable for the $1,531,112 collected from June 6, 2014 to May 7, 2015. Id.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs and the Class request that this Court grant their motion for summary judgment.

RESPECTFULLY SUBMITTED AND DATED this 1st day of April, 2019.

TERRELL MARSHALL LAW GROUP PLLC

By: /s/ Beth E. Terrell, CSB #178181
    Beth E. Terrell, CSB #178181
    Email: bterrell@terrellmarshall.com
    Blythe H. Chandler, *Admitted Pro Hac Vice*
    Email: bchandler@terrellmarshall.com
    Maria Hoisington-Bingham, *Admitted Pro Hac Vice*
    Email: mhoisington@terrellmarshall.com
    936 North 34th Street, Suite 300
    Seattle, Washington 98103-8869
    Telephone: (206) 816-6603
    Facsimile: (206) 319-5450

    Paul Arons, CSB #84970
    Email: lopa@rockisland.com
    LAW OFFICE OF PAUL ARONS
    685 Spring Street, Suite 104
    Friday Harbor, Washington 98250
    Telephone: (360) 378-6496
    Facsimile: (360) 378-6498

    Deepak Gupta, *Admitted Pro Hac Vice*
    Email: deepak@guptawessler.com
    Daniel Townsend, *Admitted Pro Hac Vice*
    Email: daniel@guptawessler.com
    GUPTA WESSLER PLLC
    1900 L Street, NW, Suite 312
    Washington, DC 20036
    Telephone: (202) 888-1741
    Facsimile: (202) 888-7792

    Michael F. Ram, CSB #104805
    Email: mram@robinskaplan.com
    ROBINS KAPLAN LLP
    2440 West El Camino Real, Suite 100
    Mountain View, California 94040
    Telephone: (650) 784-4040
    Facsimile: (650) 784-4041

    *Attorneys for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I, Beth E. Terrell, hereby certify that on April 1, 2019, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which will send notification to

all registered CM/ECF users:

> Michael A. Taitelman, CSB #156254
> Email: mtaitelman@ftllp.com
> Sean M. Hardy, CSB #266446
> Email:  smhardy@ftllp.com
> FREEDMAN & TAITELMAN, LLP
> 1901 Avenue of the Stars, Suite 500
> Los Angeles, California 90067
> Telephone: (310) 201-0005
> Facsimile: (310) 201-0045
>
> *Attorneys for Defendants*

DATED this 1st day of April, 2019.

> TERRELL MARSHALL LAW GROUP PLLC
>
> By:  /s/ Beth E. Terrell, CSB #178181
> Beth E. Terrell, CSB #178181
> Email: bterrell@terrellmarshall.com
> 936 North 34th Street, Suite 300
> Seattle, Washington 98103-8869
> Telephone: (206) 816-6603
> Facsimile: (206) 319-5450
>
> *Attorneys for Plaintiffs*