UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREN SOLBERG, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>VICTIM SERVICES, INC. D/B/A CORRECTIVESOLUTIONS, et al.,<br><br>Defendants. | Case No. 14-cv-05266-VC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT; DENYING MOTION TO AMEND CLASS DEFINITION**<br><br>Re: Dkt. Nos. 314, 320, 331 |

Many district attorneys throughout California have established diversion programs for people accused of passing bad checks with fraudulent intent. These programs allow suspects to avoid the possibility of criminal prosecution if they pay restitution and take a financial responsibility class. The district attorneys typically contract with private entities to administer the diversion programs.

In this class action, the plaintiffs contend that a private entity—a company called Victim Services—administers diversion programs around the state in a way that violates the federal Fair Debt Collection Practices Act (FDCPA), as well as state law. The parties have filed cross-motions for summary judgment. The motions raise several complicated questions, only some of which can be answered at this stage:

First, is Victim Services exempt from the FDCPA's coverage? The answer is no, at least for the period covered by this class action, because Victim Services failed to satisfy at least one of the statute's prerequisites for exclusion from coverage.

Second, did the letter that Victim Services sent to suspects on behalf of district attorneys mislead debtors in violation of the FDCPA? The answer to this question is no as well—the letters

sent during the class period were not misleading in any material respect.

Third, did Victim Services violate the FDCPA by charging participants fees that are not authorized by California law for these diversion programs? This question cannot be answered based on the materials the parties have submitted in connection with their cross-motions for summary judgment.

Fourth, did Victim Services violate the provisions of California law invoked by the plaintiffs? The answer to this question is no, with one caveat. If Victim Services charged unauthorized fees, this of course would be a state-law violation as well as a violation of the FDCPA.

Accordingly, summary judgment is granted to Victim Services on all claims except those based on the allegation that it charged fees not authorized by state law. The parties will be permitted to file renewed cross-motions for summary judgment if they determine that this question can be answered without regard to any disputed material facts.

I

In California, it is illegal to pass a bad check with fraudulent intent. *See* Cal. Penal Code § 476a. Because bad checkwriting is prevalent but frequently involves small dollar amounts, district attorneys often lack the resources to effectively deter this crime by prosecution. Many counties have therefore turned to pre-charge diversion programs that lower the stakes for the suspect but raise the probability that the suspect will face some consequence for writing a bad check. The bargain of the diversion program is straightforward: If the suspect makes the alleged victim whole, pays the diversion program's administrative fees, and attends a class about financial responsibility, the district attorney will agree not to prosecute the suspect.

The California Legislature laid the groundwork for these diversion programs by passing the Bad Check Diversion Act. *See* Cal. Penal Code § 1001.60 *et seq.* This statute, in addition to setting parameters for the programs generally, allows district attorneys to contract with private entities to handle referrals from victims, collect fees, and teach the classes. Many (if not all) district attorneys in California use private entities to administer their bad-check diversion

programs.

Karen Solberg, Nancy Morin, and Narisha Bonakdar each wrote a bad check and were subsequently contacted for participation in one of these diversion programs. The contact was made by Victim Services, Inc., a private entity that administered the bad-check diversion programs for the district attorneys in the checkwriters' respective counties. Only Bonakdar took up the offer to participate in a diversion program and pay restitution; the other two disputed that they had committed a bad-check offense. But all three checkwriters eventually concluded that Victim Services' administration of the diversion program violates a federal statute that regulates debt collection, the Fair Debt Collection Practices Act (FDCPA).

Thus, in December 2014, the three checkwriters (and two other people who have since dismissed their claims) filed this class action against Victim Services, three related corporate entities, and two corporate officers that jointly administered bad-check diversion programs on behalf of district attorneys in 32 California counties. For short, this ruling refers to the defendants collectively as Victim Services. The plaintiffs bring claims under the FDCPA based on Victim Services' allegedly false and misleading demand letters, and based on Victim Services' collection of fees allegedly not authorized by state law. On top of the FDCPA claims, the plaintiffs pursue claims for unfair business practices under California's Unfair Competition Law (UCL) and for fraudulent and negligent misrepresentation under California's general tort law. They seek damages of more than $6 million on behalf of a statewide class of checkwriters contacted by Victim Services.

For the past five years, the plaintiffs and Victim Services have engaged in protracted litigation over pretrial motions. Victim Services first made unsuccessful attempts to dismiss the complaint and to strike the state-law claims under California's anti-SLAPP statute, which protects defendants' exercise of their First Amendment rights. As Ninth Circuit law permits, Victim Services immediately appealed the denial of its anti-SLAPP motion.

There was also a skirmish over arbitration. As mentioned earlier, Bonakdar was the only plaintiff to enter into a non-prosecution agreement with the district attorney. Her contract to

participate in the diversion program contained an arbitration provision, and Victim Services moved to compel arbitration with Bonakdar on this basis. This Court concluded that the Federal Arbitration Act does not apply to contracts between a district attorney and a suspect to resolve a question of criminal liability, and that California law does not permit arbitration of a dispute regarding the performance of a core government function by the government's agent. *Breazeale v. Victim Services, Inc.*, 198 F. Supp. 3d 1070 (N.D. Cal. 2016). As with an anti-SLAPP motion, the denial of motion to compel arbitration is immediately appealable. The Ninth Circuit affirmed the anti-SLAPP and arbitration rulings in a consolidated appeal. *Breazeale v. Victim Services, Inc.*, 878 F.3d 759 (9th Cir. 2017).

Next, the parties fought over class certification. After narrowing the plaintiffs' requested class definition, this Court certified two overlapping statewide classes. *See* Dkt. No. 297. The first class, which is for the FDCPA claims, consists of people who received a letter from Victim Services from December 1, 2013, to May 7, 2015. The second class, for the UCL claims, contains all people who paid fees to Victim Services in response to the letter between September 1, 2011, and May 7, 2015. Victim Services then filed a motion with the Ninth Circuit seeking permission to immediately appeal the class certification order under Federal Rule of Civil Procedure 23(f), but this motion was denied.

That winding procedural history brings this case to its present stage, in which the plaintiffs and Victim Services each move for summary judgment on the FDCPA, UCL, and state-law misrepresentation claims.

## II

The plaintiffs' primary argument is that Victim Services, acting as an agent of district attorneys, engaged in unlawful debt collection practices. At the outset, one might question whether this case even involves "debt collection." These diversion programs recover restitution for alleged violations of California Penal Code section 476a, the offense of passing a bad check with intent to defraud. An effort by a prosecutor, as an actor in the criminal justice system, to seek restitution on behalf of a victim is quite different from an effort by a private party to collect

from a debtor. *Cf. Lagos v. United States*, 138 S. Ct. 1684, 1688 (2018) (distinguishing "government investigations and criminal proceedings" from "private investigations and civil or bankruptcy litigation" for purposes of statute authorizing restitution). Even though the restitution will equal the face value of the bad check plus any bank charges, it is counterintuitive (at best) to put restitution sought by a prosecutor in the same conceptual bucket as debt collection.

Nor does the recovery of restitution in this context seem like recovery of a "debt" as that term is used in the federal debt collection statute that the plaintiffs invoke. Consider how the FDCPA defines "debt": "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5). The concept undergirding the term "debt" is that the obligation to pay arises out of a qualifying transaction. A merchant that pursues its civil remedies for a bad check can fairly be described as collecting a debt—that is, enforcing a payment obligation that arises out of a transaction. *See Charles v. Lundgren & Associates, P.C.*, 119 F.3d 739, 742 (9th Cir. 1997). In contrast, it's a crime to fraudulently pass a bad check regardless of whether the check writer is transacting for goods or services. *See* Cal. Penal Code § 476a. The offender's obligation to pay restitution to the victim thus arises not from the transaction but from the agreement with the district attorney to resolve a dispute regarding criminal liability.

Given this mismatch, one might have expected Victim Services to argue that it does not engage in "debt collection" when it acts as an agent of a district attorney's office to assist in the administration of a criminal justice program that includes the recovery of restitution. But that train has left the station. At the turn of the century, a spate of federal district courts interpreted the FDCPA to cover the efforts by private entities to obtain criminal restitution in their capacity as agents of diversion programs. *See, e.g.*, *Liles v. American Corrective Counseling Services, Inc.*, 131 F. Supp. 2d 1114, 1119–20 (S.D. Iowa 2001). The distinction between civil and criminal enforcement, those courts reasoned, "makes no difference" if the restitution

compensates the merchant harmed by the bad check. *Gradisher v. Check Enforcement Unit, Inc.*, 133 F. Supp. 2d 988, 990 (W.D. Mich. 2001). These rulings are arguably wrong as a matter of statutory interpretation, for the reasons discussed above. Moreover, assuming the statutory term "debt collection" is susceptible to either interpretation, there would have been good reason to avoid adopting the interpretation that includes district attorneys' bad-check diversion programs. Absent a plain statement of intent, Congress is presumed not to regulate in areas traditionally left to the states. *Breazeale*, 198 F. Supp. 3d at 1077–79. The enforcement of state criminal law is obviously one such area. *See Bond v. United States*, 572 U.S. 844, 858 (2014). And at root, these diversion programs are criminal justice programs, so state and local government officials, not Congress, are supposed to be in charge.[1]

But Congress did not respond to these rulings by clarifying that seeking restitution as part of a local law enforcement program is different from debt collection. Instead, it responded by amending the FDCPA to specify that private administrators of diversion programs can *potentially* avoid coverage under the statute, but only if they meet a series of detailed, confusing requirements. Financial Services Regulatory Relief Act of 2006, Pub. L. No. 109-351, § 801(a)(2), 120 Stat. 1966, 2004–06 (codified at 15 U.S.C. § 1692p). These requirements are discussed at length in Section III.A, but for now suffice it to say that although the prior version of the FDCPA arguably should not have been construed to cover entities involved in the administration of local law enforcement programs, the amended version reflects a clear expression of intent by Congress for the FDCPA to cover some of those entities—specifically, the entities that don't meet the series of requirements that would allow them to enjoy an exemption. *Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833, 1844 (2018) ("There is no reason to create an exception to a prohibition unless the prohibition would otherwise forbid what the exception allows."); *see also Group Life & Health Insurance Co. v. Royal Drug Co.*, 440

---

[1] Incidentally, if a district attorney's office is not sufficiently involved in the administration and direct supervision of a diversion program (which may well be the case here), the program could violate the California Constitution. *See* Cal. Const. art. 5, § 13; *People v. Eubanks*, 14 Cal. 4th 580, 589 (1996).

U.S. 205, 219–20 (1979).

Thus, Victim Services has understandably refrained from arguing that the FDCPA does not cover bad-check diversion programs. But the result is vexing—the Court must attempt to apply a series of complicated statutory requirements regarding debt collection to bad-check diversion programs, even though many of those requirements were not designed for, and often cannot be sensibly applied to, diversion programs. As the discussion below makes clear, this problem pervades the plaintiffs' claims.

III

Although Victim Services does not make the argument discussed above, it does argue that it falls within two exceptions to the FDCPA's coverage. First, Victim Services contends that it meets the specific requirements of the exception for diversion programs discussed in the preceding section. *See* 15 U.S.C. § 1692p. Second, Victim Services contends that it satisfies the exception for people or entities who act as fiduciaries to creditors. *See* § 1692a(6)(F)(i).[2]

As a preliminary matter, the plaintiffs argue that these statutory exceptions must be narrowly construed to further the FDCPA's guiding purpose of protecting debtors from deceptive and unfair practices. Yet the Supreme Court has recently shied away from invoking this longstanding narrow-construction canon, instead applying the principle that statutory exceptions must be given a "fair reading." *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019); *see Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018). Given this vague language, it's unclear whether courts should narrowly construe the FDCPA's exceptions in cases of ambiguity or instead strive for the statute's best reading, no matter where it leads. But in this case, the narrow-construction canon—to the extent it survives—need not be deployed. Either way, the plaintiffs and the FDCPA class are entitled to summary judgment as to

---

[2] The FDCPA contains a separate exception for government actors. That exception doesn't apply to Victim Services, notwithstanding its performance of a government function, because the government actor exception is available only to "any *officer* or *employee* of the United States or any State to the extent that collecting or attempting to collect any debt is in the performance of his official duties." 15 U.S.C. § 1692a(6)(C) (emphasis added); *see Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1263 (9th Cir. 1996).

both exceptions.

A

First, Victim Services contends that its collection activity falls within the exception for diversion programs, which includes programs "for alleged bad check offenders who agree to participate voluntarily in such program to avoid criminal prosecution." 15 U.S.C. § 1692p(2)(A). This exception extends to private entities that administer such diversion programs under contract with a district attorney. § 1692p(2)(B). But to qualify for this exception, the private entity must comply with six requirements. *See* § 1692p(2)(C). During the class period, Victim Services failed to comply with at least one of these requirements, and possibly more.

To be exempt from FDCPA liability, diversion programs must notify suspects of their right to request that the district attorney's office determine the existence of probable cause that the suspect committed a bad-check offense. *See* § 1692p(2)(C)(v). This disclosure ensures that suspects have a means to confirm, before deciding whether to participate in the program, that they were appropriately contacted for diversion. In addition, the diversion program must inform the suspect that restitution efforts will be paused until the requested determination of probable cause is made. Specifically, the statute provides that private entities must "include[ ] as part of an initial written communication with an alleged offender a clear and conspicuous statement that," among other things, "if the alleged offender notifies the private entity or the district attorney in writing, not later than 30 days after being contacted for the first time pursuant to clause (iv), that there is a dispute . . . , before further restitution efforts are pursued, the district attorney or an employee of the district attorney authorized to make such a determination makes a determination that there is probable cause to believe that a crime has been committed." § 1692p(2)(C)(v)(III).

Victim Services did not comply with this notice requirement. Attached as Appendix A to this ruling is the letter for the Santa Cruz diversion program, which is representative of the letters in use across California during the class period. That letter informed the suspect: "You may dispute the validity of this allegation in writing to this Office within 30 days of receiving this Official Notice." Santa Cruz County Form Letter 2 ("Form Letter"), Dkt. No. 315-1. But the

8

letter does not state that an employee of the district attorney will determine the existence of probable cause; it states only that "the authorized administrator of the Check Restitution Recovery Program will review the written dispute based on criteria established by [that county's] District Attorney." *Id.* And the letter makes clear that the authorized administrator is a private entity under contract with the district attorney. *Id.* at 1. Nor does the letter assure the recipient that restitution efforts will be put on hold until that determination is made. As a matter of law, this letter is inconsistent with the notice provision in section 1692p(2)(C)(v). *See Cavnar v. BounceBack, Inc.*, 2015 WL 4429095, at \*3 (E.D. Wash. July 17, 2015).

Victim Services appears to object that this application of the statute is nitpicky. Yet Congress chose to impose highly specific notice requirements for diversion programs that wish to avoid coverage under the FDCPA. If the requirements were more general (for example, "to qualify for the exemption, the program must notify the suspect of the opportunity to dispute the existence of probable cause"), perhaps Victim Services could be found in substantial compliance. But in the face of such a specific notice requirement, and in the face of mandate that the notification be "clear and conspicuous," the language in the letter used by Victim Services during the class period is inadequate to support an exemption from the FDCPA.

Although this alone prevents Victim Services from escaping the label of "debt collector" within the meaning of the statute, it's worth touching on a few of the parties' other arguments, particularly given the dearth of case law regarding the diversion program exception and the inherent difficulty in applying the FDCPA to diversion programs. To begin with, the plaintiffs invoke the requirement that the private entity administering the diversion program must comply "with the penal laws of the State." 15 U.S.C. § 1692p(2)(C)(i). The plaintiffs note that under California's Bad Check Diversion Act, the district attorney must consider five factors before referring a case to a bad-check diversion program, including the suspect's "prior criminal record" and the "strength of the evidence, if any, of intent to defraud the victim." Cal. Penal Code § 1001.62(b), (e). It seems impossible that any of the district attorneys (or their employees) could have been performing this analysis, because the victims' submissions don't contain enough

information to consider those factors. *See* Fineman Dep. 30:12–31:1, Dkt. No. 315-18. According to the plaintiffs, the district attorneys' shortcomings in this respect mean that Victim Services fails to satisfy the FDCPA's requirement to comply with the penal laws of the state.

But that is a non sequitur. To be sure, it is troubling that district attorneys appear to be violating state law in the administration of their bad-check diversion programs. But the FDCPA's diversion program exception requires the private entity *itself* to be in compliance with the penal laws of the state. The conduct the plaintiffs complain of here is the conduct of the district attorneys, and the obligation to consider the five referral factors is directed solely to the district attorneys. *See* Cal. Penal Code § 1001.62. Thus, while the plaintiffs have raised serious concerns about the district attorneys' compliance with state law (which presumably could be remedied by a writ action against district attorneys in state court), those concerns do not disqualify Victim Services from this exception.[3]

This case also raises novel issues with respect to the diversion program exception's twin prohibitions on private entities exercising prosecutorial discretion or making their own probable cause determinations. 15 U.S.C. § 1692p(2)(C)(iii)–(iv). It is unclear whether the diversion programs in California abide by these restrictions. On the one hand, Victim Services forswears any ability to exercise independent prosecutorial discretion when initiating restitution efforts. Indeed, the diversion programs might violate the California Constitution if Victim Services could exercise discretion in this regard. *See People v. Eubanks*, 14 Cal. 4th 580, 589 (1996). On the other hand, the structure of the referral system indicates that at least some district attorneys' offices exercised virtually no supervisory role, at least with respect to individual checks. Several counties employed an auto-open procedure whereby Victim Services forwarded a list of checks

---

[3] The plaintiffs' argument about the failure of district attorneys to conduct the required analysis before referring suspects to the program underscores why the FDCPA is such a bad fit for criminal justice diversion programs. Throughout this case, the plaintiffs have made many arguments that suggest their ultimate concern is less with the specific way Victim Services has conducted itself and more with the fairness of the diversion programs in general. But an FDCPA lawsuit is not the appropriate venue for a frontal attack on bad-check diversion programs. And the federalism implications of this case would be only heightened if the Act is interpreted to prescribe a federal code of best practices for local prosecutors.

to the district attorney and then institutes collection efforts unless the district attorney objects. *See* Noland Dep. 31:14–32:13, Dkt. No. 315-10.

However, this is one of many issues that cannot be resolved on the current record compiled by the parties for these cross-motions for summary judgment. Previously, the plaintiffs moved for, and obtained, certification of a California-wide class of people allegedly victimized by Victim Services' conduct. But this issue—whether Victim Services acted too much like a prosecutor in the administration of these programs—does not appear amenable to resolution on a statewide basis. Because each of the 32 district attorneys established a bad-check diversion program with the approval of the respective county's board of supervisors, there are really 32 diversion programs at issue in this case. So it is possible some district attorneys delegated too much discretion to Victim Services while other district attorneys did not. And if a decision about whether Victim Services is excluded from the FDCPA's definition of "debt collector" required a county-by-county analysis of the discretion granted Victim Services, the Court's prior class certification ruling would presumably need to be revisited.[4]

On a related note, the FDCPA's diversion program exception doesn't clarify whether the district attorney must make an *individualized* finding of probable cause. What the statute requires is that the district attorney "determine[ ] . . . that probable cause of a bad check violation under State penal law exists." 15 U.S.C. § 1692p(2)(C)(iv). Here, the district attorneys decide in advance that certain facts will *categorically* establish probable cause, and then a computer program mechanically applies the district attorneys' intake criteria to individual cases. That approach can claim some support in existing state law: one California court declared that the passing of a bad check coupled with the failure to pay upon the victim's subsequent demand—

---

[4] The plaintiffs' motion to strike the declaration of former Los Angeles County District Attorney Steve Cooley, Dkt. No. 320-2, is denied. Victim Services didn't disclose Cooley as a witness in its initial disclosures. Fed. R. Civ. P. 26(a)(1)(i). But Victim Services later identified Cooley in its initial document production. *See* Dkt. No. 329-3. The plaintiffs had ample opportunity to depose him if they wished, so Victim Services' failure to comply with Rule 26 is "harmless." Fed. R. Civ. P. 37(c)(1); *see Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106–07 (9th Cir. 2001).

two existing linchpins of these diversion programs—established "manifest" probable cause of a violation of California Penal Code § 476a. *Morris v. Moore*, 61 Cal. App. 314, 318–19 (1923); *see also Schwarm v. Craighead*, 552 F. Supp. 2d 1056, 1078 (E.D. Cal. 2008) ("In fact, the BCDA appears to presume that the probable cause determination will have been made before a district attorney receives a bad check."). On the other hand, probable cause determinations are typically not made on a group basis, and the Supreme Court has "rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach" to probable cause. *Florida v. Harris*, 568 U.S. 237, 244 (2013).

At the end of the day, while the parties raise several challenging issues relating to the diversion program exception, what's clear is that Victim Services must comply with the FDCPA's notice requirement to be exempt from the statute's reach, and it did not do so during the class period. Accordingly, Victim Services cannot avoid the FDCPA's coverage by invoking the diversion program exception.

B

Victim Services also seeks to take advantage of the FDCPA's fiduciary exception. A fiduciary that collects occasional debts in the course of its duties to its principal is not bound by the Act's provisions. Specifically, Congress excluded from the definition of "debt collector" "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement." 15 U.S.C. § 1692a(6)(F)(i). This circuit's lead case on the fiduciary exception is *Rowe v. Educational Credit Management Corp.*, 559 F.3d 1028 (9th Cir. 2009). There, the Ninth Circuit announced the two requirements for this exception, both of which can be readily gleaned from the statute's text: "First, the entity must have a 'fiduciary obligation.' Second, the entity's collection activity must be 'incidental to' its 'fiduciary obligation.'" *Id.* at 1032.

Victim Services' invocation of this exception is based on the assertion that it has a fiduciary duty to the district attorneys. But that's the wrong inquiry. To qualify for the fiduciary

exception, Victim Services would need to owe a fiduciary duty to the victims of the alleged crime, because those are the people to whom the debt is allegedly "owed." 15 U.S.C. § 1692a(6)(F)(i). *See also Rowe*, 559 F.3d at 1034 (explaining that section 1692a(6)(F)(i) is concerned with fiduciaries that "collect a debt on behalf of the entity to whom the fiduciary obligation is owed"). Like the neighboring exceptions in section 1692a(6)(F)(ii)–(iv) for those who originate or obtain debts, the fiduciary exception serves to reinforce the FDCPA's critical distinction between first-party and third-party debt collection. *See Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1723–24 (2017). Only those fiduciaries that can step into the shoes of the present debt owner can credibly claim not to be third-party debt collectors. Whether Victim Services owes a fiduciary obligation to some third party (like a district attorney) is beside the point.

The case law underscores the novelty of Victim Services' invocation of the fiduciary exception. No court has applied this provision absent a fiduciary relationship with the present debt owner. In *Rowe*, for example, the guaranty agency owed a fiduciary obligation to and collected debts on behalf of the Department of Education. *See* 559 F.3d at 1033. Several cases involved a property management company collecting fees on behalf of its principal, the homeowner association. *See, e.g.*, *Harris v. Liberty Community Management, Inc.*, 702 F.3d 1298, 1302 (11th Cir. 2012); *Berndt v. Fairfield Resorts, Inc.*, 339 F. Supp. 2d 1064, 1068 (W.D. Wis. 2004). In addition, courts have recognized the potential application of section 1692a(6)(F)(i) to the activities of a member on behalf of a member-managed limited liability company, *see Jones v. Baugher*, 689 F. Supp. 2d 825, 832 n.17 (W.D. Va. 2010), and a bail-bond company that originated the debt and retained collateral security, *see Buckman v. American Bankers Insurance Co. of Florida*, 924 F. Supp. 1156, 1158 (S.D. Fla. 1996).

The legal fiction ratified by section 1692p—that Victim Services collects *debts* on behalf of victims of bad-check offenses—defeats the application of section 1692a(6)(F)(i) to the arrangement in these diversion programs. From the FDCPA's perspective, the district attorney (the beneficiary of the alleged fiduciary obligation) is a third-party debt collector too, albeit one

shielded by the separate government-actor exception in section 1692a(6)(C).[5] It would be truly strange if Victim Services could escape the Act by dint of owing a fiduciary obligation to another third-party debt collector.

What's more, even if the correct inquiry were whether Victim Services is a fiduciary of the district attorneys, the answer would likely be "no." To be sure, Victim Services acts "as an agent of the government, assisting the government in the exercise of its police power." *Breazeale*, 198 F. Supp. 3d at 1077 n.2. Yet not all agents are fiduciaries. What distinguishes a fiduciary from a run-of-the-mill agent is the fiduciary's duty of "utmost good faith, trust, confidence, and candor" to the principal. *Rowe*, 559 F.3d at 1033. On that point, another court in this district has already determined that the private entity's obligations under the Bad Check Diversion Act are solely contractual—in other words, not grounded in a fiduciary's duty to safeguard its principal's best interests. *See Del Campo v. Mealing*, 2013 WL 4764975, at *6 (N.D. Cal. Sept. 5, 2013).[6]

Topping it off, Victim Services does not appear to satisfy the second requirement for the fiduciary exception. The Ninth Circuit has held that collection activity is "incidental" only if it is not "central" to the fiduciary obligation. *Rowe*, 559 F.3d at 1034. Here, Victim Services' collection of restitution seems central—and therefore not incidental—to the administration of the bad-check diversion program. The alleged fiduciary obligation to the district attorney kicks in only after a merchant has forwarded a bad check to Victim Services "to act as a collection agent." *Id.* at 1035. That fact distinguishes this case from, say, the property manager whose ongoing maintenance responsibilities involve the periodic collection of assessments. *See Harris*,

---

[5] As explained in footnote 2, this exception does not apply to a private contractor like Victim Services.

[6] Another difficult question—which need not be answered in this case—is whether section 1692a(6)(F)(i) prescribes a uniform federal definition for fiduciaries or instead incorporates the law under which the fiduciary relationship arises. *See Skilling v. United States*, 561 U.S. 358, 417–18 (2010) (Scalia, J., concurring in part and concurring in the judgment) (discussing the potential sources of a fiduciary duty for honest-services fraud). Recently, the Ninth Circuit suggested in passing that courts should look to state law when the alleged fiduciary relationship is a creature of state law. *Vien-Phuong Thi Ho v. ReconTrust Co., NA*, 858 F.3d 568, 575 n.9 (9th Cir. 2017).

702 F.3d at 1302. Moreover, Victim Services targeted merchants with promotional materials that tout the availability of restitution and contrast the diversion program's costs with third-party debt collection. *See* Payliance Program Overview 3–9, Dkt. No. 315-13. Victim Services also emphasized restitution to counties. *See* Glenn County Startup Packet 979, Dkt. No. 315-9.

Victim Services' only response is that the diversion program's financial responsibility classes are the central component of the services provided to the district attorney. But it's far from clear that a fiduciary obligation can have only one central feature. *Cf.* 8 U.S.C. § 1158(b)(1)(B)(i) (requiring asylum applicants to prove that a protected characteristic was "at least one central reason for persecuting the applicant"). And even if *Rowe* called for an inquiry into the most important aspect of the fiduciary relationship, the district attorneys appear to prioritize the recovery of restitution over completion of the class. Some counties specified that "no bad check writer will be allowed to attend a bad check diversion class until all restitution, class, and administrative fees have been paid in full." *E.g.*, Los Angeles County Contract Ex. A, § 7.8.2, Dkt. No. 320-6. Other counties gave the distribution of restitution priority over other program fees and the class on financial responsibility. *See, e.g.*, San Bernardino County Contract § V.H.1, Dkt. No. 323-6.

## IV

Because Victim Services must be considered a "debt collector" within the meaning of the FDCPA, the next question is whether it has violated the statute in its administration of the bad-check diversion programs. The plaintiffs assert two violations. First, they contend that the form letter sent by Victim Services to suspected bad checkwriters is false and misleading. Second, they contend that Victim Services collects fees not authorized by law. On the first issue, Victim Services is entitled to summary judgment. But the current record does not permit summary judgment for either side on the second issue.[7]

---

[7] As mentioned earlier, Victim Services is the primary defendant in this case, but it is just one of several related defendants. The parties dispute whether those other defendants should be considered debt collectors. However, that question matters only if there was a violation of the FDCPA. Because the plaintiffs have not yet been able to create a genuine issue of material fact

A

The FDCPA forbids debt collectors to "use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. To give content to that general prohibition, the Act provides 16 illustrative examples of false or misleading conduct, several of which are relevant to this case.

Whether conduct is false or misleading within the meaning of the FDCPA is an objective inquiry that the Ninth Circuit treats as an issue of law. *See Gonzales v. Arrow Financial Services, LLC*, 660 F.3d 1055, 1061 (9th Cir. 2011). Misrepresentations are actionable only if they are "material." *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1033 (9th Cir. 2010). A material misrepresentation is one that could "cause the least sophisticated debtor to suffer a disadvantage in charting a course of action in response to the collection effort." *Tourgeman v. Collins Financial Services, Inc.*, 755 F.3d 1109, 1121 (9th Cir. 2014).

1

The plaintiffs first attack the demand letter that Victim Services sent to suspects. An exemplar of the letters sent during the class period is attached to this ruling as Appendix A. The plaintiffs' biggest complaint about the letter is that it creates the misimpression—through the use of district attorney letterhead and the district attorney's signature—that it was sent directly by a district attorney rather than by a private company. But that impression is not misleading in the context of a program under the Bad Check Diversion Act. The district attorney establishes the diversion program "within his or her office." Cal. Penal Code § 1001.60. And when the district attorney has hired a private entity to administer the program, the private entity acts "as an agent of the government in the exercise of the government's criminal law enforcement power." *Breazeale*, 198 F. Supp. 3d at 1076–77. There's nothing misleading or otherwise legally inappropriate about an agent, with the principal's authorization, sending out a letter under the principal's name, inviting the suspect to participate in the principal's program.

---

on that question, there is no need at this point to consider whether the other defendants are debt collectors.

In *Sheriff v. Gillie*, 136 S. Ct. 1594 (2016), the Supreme Court reached the same conclusion on fairly similar facts. That case involved the Ohio Attorney General's use of independent contractors—referred to as "special counsel"—to collect debts owed to the State of Ohio. *Id.* at 1597. Special counsel communicated with debtors on the Attorney General's letterhead, a practice that was challenged as false and misleading under section 1692e. *See id.* at 1599–1600. The Court rejected that claim because "use of the letterhead accurately conveys that special counsel, in seeking to collect debts owed to the State, do so on behalf of, and as instructed by, the Attorney General." *Id.* at 1598. Stated differently, the use of the letterhead reveals "on whose authority special counsel writes to the debtor" and truthfully represents the special counsel's "institutional affiliation." *Id.* at 1601–02. The FDCPA, "sensibly read," did not "require special counsel to obscure that reality." *Id.* at 1603.

So too here. The "use of the letterhead accurately conveys" that Victim Services collects restitution on behalf of, and "as instructed by," the district attorneys. *Id.* at 1598. It's true, as the plaintiffs point out, that the letter at issue in *Sheriff* included the independent contractor's contact information and a "conspicuous notation that the letter is sent by a debt collector." *Id.* at 1601. Victim Services, by contrast, disclosed only that "[t]he Check Restitution Recovery Program is administered by a private entity under contract with the [county's] District Attorney." Form Letter at 1. But the Supreme Court did not hinge its analysis on the inclusion of the private entity's contact information, and the difference between the two disclosures wouldn't disadvantage the least sophisticated debtor in charting a response to the letter. In fact, the use of the letterhead encourages recipients, if they are unsure whether the district attorney approved the communication, "to use official channels to ensure the legitimacy of the letters." *Sheriff*, 136 S. Ct. at 1602.

Just as the use of the district attorneys' letterhead did not violate the FDCPA's general prohibition against making false or misleading statements, neither did it violate any of the statute's specific prohibitions. Because the letters are effectively sent by the district attorneys through their agents, they are not a "false representation or implication that any individual is an

attorney or that any communication is from an attorney." 15 U.S.C. § 1692e(3). Similarly, because it was authorized to use the district attorneys' letterhead and send out the letters under the name of the district attorneys, Victim Services did not "simulate[ ] . . . a document authorized, issued, or approved by . . . any State," or "create[ ] a false impression as to its source, authorization, or approval." § 1692e(9). Finally, Victim Services' accurate statement of its affiliation with the diversion program did not involve the "use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization." § 1692e(14); *see Sheriff*, 136 S. Ct. at 1602.

2

The plaintiffs also paint the form letter's references to the possibility of criminal prosecution as false and misleading. The FDCPA forbids a debt collector to coerce a debtor into repaying a debt with threats that the debt collector legally can't or factually won't carry out. Victim Services, of course, does not itself possess the legal authority to initiate a prosecution, nor is the district attorney likely to prosecute any given bad-check offense. But again, the plaintiffs' argument appears to be grounded in the faulty assumption that Victim Services is acting as something other than the lawful agent of the district attorneys. Once the letter is scrutinized with a proper background understanding of the company's role, it becomes clear that the letter's reference to the possibility of prosecution is not misleading.

Victim Services' letter begins:

> You have been accused of violating California Penal Code 476a, entitled "Making or Delivering Check With Insufficient Funds". A conviction under this statement is punishable by up to one (1) year in the county jail for checks up to $450, and county jail or state prison for checks in excess of $450.

Form Letter at 1. The letter further explains that the bad-check diversion program is "a pre-charge program designed to allow people accused of having violated the above-referenced statute to avoid the possibility of further action against the accused by the District Attorney's Office." *Id.* If the recipient makes restitution and participates in the diversion program, "[the district attorney's] office will consider this matter resolved." *Id.* The recipient is also told: "You have the

right to choose not to participate, and to contest this matter." *Id.* at 2.

Victim Services did not mislead the letter's recipient by informing her that she has been accused of passing a bad check. Under the Bad Check Diversion Act, a check is referred to a diversion program only when the victim makes this accusation. And the "statement of the penalty for issuance of a bad check" is required by state law. Cal. Penal Code § 1001.63(d). The plaintiffs highlight the potentially coercive effect of informing a debtor that a bad check can lead to jail time. No doubt, the letter's recipient might fear prosecution upon learning that passing a bad check can carry criminal consequences. But to the extent the recipient is concerned about the possibility of criminal charges down the line, the FDCPA "does not protect consumers from fearing the actual consequences of their debts." *Sheriff*, 136 S. Ct. at 1603.

The letter from Victim Services also notes the possibility of further action by the district attorney and represents that the suspect can receive a non-prosecution agreement by participating in the diversion program. The plaintiffs argue that these statements are misleading because Victim Services referred to the district attorneys only 1.4 percent of those who failed to complete every aspect of the diversion program—that is, make restitution, pay the specified fees, and attend the class on financial responsibility. *See* Terrell Decl. ¶¶ 39–46, Dkt. No. 315. In the plaintiffs' view, any reference to the possibility of further action by the district attorney is misleading due to the low rate of prosecution for this offense.

But the reference to the possibility of further action by the district attorney cannot "reasonably be interpreted to imply that the debt collector will take action it has no intention or ability to undertake." *Gonzales*, 660 F.3d at 1063. Nor is the letter "calculated to intimidate the least sophisticated debtor into believing that legal action against her is imminent." *Irwin v. Mascott*, 112 F. Supp. 2d 937, 951 (N.D. Cal. 2000). This is in contrast to a previous case in this district, where a private entity operating a diversion program under the Bad Check Diversion Act sent a letter that stated: "Due to your failure to complete the requirements of the District Attorney's Bad Check Restitution Program as specified in previous notices, we are now initiating formal prosecution proceedings against you." *Del Campo v. American Corrective Counseling*

*Services, Inc.*, 718 F. Supp. 2d 1116, 1135 (N.D. Cal. 2010). The least sophisticated debtor (or really any debtor) could be misled by that blustering threat, but a reference to the possibility of future prosecution is not misleading in the same way.[8]

At bottom, the plaintiffs seem to assume that the administration of a restitution-based diversion program is misleading unless the district attorneys prosecute a critical mass of those who do not complete the diversion program. This position raises (to put it mildly) a serious "federalism concern." *Sheriff*, 136 S. Ct. at 1602. A use-it-or-lose-it interpretation of the FDCPA would trammel the counties' ability to experiment with diversion programs and might even encourage the district attorneys to more aggressively prosecute bad-check offenses. The plaintiffs' interpretation isn't necessarily better for debtors either. The diversion program is voluntary, and suspects are always free to play the odds. Two of the plaintiffs in this case—Solberg and Morin—took that route. But even if prosecutions are rare, some suspects will rationally prefer the certainty of a non-prosecution agreement to the possibility (however remote) of entanglement with the criminal justice system. *See* John Rappaport, *Criminal Justice, Inc.*, 118 Colum. L. Rev. 2251, 2281 (2018).[9]

In sum, the reference to the possibility of criminal prosecution does not violate the FDCPA in the context of this case. Victim Services' letter is neither false nor misleading in this respect under the general prohibition of section 1692e. Likewise, its letter does not violate

---

[8] It's a bit strange in this context to focus on the least sophisticated *debtor*, as opposed to the least sophisticated *offender*. A person's aptitude in financial matters is only weakly related (if at all) to the ability to navigate the criminal justice system—which is really the animating concern behind the plaintiffs' claims. Chalk this up as another example of the difficulty in applying a federal debt collection statute to a law enforcement program.

[9] A different analysis might have been required if the plaintiffs proposed a class of individuals contacted by Victim Services even though the relevant district attorney's prosecution criteria excluded their bad checks. *See Schwarm*, 552 F. Supp. 2d at 1079. For example, some district attorneys do not consider prosecuting checks under a certain face amount. *See, e.g.*, Orange County Prosecution Review Criteria, Dkt. No. 315-40. But the plaintiffs have not presented evidence on this issue that would apply classwide. In any event, internal prosecution criteria are a shaky foundation for regulating pre-charge diversion programs. The minimum-value threshold might reflect the district attorney's categorical exercise of discretion under California Penal Code section 1001.62 to refer those checks to the diversion program. If the diversion program can't be used for checks outside the prosecution criteria, it is easy to imagine that district attorneys will expand their prosecution criteria.

section 1692e's specific prohibitions against "representation[s] or implication[s] that nonpayment of any debt will result in the arrest or imprisonment of any person . . . unless such action is lawful and the debt collector or creditor intends to take such action"; and against "threat[s] to take any action that cannot legally be taken or that is not intended to be taken." 15 U.S.C. § 1692e(4), (5).

3

The plaintiffs also argue that Victim Services did not include two necessary disclosures in its form letter. Congress was concerned that debt collectors would adopt the pretense of some other line of work to trick debtors into divulging information. The FDCPA therefore requires debt collectors "to disclose in the initial written communication . . . that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose." 15 U.S.C. § 1692e(11). Congress also created a process by which a putative debtor could confirm the existence of the debt before paying up. Under that provision, debt collectors must disclose that "if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt . . . against the consumer." § 1692g(a)(4).

While these two provisions do not map onto a diversion program in any obvious way (which again highlights the problems with applying the FDCPA to criminal justice diversion programs), the FDCPA eschews "a hypertechnical approach." *Davis v. Hollins Law*, 832 F.3d 962, 967 (9th Cir. 2016). And here it is "possible to resolve these conflicts without great harm to either the Act or state [diversion] schemes." *Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1037 (2019).

Under the first provision, the debt collector must reveal that its goal is to collect a debt, as opposed to some other purpose more likely to elicit information from the debtor. The recovery of restitution for a bad-check offense is considered debt collection under the FDCPA, and Victim Services encouraged the recipient to promptly communicate for the purpose of paying that debt. *See* Form Letter at 1. Therefore, Victim Services' letter does not materially vary from the

disclosure required by section 1692e(11). *See Davis*, 832 F.3d at 967.

The second provision establishes a process for the debtor to verify a debt, which in this context means that the diversion program must confirm the basis for restitution. Cal. Penal Code §§ 1001.60, 1001.64. Victim Services' letter states that the dispute-resolution procedure entails review "based on criteria established by the" district attorney—in other words, verification that probable cause authorizes the diversion program to collect restitution. Form Letter at 2. This disclosure satisfies section 1692g(a)(4).

B

Other than complaining that the letter is misleading, the plaintiffs focus on Victim Services' collection of administrative fees. The Act contains a general prohibition on "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. More specifically, the Act is violated by the "collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt *or permitted by law*." § 1692f(1) (emphasis added). The plaintiffs contend that Victim Services collected fees not permitted by California law—namely, up to $185 for the financial responsibility class, a $10 credit/debit card fee, a $25 class rescheduling fee, and a $10 late fee. For ease of reference, this ruling refers to these charges as the "class fees."

California's Bad Check Diversion Act explicitly permits the diversion programs to charge certain fees, but it does not mention the class fees. In addition to the recovery of restitution, the Act authorizes the district attorney to collect a "processing fee" not to exceed $50 and a "bank charge" not to exceed $15. Cal. Penal Code § 1001.65(a), (c). The Act also authorizes the *court* to "require a defendant to participate in and successfully complete a check writing education class" as a condition of probation following a *conviction*. § 1001.65(b). To impose this condition, the court must "make inquiry into the financial condition of the defendant and, upon a finding that the defendant is able in whole or part to pay the expense of the education class, the court may order him or her to pay for all or part of that expense." § 1001.65(b).

The plaintiffs contend that the Bad Check Diversion Act, by expressly authorizing certain fees, should be interpreted to prohibit all other fees not mentioned. This interpretation rests on a negative inference that lawyers dress up with the Latin maxim *expressio unius est exclusio alterius*, which—as a note of caution—"applies only when circumstances support a sensible inference that the term left out is meant to be excluded." *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 940 (2017) (internal quotation marks and alteration omitted). The plaintiffs also note that the Act interposes a judicial determination of the defendant's financial need to protect those who cannot afford post-conviction classes, and they contend that collecting class fees from those same individuals in the pre-charge context would circumvent this safeguard.

Whatever sway these arguments might typically hold, state law forecloses the plaintiffs' interpretation of the Bad Check Diversion Act. The California Legislature has announced its "intent" that these "provision[s] of law not be construed to preempt other current or future pretrial or precomplaint diversion programs." Cal. Penal Code § 1001. In California, as elsewhere, "the words of a statute" are "the most reliable indicator of legislative intent." *Tuolumne Jobs & Small Business Alliance v. Superior Court*, 59 Cal. 4th 1029, 1037 (2014). Canons like *expressio unius* that resolve ambiguity by reference to presumed legislative intent cannot override an "anti-preemption provision" like section 1001 that embodies express legislative intent on the issue. *Bank of America v. City & County of San Francisco*, 309 F.3d 551, 565 (9th Cir. 2002); *cf. Puerto Rico v. Franklin California Tax-Free Trust*, 136 S. Ct. 1938, 1946 (2016) (explaining that the presumption against preemption does not apply to the interpretation of an express preemption clause). So while the Bad Check Diversion Act contemplates the collection of specified fees, it leaves the door open for unspecified fees adopted in a manner consistent with state law.

The fees' legality therefore turns on background principles of California law. On this front, the plaintiffs contend that fees are actually "taxes" prohibited by state law absent approval by two-thirds of the respective local government's electorate. Cal. Const. art. XIII.C, § 2(d). Victim Services, by contrast, argues that they are not taxes but "user fees." Under the California

Constitution, a user fee is defined as a "charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product." Cal. Const. art. XIII.C, § 1(e)(2). Whether the class fees are impermissible taxes or permissible user fees depends on two issues not yet adequately briefed or reflected in the summary judgment record.

The first issue is whether the class fees are reasonably proportionate to the services provided by Victim Services. *See Isaac v. City of Los Angeles*, 66 Cal. App. 4th 586, 597 (1998). The plaintiffs have thus far focused on whether Victim Services profited by charging more than its average cost of processing payments or providing financial responsibility classes. But state law asks a different question: Did the *counties* profit from the user fees? The California Constitution prohibits local governments from raising revenue through the provision of optional services; money that compensates a private party for providing that optional service does not fill the local government's coffers. So the compensation offered to Victim Services to administer the diversion program could theoretically be a "reasonable cost of providing the service or activity for which the fee is charged." *City of Dublin v. County of Alameda*, 14 Cal. App. 4th 264, 281 (1993). Put another way, the money retained by Victim Services is a cost borne by the counties, not excess revenue extracted by the counties. *See California Building Industry Association v. State Water Resources Control Board*, 4 Cal. 5th 1032, 1051 (2018). If the amounts paid by the counties to Victim Services for the class fees are "excessive and disproportionate" (and therefore if the amounts collected from participants are excessive and disproportionate), they are in fact unlawful taxes. *Monterey Peninsula Water Management District v. Public Utilities Commission*, 62 Cal. 4th 693, 702 (2016). The plaintiffs will have the opportunity, if they wish, to conduct the proper inquiry about the legality of the fees and supplement the record.

Another issue is whether the counties complied with the state-law procedural hurdles for imposing user fees. The briefing and record are incomplete on this issue as well. For starters, the California Government Code seems to set out multiple procedures for authorizing user fees. If

the class fees are under one chapter of the Government Code, they "shall be adopted by ordinance," and the county board of supervisors "shall make a finding" that the "fee charged is based on the cost or value of the services rendered." Cal. Gov't Code § 25336(d). Yet the Code also states that "[t]he procedures, pursuant to this chapter, are alternative to any other procedure provided by law with respect to the establishment of fees or charges" and "may be used by a county notwithstanding any other provision of law and without complying with any other provisions in conflict therewith." § 25337. And another chapter provides that the county board of supervisors may "by resolution or ordinance" establish user fees, "provided that they are not property-related fees and charges." § 25215.4(a). The interaction of these provisions is far from clear, and the parties have not discussed it. Nor have the parties submitted evidence about whether the counties have complied with whatever procedures are required.

To sum up, the open questions that prevent summary judgment of the claim that Victim Services violated the FDCPA by charging fees not authorized by law are: (1) whether, as a substantive matter, the user fees represent a reasonable cost to the counties (not to Victim Services) of operating the bad-check diversion programs; (2) what procedures potentially apply to the counties' authorization of user fees; (3) whether those procedures are inclusive or exclusive of others; and (4) whether each county authorized the user fees through at least one appropriate procedural mechanism. Therefore, the cross-motions for summary judgment on the lawfulness of the fees are denied. Denial is without prejudice to filing renewed summary judgment motions if the parties determine that no genuine factual disputes exist on this question.[10]

V

Although the plaintiffs focus primarily on their claims under the federal Fair Debt Collection Practices Act, they also bring state-law claims for violation of California's Unfair Competition Law and for fraudulent and negligent misrepresentation.

---

[10] Again, to the extent this issue is not amenable to resolution on a statewide basis, the Court's prior class certification ruling might need to be revisited.

The UCL prohibits unfair competition, which is defined as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. This provision has been interpreted to create separate causes of action for unlawful, unfair, and fraudulent practices; the plaintiffs raise claims under each prong. Although Victim Services performs a law enforcement function for the counties, the diversion program is still subject to the UCL. The California Supreme Court has excluded governmental entities from these provisions, but private entities that contract with the government are bound to refrain from unfair competition. *See Wells v. One2One Learning Foundation*, 39 Cal. 4th 1164, 1203–04 (2006).

Largely for the same reasons that the letter is not misleading under the FDCPA, Victim Services' business practices are not fraudulent. *See* Section IV.A. The plaintiffs cannot demonstrate that "members of the public are likely to be deceived" if the least sophisticated debtor would not be materially misled by the form letter. *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009) (internal quotation marks omitted). And even under the more expansive definition of unfairness, the administration of these bad-check diversion programs is not unfair. Victim Services' activities implement the policy goals pursued by the California Legislature through the Bad Check Diversion Act, so its non-misleading business practices do not "offend[ ] an established public policy." *South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886–87 (1999); *see Hodsdon v. Mars, Inc.*, 891 F.3d 857, 865–66 (9th Cir. 2018). If district attorneys are giving too much discretion to or failing to adequately supervise Victim Services, that is a failing of the district attorneys, who have not been named as defendants in this case.

The unlawful prong of the UCL provides a cause of action to enforce violations of other laws, including the FDCPA. *Randall v. Ditech Financial, LLC*, 23 Cal. App. 5th 804, 811–12 (2018). Insofar as it relies on the FDCPA, the UCL claim could succeed only on the collection of the class fees, an issue that cannot be decided on this record. *See* Section IV.B. Thus, neither party is entitled to summary judgment on this claim. But for reasons already stated, the plaintiffs

cannot premise this claim on the requirement of probable-cause determination or the five-factor referral criteria, both of which are directed only to the district attorneys. *See* Cal. Penal Code §§ 1001.60, 1001.62. Not only does the language of statute undercut the plaintiffs' claim, but if the obligations of the district attorneys were considered part of Victim Services' business practices, the UCL could interfere with the district attorneys' "sovereign functions." *Wells*, 39 Cal. 4th at 1204.

2

With respect to the plaintiffs' claim that Victim Services fraudulently and negligently misrepresented that they had been accused of a crime and had to participate in the diversion program to avoid prosecution, no reasonable jury could find (at least) one element shared by both claims: a material misrepresentation by Victim Services. A claim for fraudulent misrepresentation requires that "the defendant represented to the plaintiff that an important fact was true" and that the "representation was false." *Graham v. Bank of America, N.A.*, 226 Cal. App. 4th 594, 605 (2014). Likewise, a claim for negligent misrepresentation requires "the misrepresentation of a past or existing material fact." *Tindell v. Murphy*, 22 Cal. App. 5th 1239, 1252 (2018). As already explained, the letters did not falsely represent Victim Services' authority or the material aspects of the diversion program. Summary judgment is therefore granted to Victim Services on these two claims. The plaintiffs' motion to amend the class definition to include these claims is denied.

VI

A further case management conference is scheduled for Wednesday, December 11, 2019, at 10:00 a.m. in San Francisco, Courtroom 4, 17th Floor, to map out a plan for adjudicating the plaintiffs' remaining claims. A joint case management statement is due by December 4, 2019.

**IT IS SO ORDERED.**

Dated: November 20, 2019

VINCE CHHABRIA
United States District Judge

# Appendix A



**Santa Cruz County District Attorney**
**Check Restitution Recovery Program**
PO Box 8523
Santa Cruz CA 95061  8523

**Bob Lee**
District Attorney



08MF730

# OFFICIAL NOTICE - IMMEDIATE ATTENTION REQUIRED

*** DIV 0409DUP BLU 001
3000000015 01 0000 0000 8/1

|ı|ıl|ı|ıl|ıl|ılı|ılıllı|||ı|ılı||ılı|ıl|ı|ıllıı|ıı|ı||

JUDITH MARISCAL
LAKE BLVD
FELTON CA 95018

Office Hours: 9:00 a.m. - 5:00 p.m.
Phone:  (855)211-0581
Date of Notice: 04/09/2014
Case #: 42684586
Balance Due: $255.01
Page:   1

You have been accused of violating California Penal Code 476a, entitled "Making or Delivering Check With Insufficient Funds".  A conviction under this statute is punishable by up to one (1) year in the county jail for checks up to $450, and county jail or state prison for checks in excess of $450.  See page 5 for details on the party(s) initiating this allegation.

My office has established a Check Restitution Recovery Program.  The Check Restitution Recovery Program is authorized by the California legislature, and is a pre-charge program designed to allow people accused of having violated the above-referenced statute to avoid the possibility of further action against the accused by the District Attorney's Office.  Participation in the Check Restitution Recovery Program is voluntary.  The Check Restitution Recovery Program has two steps:

1. **Pay all restitution on all reported checks, plus any administrative, returned item, and program fees.**
2. **Attend a Financial Accountability class.**

**Santa Cruz County District Attorney Check Restitution Recovery Program**
### TOTAL BALANCE DUE: $255.01

You have the right to dispute this matter, as set forth on page 2 of this notice. In order to participate in the Check Restitution Recovery Program you must pay in full and schedule class within THIRTY (30) DAYS from the date of this Notice.

### PLEASE CALL (855)211-0581 or visit www.checkprogram.com TO MAKE PAYMENT/SCHEDULE CLASS
**Please have your case number ready:  42684586 and Password: 39885223**
**PAYMENTS ACCEPTED: CREDIT & DEBIT CARDS, WESTERN UNION, MONEY ORDERS, OR CASHIER'S CHECK**

If you choose to participate in the Check Restitution Recovery Program, and if you successfully complete the program's two steps outlined above, my office will consider this matter resolved. The Check Restitution Recovery Program is administered by a private entity under contract with the Santa Cruz County District Attorney.

For additional information or if you believe you received this Notice in error, please see the reverse side.

Sincerely,

*Bob Lee*

**Bob Lee**
**District Attorney**

See reverse side ➡

---

This notice has been printed and mailed on behalf of my office by a third party administrator of the Check Restitution Recovery Program at no cost to the taxpayer.

**DEF 114532**

■ **IF YOU BELIEVE YOU RECEIVED THIS NOTICE IN ERROR OR WISH TO DISPUTE THIS NOTICE IN WRITING:**

- Review your records CAREFULLY.
- Call the District Attorney's Check Restitution Recovery Program Office at (855)211-0581.
- Ask for a Compliance Specialist.
- Explain the error.
- The Compliance Specialist will ask you to fax or mail in documentation of the error. For cases involving stop payments on checks or performance disputes, please consult a Compliance Specialist for more information.
- You may dispute the validity of this allegation in writing to this Office within 30 days of receiving this Official Notice. Upon submitting your written dispute not later than 30 days after receiving the Official Notice (along with any relevant supporting documentation), the authorized administrator of the Check Restitution Recovery Program will review the written dispute based on criteria established by the Santa Cruz County District Attorney.
- Fax or mail your case documentation to:   **Fax: (800) 227-3041**

    **Santa Cruz County District Attorney**
    **Check Restitution Recovery Program**
    **PO Box 8523**
    **Santa Cruz CA 95061-8523**


■ **IF YOU BELIEVE YOU RECEIVED THIS NOTICE AS A RESULT OF IDENTITY THEFT, FORGERY, THEFT, OR OTHER FRAUD:**

You will be required to promptly provide further written documentation to support your claim. If you are a victim of identity theft, you will need to go to the bank to obtain and sign an identity theft affidavit.  If you were not the victim of identity theft but did not write the check(s), you will need to go to the bank to obtain and sign an affidavit of forgery that you did not write the check(s) in question. In most cases, if you believe the check(s) where stolen or forged, you will also be required to file a police report.


■ **IF YOU BELIEVE YOU WERE NOT PROPERLY NOTIFIED:**

The Check Restitution Recovery Program is only for reports of bad check activity from those businesses or parties that have notified you according to California State Law and provided you with an opportunity to make good on the check. In addition to notification from the party you issued the check to banks routinely send customers notice of returned items. Non-sufficient funds (NSF) checks also appear on your monthly account statement.  **PLEASE CHECK YOUR RECORDS CAREFULLY.**


■ **IF YOU HAVE ALREADY PAID THE MERCHANT OR FILING PARTY:**

Please fax or mail documentation that the merchant or filing party received payment BEFORE the date of this Notice.  Appropriate documentation consists of a receipt of payment to the victim and/or a cleared copy (front and back) of repayment to the victim. The administrator of the Check Restitution Recovery Program will review the submitted documentation. Allow fourteen (14) days to information before calling.


■ **IF YOU WANT TO CONTEST THIS MATTER:**

You have the right to choose not to participate, and to contest this matter. If you wish, you may want to consult an attorney.

Personal bankrupcies DO NOT void responsibility in a criminal matter.

**To Make Payment/Schedule Class, Call (855)211-0581 or www.checkprogram.com**
**Case Number: 42684586  Password: 39885223**
**PAYMENTS ACCEPTED: CREDIT & DEBIT CARDS, WESTERN UNION, MONEY ORDERS, OR CASHIER'S CHECK**

[8/1]         04/09/2014         Doc FirstNotcCA      K10XVII

■ **TERMS AND CONDITIONS OF THE CHECK RESTITUTION RECOVERY PROGRAM:**

Participant agrees to participate in the Santa Cruz County District Attorney Check Restitution Recovery Program ("Program"). Participant acknowledges and agrees that the fees charged for the Program are reasonable and appropriate. Participant acknowledges and agrees that in addition to the fees that are charged, participant is required to attend a rehabilitative counseling class conducted by an instructor hired by the private entity under contract with the District Attorney to administer the Program ("Administrator"). Participant further agrees that by paying the fees charged for the Program, participant is bound by the terms and conditions of the Program, as set forth in this agreement.

Agreement to Arbitrate: You and Administrator agree to resolve any and all claims and disputes relating in any way to the Program ("Claims"), except for Claims concerning the validity, scope or enforceability of this Arbitration Agreement, through BINDING INDIVIDUAL ARBITRATION before the American Arbitration Association ("AAA"). This means you will be unable to have Claim(s) resolved by a court or jury, or to participate in a class action or class arbitration. Other rights you would have if you went to court may be unavailable or limited in arbitration, including your right to appeal. The only exception to this agreement to arbitrate is that you and/or Administrator may seek relief in a small claims court for Claims within the jurisdiction of that court in any particular state.

CLASS ACTION WAIVER: NO ARBITRATOR OR COURT MAY ORDER, PERMIT OR CERTIFY A CLASS ACTION, REPRESENTATIVE ACTION, PRIVATE ATTORNEY-GENERAL ACTION OR CONSOLIDATED ARBITRATION IN CONNECTION WITH THIS ARBITRATION AGREEMENT. NO ARBITRATOR OR COURT MAY ORDER OR PERMIT A JOINDER OF PARTIES IN CONNECTION WITH THIS ARBITRATION AGREEMENT UNLESS ALL PARTIES CONSENT TO SUCH JOINDER IN WRITING.

Governing Law and Jurisdiction: Any arbitration proceeding will be governed by the Consumer Procedures or other applicable rules of AAA in effect when the Claim is filed. The arbitration proceeding will take place in the county where you reside or any other mutually acceptable location. Judgment on the arbitration award may be entered in any court having jurisdiction.

The arbitrator shall follow applicable law and is empowered to grant any relief, including attorneys' fees, costs, and other expenses, to the extent such relief would be available in court. You and Administrator agree the Program and transactions subject to this Arbitration Agreement involve interstate commerce and that this Arbitration Agreement is governed by and enforceable under the Federal Arbitration Act. You and Administrator also agree this Arbitration Agreement extends to parties related to Administrator that are involved in any Claims, including without limitation, Administrator's parents, affiliates, subsidiaries, agents, principals, contractors, officers and employees.

Costs: Administrator shall pay all arbitration costs if it initiates arbitration. If you initiate arbitration, you will not be required to pay any fees that exceed the fees you would have paid had you brought the Claim(s) in court. You may seek a waiver of the filing fee under AAA Rules. If you do not qualify for a waiver, you may request, in writing, that Administrator advance all or part of the filing fee.

Enforceability: This Arbitration Agreement shall govern if there is a conflict between it and the AAA Rules, unless Administrator waives any conflict in writing. If any part of this Arbitration Agreement, except the class action waiver, is found invalid or unenforceable, the remaining provisions shall remain in full force and effect. If the class action waiver is found invalid or unenforceable as to a particular Claim, the Arbitration Agreement shall not apply to that Claim.

You may contact AAA to obtain information about arbitration, arbitration procedures and fees by calling 800-778-7879 or visiting www.adr.org.

YOU HAVE THE RIGHT TO REJECT THIS ARBITRATION AGREEMENT, BUT YOU MUST DO SO PROMPTLY. If you do not agree to arbitration, you must notify us in writing within sixty (60) days after the date you enroll in the Program. You must send your notice to: 806 E Avenida Pico STE I PMB 340, San Clemente, CA 92673-5639, and include your full name, address, and the statement "I reject the arbitration agreement for the Santa Cruz County District Attorney Check Restitution Recovery Program."

■ **OTHER IMPORTANT INFORMATION:**

Completion of the Check Restitution Recovery Program is valid ONLY if you comply with ALL District Attorney's requirements. Should you be permitted to comply by a payment plan, such payments may be allocated ratably between restitution and program fees until they are fully satisfied. By making full or partial payment, you are agreeing to be enrolled in the Check Restitution Recovery Program, and you are agreeing to pay restitution on all reported checks as well as pay all required fees, including program, administrative, and returned item fees pursuant to the terms of this Notice. Once enrolled, program fees will be non-refundable.

**You may wish to consult an attorney to obtain legal advice about your rights in regards to this matter.**

The Program does not accept personal checks. Sending a personal check for payment shall be deemed sufficient authorization to complete the payment via electronic debit. By doing so, your checking account will be debited for the amount of the check and your cancelled check will not be returned to your bank. Electronic debit entries returned for insufficient or uncollected funds may be resubmitted two times following the return of the original entry.

Please note, your balance may increase if additional checks are reported to this office or program fees are changed. Additionally, you may incur a fee for missing or rescheduling class, making a late or insufficient payment, and/or paying over the phone or Internet.

**DEF 114534**

This

page

intentionally

blank.

DEF 114535



**Santa Cruz County District Attorney**
**Check Restitution Recovery Program**
PO Box 8523
Santa Cruz CA 95061-8523

**Bob Lee**
District Attorney

# OFFICIAL NOTICE - IMMEDIATE ATTENTION REQUIRED

**BALANCE DUE ON  05/09/2014**         $255.01

Office Hours: 9:00 a.m. - 5:00 p.m.
Page:   5   of   5

## PAYMENT OPTIONS:

**1. INTERNET**      **www.checkprogram.com**
Case Number:  42684586
Password:     39885223
**Credit and Debit Cards**

**2. PHONE**        (855)211-0581
**Credit and Debit Cards or Western Union**

**3. MAIL**         **Santa Cruz County District Attorney**
**Check Restitution Recovery Program**
PO Box 8523
Santa Cruz CA 95061-8523

**Money Orders and Cashier's Checks Only**

| VICTIM | CHECK # | DATE | AMOUNT | RETURNED ITEM FEE | ADMIN FEE | TOTAL THIS CHECK |
|---|---|---|---|---|---|---|
| DOLLAR TREE 3759 | 2006 E | 5/27/2013 | $25.01 | $0.00 | $50.00 | $75.01 |
| | | | **Financial Accountability Class Fee** | | | $180.00 |

*** Additional service fee may be due victim. ***

**TOTAL BALANCE DUE:**         **$255.01**

**To Make Payment/Schedule Class, Call (855)211-0581 or www.checkprogram.com**
Case Number: 42684586  Password: 39885223
PAYMENTS ACCEPTED: CREDIT & DEBIT CARDS, WESTERN UNION, MONEY ORDERS, OR CASHIER'S CHECK

REF: 114536

[8/3]          04/09/2014          Doc FirstNotcBCA      C13VI